UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x
                                              :

In re:                                     :        Chapter 11

                                              :

THE NEW YORK RACING ASSOCIATION INC.,    :        Case No. 06-12618 (JMP)

                                              :

                 Debtor.                :

                                              :

-------------------------------------------------------------------------x

## DISCLOSURE STATEMENT FOR THE
## THIRD AMENDED PLAN OF DEBTOR PURSUANT TO
## CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0119
(212) 310-8000

Attorneys for the Debtor and Debtor in Possession

Dated: New York, New York
       November 29, 2007

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ..................................................................................................... 1

II.     COMPROMISE AND SETTLEMENT ................................................................... 3

III.    OVERVIEW OF PLAN ........................................................................................... 4

IV.     OVERVIEW OF THE DEBTOR'S OPERATIONS AND CHAPTER 11 CASE ...... 9

        A.    The Debtor's Corporate Structure .................................................................. 9

        B.    The Debtor's Prepetition Business Operations ............................................ 10

        C.    The Debtor's Capital Structure and Prepetition Financing .......................... 11

        D.    Significant Events Leading to Commencement of the Chapter 11 Case ....... 12

              1.    New Management ................................................................................. 12

              2.    Revenues and Expenses ...................................................................... 13

              3.    The VLT Process ................................................................................ 14

              4.    Ancillary Asset Sales ......................................................................... 14

              5.    2005 Memorandum of Understanding with the State of New York ....... 15

              6.    Prepetition Franchise RFP Process ..................................................... 16

              7.    State Approvals .................................................................................. 16

        E.    The Chapter 11 Case .................................................................................... 17

              1.    Commencement of the Chapter 11 Case .............................................. 17

              2.    "First-Day" Orders ............................................................................. 17

              3.    Appointment of the Creditors' Committee ........................................... 17

              4.    DIP Financing .................................................................................... 17

              5.    The State Motion to Dismiss the Chapter 11 Case ............................... 19

              6.    Adversary Litigation Commenced By the Debtor in Possession ........... 19

              7.    Adversary Proceedings Brought Against NYRA ................................. 20

              8.    Postpetition Franchise Selection Process ............................................ 22

              9.    2007 Memorandum of Understanding with the State of New York ....... 23

              10.   Claims Process ................................................................................... 25

V.      THE PLAN OF REORGANIZATION ................................................................... 25

        A.    Chapter 11 Generally ................................................................................... 25

        B.    Compromise and Settlement with the State of New York .............................. 25

              1.    Franchise Agreement .......................................................................... 26

              2.    Resolution of the Adversary Litigation ............................................... 26

              3.    Resolution of the Motion to Dismiss .................................................. 26

              4.    Transfer of the Racetracks and Other Property .................................... 26

i

| | | | |
|---|---|---|---|
| | 5. | NYRA Obligations | 26 |
| | 6. | Sale of Ancillary Property | 26 |
| C. | | Administrative Expense Claims and Priority Tax Claims | 27 |
| | 1. | Administrative Expense Claims | 27 |
| | 2. | Professional Compensation and Reimbursement Claims | 27 |
| | 3. | Payment of Priority Tax Claims | 27 |
| | 4. | Debtor in Possession Financing | 27 |
| D. | | Classification and Treatment of Claims and NYRA Equity Interests | 28 |
| | 1. | Class 1: Priority Non-Tax Claims | 28 |
| | 2. | Class 2: Secured Claims | 28 |
| | 3. | Class 3: Unsecured Claims | 29 |
| | 4. | Class 4: Insured Litigation Claims | 29 |
| | 5. | Class 5: State Claims | 29 |
| | 6. | Class 6: PBGC Claims | 29 |
| | 7. | Class 8: Penalty Claims | 30 |
| | 8. | Class 9: NYRA Equity Interests | 31 |
| | 9. | Controversy Concerning Impairment | 31 |
| E. | | Provisions for the Treatment of Disputed Claims | 31 |
| | 1. | Objections to Claims and Prosecution of Disputed Claims | 31 |
| | 2. | Estimation of Claims | 31 |
| | 3. | Payments and Distributions on Disputed Claims | 32 |
| F. | | Distributions Pursuant to the Plan | 32 |
| | 1. | Establishment of Disbursement Account(s) | 32 |
| | 2. | Time and Manner of Distributions | 32 |
| | 3. | Setoffs | 33 |
| | 4. | Allocation of Plan Distributions Between Principal and Interest | 33 |
| G. | | Prosecution of Claims Held by the Debtor | 33 |
| H. | | Executory Contracts, Unexpired Leases and Benefit Plans | 33 |
| | 1. | Assumption of Executory Contracts and Unexpired Leases | 33 |
| | 2. | Cure of Defaults | 34 |
| | 3. | Rejection Damage Claims | 34 |
| | 4. | Indemnification and Reimbursement Obligations | 34 |

|   |   |   |   |
|---|---|---|---|
| | 5. | Termination of Benefit Plans | 34 |
| I. | | Reservation of "Cram Down" Rights | 34 |
| J. | | Conditions Precedent to the Effective Date of the Plan | 34 |
| | 1. | Entry of the Confirmation Order | 35 |
| | 2. | Execution of Actions Relating to the Granting of the Franchise | 35 |
| | 3. | Execution of the Franchise Agreement | 35 |
| | 4. | Execution of the State Settlement Agreement | 35 |
| | 5. | Execution of Documents; Other Actions | 35 |
| | 6. | Allowed Claim Threshold | 35 |
| | 7. | IRS Claim | 35 |
| K. | | Dissolution of the Creditors' Committee | 35 |
| L. | | The Reorganized Debtor | 35 |
| | 1. | Provision for Management | 35 |
| | 2. | Corporate Form | 36 |
| M. | | Retention of Jurisdiction | 36 |
| N. | | Miscellaneous Provisions | 36 |
| | 1. | Title to Assets | 36 |
| | 2. | Exemption from Transfer Taxes | 37 |
| | 3. | Discharge of Debtor | 37 |
| | 4. | Injunction on Claims | 37 |
| | 5. | Term of Existing Injunctions or Stays | 38 |
| | 6. | Limited Release of Directors, Officers and Employees | 38 |
| | 7. | Exculpation | 38 |
| | 8. | Injunction on Actions | 39 |
| | 9. | Post-Effective Date Fees and Expenses | 39 |
| O. | | Modification, Revocation or Withdrawal of the Plan | 39 |
| | 1. | Modification of Plan | 39 |
| | 2. | Revocation or Withdrawal | 39 |
| VI. | | FINANCIAL INFORMATION AND PROJECTIONS | 40 |
| A. | | Purpose of and Responsibility for the Projections | 40 |
| B. | | Summary of Significant Assumptions | 40 |
| | 1. | Plan Terms and Consummation | 40 |

| | 2. | Assumptions Preceding the Effective Date | 41 |
|---|---|---|---|
| | 3. | Transfer of the Racetracks and Other Property | 41 |
| | 4. | Franchise Agreement and State Support Payments | 41 |
| | 5. | Ancillary Property Sale | 41 |
| | 6. | Handle Projections | 41 |
| | 7. | Revenue Mix | 41 |
| | 8. | VLT Timing and Win Per Machine | 42 |
| | 9. | Operating Expenses | 42 |
| | 10. | Pension | 42 |
| | 11. | Capital Investment | 42 |
| | 12. | Estimated Claims and Recoveries | 42 |
| | 13. | IRS Note | 42 |
| VII. | | CERTAIN FACTORS TO BE CONSIDERED | 46 |
| | A. | Certain Bankruptcy Considerations | 46 |
| | B. | Certain Risk Factors Relating to Confirmation of the Plan | 46 |
| | 1. | Inability to Resolve or Cap Claim Amounts | 46 |
| | 2. | Necessity of Action by the State of New York | 48 |
| | C. | Additional Risk Factors and Considerations | 48 |
| | 1. | Legislative Process | 48 |
| | 2. | Risks Associated with Ancillary Property Sale | 49 |
| | 3. | Risks Associated with the Reorganized Debtor's Business | 49 |
| VIII. | | ALTERNATIVES TO THE PLAN | 50 |
| | A. | Liquidation Under Chapter 7 of the Bankruptcy Code | 50 |
| | B. | Alternative Chapter 11 Plans | 50 |
| | C. | Certain Risk Factors | 51 |
| IX. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 51 |
| | A. | Consequences to the Debtor | 52 |
| | B. | Consequences to Holders of Certain Claims and NYRA Equity Interests | 52 |
| | 1. | Generally | 52 |
| | 2. | Holders of Unclassified Claims | 52 |
| | 3. | Holders of Secured Claims | 52 |
| | 4. | Holders of Unsecured Claims | 53 |

|   | 5. | Allocation of Consideration to Interest | 53 |
|---|---|---|---|
|   | 6. | Market Discount | 53 |
|   | 7. | NYRA Equity Interests | 53 |
| C. | | Information Reporting and Withholding | 53 |
| X. | | VOTING PROCEDURES AND REQUIREMENTS | 54 |
| A. | | Holders of Claims Entitled to Vote | 54 |
| B. | | Voting Deadlines | 54 |
| C. | | Voting Procedures | 55 |
|   | 1. | Acceptance by a Class | 55 |
|   | 2. | Withdrawal or Change of Vote | 55 |
| XI. | | CONFIRMATION OF THE PLAN | 55 |
| A. | | The Confirmation Hearing | 55 |
| B. | | Objections to Confirmation | 56 |
| C. | | General Requirements for Confirmation | 56 |
| D. | | Best Interests Test | 56 |
|   | 1. | The Plan | 58 |
|   | 2. | Conversion to Chapter 7 and Appointment of the Trustee | 58 |
| E. | | No Unfair Discrimination / Fair and Equitable Test | 60 |
|   | 1. | Secured Creditors | 60 |
|   | 2. | Unsecured Creditors | 60 |
|   | 3. | NYRA Equity Interests | 60 |
| F. | | Classification of Claims and NYRA Equity Interests Under the Plan | 60 |
| G. | | Feasibility | 61 |
| XII. | | CONCLUSION | 61 |

# I.   INTRODUCTION

The New York Racing Association Inc. ("NYRA" or the "Debtor"), as debtor and debtor in possession (the "Debtor in Possession"), submits this Disclosure Statement, dated November 29, 2007 (the "Disclosure Statement"), in connection with the solicitation of acceptances and rejections with respect to the Third Amended Plan of Debtor Pursuant to Chapter 11 of the United States Bankruptcy Code, dated November 29, 2007 (the "Plan"), a copy of which is annexed to this Disclosure Statement as Exhibit A.  Unless otherwise defined herein, capitalized terms used shall have the same meanings ascribed to them in the Plan.

The purpose of this Disclosure Statement is to set forth information (1) regarding the history of the Debtor, its business and the Chapter 11 Case, (2) concerning the Plan and alternatives to the Plan, (3) advising holders of Claims and NYRA Equity Interests of their rights under the Plan, (4) assisting the holders of Claims in making an informed judgment as to whether they should vote to accept or reject the Plan, and (5) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

On November 29, 2007, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement, in accordance with section 1125 of the Bankruptcy Code, as containing adequate information of a kind and in sufficient detail to enable hypothetical reasonable investors typical of holder of Claims against NYRA to make an informed judgment in voting to accept or reject the Plan.  However, the Bankruptcy Court has not passed on the merits of the Plan.  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  In voting on the Plan, holders of Claims should not rely on any information relating to the Debtor and its business, other than the information contained in this Disclosure Statement, the Plan and all exhibits hereto and thereto.

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR NYRA EQUITY INTEREST.  THE DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW.  THE DESCRIPTION OF THE PLAN IS A SUMMARY ONLY, WHICH IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN, AND IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS AND PROVISIONS OF THE PLAN ARE CONTROLLING.  HOLDERS OF CLAIMS AND NYRA EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS.

Pursuant to provisions of the Bankruptcy Code, only classes of claims or equity interests which are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such plan are entitled to vote on the plan.  In this case, only Claims in Classes 3, 4, 5, 7, and 8 are impaired by and entitled to receive a distribution under the Plan, and holders of Claims in those Classes are the only Entities entitled to vote to accept or reject the Plan.  Classes of claims or equity interests that are not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.  Claims in Classes 1, 2, and 6 are unimpaired by the Plan, and holders thereof are conclusively presumed to have accepted the Plan.  Holders of NYRA Equity interests in Class 9 are not entitled to receive any distributions or retain their NYRA Equity Interests pursuant to the Plan and are deemed to have rejected the Plan.

THE RECORD DATE FOR DETERMINING THE HOLDERS OF CERTAIN CLAIMS THAT MAY VOTE ON THE PLAN IS NOVEMBER 12 (the "Voting Record Date").

If you are entitled to vote to accept or reject the Plan, accompanying this Disclosure Statement should be a ballot ( "Ballot") for casting your vote(s) on the Plan and a pre-addressed envelope for the return of the Ballot.

BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO THOSE HOLDERS OF CLAIMS IN CLASSES 3, 4, 5, 7, AND 8 BECAUSE THEY ARE THE ONLY HOLDERS OF CLAIMS THAT MAY VOTE TO ACCEPT OR REJECT THE PLAN.

If you are the holder of a Claim in one of these Classes and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party in interest and have any questions concerning this Disclosure Statement, any Exhibits hereto, the Plan or the voting procedures in respect thereof, please contact:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Garrett A. Fail, Esq.
(212) 310-8000

**THE BOARD OF TRUSTEES OF THE DEBTOR HAS UNANIMOUSLY APPROVED THE TERMS OF THE DEBTOR'S PLAN AND RECOMMENDS THAT THE HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE DEBTOR'S PLAN.**

After carefully reviewing this Disclosure Statement and the Exhibit attached hereto, please indicate your vote with respect to the Plan on the enclosed Ballot and return it in the envelope provided. Voting procedures and requirements are explained in greater detail elsewhere in this Disclosure Statement and on the Ballot. **PLEASE VOTE AND RETURN YOUR BALLOT TO:**

**The Garden City Group, Inc.**
**Attention: The New York Racing Association Claims Agent**
**P.O. Box 9000 #6486**
**Merrick, NY 11566-9000**

**IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY 4:00 P.M. (NEW YORK TIME) ON DECEMBER 21, 2007. ANY EXECUTED BALLOTS WHICH ARE TIMELY RECEIVED BUT WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.**

The Debtor believes that prompt confirmation and implementation of the Plan is in the best interests of the Debtor, all holders of Claims and NYRA Equity Interests, and the Debtor's chapter 11 estate.

In accordance with the Disclosure Statement Order and section 1128 of the Bankruptcy Code, the Bankruptcy Court has fixed December 27, 2007, at 2:00 p.m. (New York Time), in the United States Bankruptcy Court, Room 601, Courtroom of the Honorable James M. Peck, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10014, as the date, time and place of the hearing to consider confirmation of the Plan, and December 21, 2007, as the last date for filing an objection to confirmation of the Plan. The hearing on confirmation of the Plan may be adjourned from time to time without further notice except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY AND THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTOR AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE. HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ IT CAREFULLY AND IN ITS ENTIRETY, AND WHERE POSSIBLE, CONSULT WITH COUNSEL OR OTHER ADVISORS, PRIOR TO VOTING ON THE PLAN.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD LOOKING PROJECTIONS AND FORECASTS, BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON BY ANY PERSONS FOR ANY OTHER PURPOSE OTHER THAN BY HOLDERS OF CLAIMS ENTITLED TO VOTE FOR THE PURPOSE OF DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OR THE TAX OR LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTOR OR ON HOLDERS OF CLAIMS OR NYRA EQUITY INTERESTS.

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND NYRA EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR NYRA EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND NYRA EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## II. <u>COMPROMISE AND SETTLEMENT</u>

Vital components of the Plan are (1) the compromise and settlement of (i) the Adversary Litigation between NYRA and, among others, the State of New York, and (ii) the State Motion to Dismiss and (2) the awarding of the Franchise. Specifically, as set forth more fully in Section IV.E.6. below, NYRA and the State of New York are litigating with respect to the ownership of the Racetracks, the effect of legislation which may vest such ownership with the State of New York, and damages associated with pre-Petition Date actions taken by the State of New York. While the Debtor believes it would be successful in connection with the Adversary Litigation, there can be no assurances. Likewise, there can be no assurance that the Debtor would successfully defeat the State Motion to Dismiss or be awarded the Franchise. As a result, a possibility exists that ownership of the Racetracks would be taken from the Debtor for little or no consideration and that Creditors would receive only a promise that their Claims against NYRA would be resolved at some point in the future.

Pursuant to the compromise and settlement embodied in the Plan, NYRA would receive a thirty (30) year Franchise to conduct pari-mutuel wagering at the Racetracks, the State of New York would contribute up to Seventy Five Million Dollars ($75,000,000.00) to satisfy Allowed Claims,

Unsecured Creditors will receive one hundred percent distribution on account of their Allowed Claims, vendors would be able to continue to do business with NYRA and benefit from such relationship, and NYRA would receive payments from the State of New York or the operator of video lottery terminals that would (i) enhance purses at the Racetracks, (ii) facilitate the maintenance and improvement of the Racetracks and (iii) support NYRA's racing operations. Additionally, pursuant to the State Settlement Agreement, the State of New York would agree to waive distributions with respect to Claims against the Debtor having a face amount in excess of $132 million. In the Debtor's opinion, all such payments and waivers provide the Debtor with significant value and far exceed the risks attendant to the continuation of the litigation.

## III. OVERVIEW OF PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article IV. below, entitled "The Plan of Reorganization." The Plan is a plan of reorganization of the Debtor. The Plan represents the product of negotiations among the Debtor and key parties in interest.

The Plan provides for the classification and treatment of Claims against and NYRA Equity Interests in the Debtor. The Plan designates eight (8) Classes of Claims and one (1) Class of NYRA Equity Interests, which classify as Claims against and NYRA Equity Interests in the Debtor. These classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and NYRA Equity Interests as well as the compromise and settlement described herein.

The following table provides a summary of the classification and treatment of Claims and NYRA Equity Interests under the Plan:

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| -- | Administrative Expense Claims | No | On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtor shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with the terms and conditions of the agreements with respect thereto. | 100%<br><br>Unimpaired |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| -- | Priority Tax Claims | No | On the Effective Date, each holder of an Allowed Priority Tax Claim, including, without limitation, the holder of the New York State Tax Claim, shall be entitled to receive distributions in an amount equal to the full amount of such Allowed Priority Tax Claim. At the option and discretion of the Debtor, which option shall be exercised, in writing, on or prior to the commencement of the Confirmation Hearing, such payment shall be made (a) in full, in Cash, on the Effective Date, (b) in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, in full, in Cash, in equal quarterly installments, commencing on the first (1st) Business Day following the Effective Date and ending on the fifth (5th) anniversary of the commencement of the Chapter 11 Case, together with interest accrued thereon at a rate to be determined by the Bankruptcy Court and set forth in the Confirmation Order, or (c) by mutual agreement of the holder of such Allowed Priority Tax Claim, including, without limitation, the holder of the New York State Tax Claim, and the Debtor or Reorganized Debtor, as the case may be. | 100%<br><br>Unimpaired |
| 1 | Priority Non-Tax Claims | No | Unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and the Reorganized Debtor, each holder of an Allowed Priority Non-Tax Claim shall receive in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Priority Non-Tax Claim, Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is possible. | 100%<br><br>Unimpaired |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| 2 | Secured Claims | No | On the Effective Date, each holder of an Allowed Secured Claim shall receive in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Secured Claim one of the following distributions: (a) the payment of such holder's Allowed Secured Claim in full, in Cash; (b) the sale or disposition proceeds of the property securing any Allowed Secured Claim to the extent of the value of their respective interests in such property; (c) the surrender to the holder or holders of any Allowed Secured Claim of the property securing such Claim; or (d) such other distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code. The manner and treatment of each Secured Claim shall be determined by the Debtor and transmitted, in writing, to each holder of a Secured Claim on or prior to the commencement of the Confirmation Hearing. | 100%<br><br>Unimpaired |
| 3 | Unsecured Claims | Yes | Commencing on the Effective Date, each holder of an Allowed Unsecured Claim shall be entitled to receive on account of such Allowed Unsecured Claim distributions of Cash in an amount equal to one hundred percent (100%) of such holder's Allowed Unsecured Claim. | 100%<br><br>Impaired |
| 4 | Insured Litigation Claims | Yes | Unless otherwise mutually agreed upon by the holder of an Allowed Insured Litigation Claim and the Debtor or Reorganized Debtor, as the case may be, each holder of an Allowed Insured Litigation Claim shall be entitled, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Insured Litigation Claim, to proceed with the liquidation of such Claim, including any litigation pending as of the Petition Date, and seek recovery from the applicable Insurance Carrier; provided, however, that, except with respect to the payment of a deductible which may be required thereunder, under no circumstances, shall the holder of an Allowed Insured Litigation Claim recover from the Reorganized Debtor any amounts with respect to such Allowed Insured Litigation Claim. | N/A<br><br>Impaired |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| 5 | State Claims | Yes | On the Effective Date, and except as provided pursuant to the terms of the State Settlement Agreement, (a) all State Claims shall be deemed Allowed State Claims and (b) each holder of an Allowed State Claim, other than the holder of the New York State Tax Claim, shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Allowed State Claims under the Plan. | N/A<br><br>Impaired |
| 6 | PBGC Claims | No | On or prior to the Effective Date, the Debtor or the Reorganized Debtor, as the case may be, shall make payments into the Benefit Plans identified in Sections 1.23 (a)-(e) of the Plan, which, together with all such payments made during the period from the Petition Date up to and including the Effective Date, shall be attributable to, and in amount sufficient to satisfy (1) funding deficiencies for the years ended on or prior to December 31, 2006 (the accumulated amount of required minimum funding contributions for such years) and (2) normal costs for the year ended December 31, 2007 (the present value of the benefits accruing during 2007); provided, however, that, to the extent of any excess funds paid during the period up to and including the Effective Date, such excess funds shall be attributable to and shall reduce accumulated funding deficiencies, if any, for the plan year ending on December 31, 2007.<br><br>On the Effective Date, and upon assumption of the Benefit Plans and payment of the amounts set forth in Section 10.1 (b) of the Plan, PBGC Claims shall be deemed withdrawn, without prejudice to the rights of the PBGC or the true party in interest with respect to the Benefit Plans to take such action as may be appropriate with respect to future actions or inactions, as the case may be, of the Reorganized Debtor, as contributing sponsor, with respect to the Benefit Plans, during the period subsequent to the Effective Date in accordance with the terms and provisions of the Benefit Plans and ERISA.  (See also, Section IV.C. below) | 100%<br><br>Unimpaired |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| 7 | IRS Claim | Yes | On the later to occur of the Effective Date and the first (1st) Business Day following the entry of a Final Order with respect to the allowance of the IRS Claim, the Reorganized Debtor shall execute and deliver to the IRS a promissory note in the amount of the Allowed IRS Claim, which promissory note shall bear interest at the rate of eight percent (8%) per annum, payable quarterly in arrears, payable in fifteen (15) equal quarterly installments commencing on March 31, 2008; provided, however, that, in the event that the IRS Claim does not become an Allowed Claim until subsequent to March 31, 2008, such equal quarterly installments shall commence on the earliest to occur of June 30, September 30, December 31 or March 31 thereafter and conclude on September 30, 2011; and, provided, further, that such promissory note may be prepaid, in whole or in part, at any time by the Reorganized Debtor, without penalty or premium, and any such prepayment shall be applied in the direct order of maturity thereof. | 100%<br><br>Impaired |
| 8 | Penalty Claims | Yes | Commencing on the Effective Date, and provided that Allowed Unsecured Claims have been paid in full, each holder of an Allowed Penalty Claim shall be entitled to receive such holder's Pro Rata Share of Cash Available for Distribution. | 0%<br><br>Impaired |
| 9 | NYRA Equity Interests | No | On the Effective Date, the NYRA Equity Interests shall be cancelled and the holders of NYRA Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such NYRA Equity Interests under the Plan. | 0%<br><br>Impaired |

The estimated recoveries are based upon the following projections and contingencies:

**The New York Racing Association Inc.**
**Estimated Claims and Recoveries**
*(in thousands of dollars)*

| | Lower Estimate | | | | Higher Estimate | | | |
|---|---|---|---|---|---|---|---|---|
| | Claims | Initial Recovery (1) | Initial Recovery % | Residual (5) | Claims | Initial Recovery (1) | Initial Recovery % | Residual (5) |
| Administrative claims (2) | $  2,763 | $  2,763 | 100.0% | - | $  5,349 | $  5,349 | 100.0% | $  - |
| Secured claims: | | | | | | | | |
|    Allowed claims (3) | 26,893 | 26,893 | 100.0% | - | 29,177 | 29,177 | 100.0% | - |
|    Post petition interest (4) | 3,765 | 3,765 | 100.0% | - | 6,127 | 6,127 | 100.0% | - |
| IRS (5) | 5,000 | 5,000 | 100.0% | - | 25,000 | 4,883 | 19.5% | 20,117 |
| Other priority claims | 1,789 | 1,789 | 100.0% | - | 2,564 | 2,564 | 100.0% | - |
| Pension funding | 17,400 | 17,400 | 100.0% | - | 17,400 | 17,400 | 100.0% | - |
| | 57,610 | 57,610 | 100.0% | - | 85,617 | 65,500 | 76.5% | 20,117 |
| General unsecured claims | 19,832 | 19,832 | 100.0% | - | 26,000 | 26,000 | 100.0% | - |
| Total | $  77,442 | $  77,442 | 100.0% | - | $  111,617 | $  91,500 | 82.0% | $  20,117 |

(1)  Estimated amounts available for initial distribution:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|    Funding from State | | $  75,000 | | | | $  75,000 | | |
|    Additional borrowings under DIP loan | | 2,442 | | | | 9,000 | | |
|    From operating cash at Effective Date (6) | | - | | | | 7,500 | | |
|    Available for Claims at Effective Date | | $  77,442 | | | | $  91,500 | | |

(2)  Consists of bankruptcy costs (including deferred professional fees) and cure payments on contracts to be assumed.
Other administrative costs are assumed to be paid from operating revenues in the ordinary course.

(3)  Excludes secured claims related to the Pension Plans, which are reflected in "Pension funding."
Assumes all real estate tax claims are secured.

(4)  Interest assumed to be simple interest at annual rates of 8% in the Lower Estimate and 18% in the Higher Estimate.

(5)  To the extent there is not enough cash available to pay claims in full, the IRS will be satisified via an 8% note maturing October 31, 2011, with level, quarterly payments of principal and interest.

(6)  To the extent cash available is not sufficeint to pay 100% on all claims, up to $7,500 of operating cash at the Effective Date will be applied to Claims.

# IV.  OVERVIEW OF THE DEBTOR'S OPERATIONS AND CHAPTER 11 CASE

## A.  The Debtor's Corporate Structure

The Debtor is a private, non-profit racing association that owns and operates racing and pari-mutuel wagering at the three largest racetracks in New York: Aqueduct, Belmont, and Saratoga.

The Debtor is a non-dividend-paying New York Business Corporation, incorporated in 1955, pursuant to Section 1-a of Chapter 440 of the Laws of New York of 1926, as amended, in response to the severe financial pressures facing four existing racing associations that owned the Racetracks and the Jamaica Racetrack.  In 1955, the New York legislature granted NYRA a pari-mutuel wagering franchise for a period of 25 years.  The Franchise has been extended from time to time, most recently to December 31, 2007.

Following its formation, the Debtor purchased the assets of the four racing associations for more than $20 million.  In the following four years, the Debtor demolished the old Aqueduct and built a new racing facility that opened in September 1959.  During the same period, substantial capital improvements were made by the Debtor to the Belmont and Saratoga racing facilities.  The acquisitions and capital improvements were effectuated by private financings totaling $105 million and internally-

generated funds. In 1959, the Debtor closed the Jamaica Racetrack and sold the property for use as a housing development.

The Debtor is governed by a board of trustees (the "Board of Trustees"), whose members (the "Trustees") receive no compensation or dividends. The Board of Trustees consists of twenty-eight (28) Trustees, twenty (20) of whom are elected and eight (8) of whom are appointed by the governor of the State of New York. There are currently three (3) vacancies on the Board of Trustees. Trustees appointed by the governor are entitled to reimbursement from NYRA for actual and necessary expenses incurred in the performance of their duties.

The Debtor's operations are regulated by the State of New York. Pursuant to the Racing Law, there are four New York State agencies with oversight and/or regulatory authority over NYRA: (i) The New York State Racing and Wagering Board (the "Racing and Wagering Board"); (ii) the Oversight Board; (iii) The New York State Division of Lottery (the "Lottery"); and (iv) The New York State Thoroughbred Racing Capital Investment Fund (the "CIF"). The Racing and Wagering Board was established in 1973 to combine the functions of the various existing racing commissions and centralize authority. The Racing and Wagering Board has general jurisdiction over all horse racing activities and all pari-mutuel betting activities, both on-track and off-track, in the State of New York and over the corporations, associations, and persons engaged in such activities. The Oversight Board was established in 2005 to oversee and monitor the operations of NYRA. Pursuant to section 208-b(7) of the Racing Law, the Oversight Board can only make non-binding recommendations to NYRA; however, the Oversight Board has, in the past, attempted to and, in certain circumstances, successfully exercised authority over NYRA's financial operations and, as discussed below, caused funds that had been appropriated to NYRA to be withheld. The legislation that established the Oversight Board, codified at Section 911 of the Racing Law, transferred the oversight and approval of all video-lottery-gaming-related contracts at Aqueduct from the Racing and Wagering Board to the Lottery. In 1983, the Racing Law was amended to, among other things, create the CIF in order to make available secured loans to NYRA for capital expenditures. The CIF is a predecessor in interest to the Oversight Board.

## B.     The Debtor's Prepetition Business Operations

Pari-mutuel wagering is a betting system in which all bets of a particular type are placed together in a comingled pool; a track's take (the "Takeout") is removed, and payoff odds are calculated by sharing the remaining pool among all placed wagers. The uniqueness of pari-mutuel wagering lies in the fact that the gambling public itself determines the payoff odds. Pari-mutuel wagering differs from fixed-odds wagering in that the final payout is not determined until the pool is closed; in fixed-odds wagering, the payout is agreed upon at the time the wager is placed.

Racetracks receive a percentage (the "Takeout Rate") of every dollar wagered on a race at its tracks (the "Handle"). The Takeout Rate does not vary based on the number of wagers placed or the numbers of winning or losing customers; it does, however, vary by type of wager. (For example, the Takeout Rate for a single-horse bet is lower than that for a double-horse bet which is lower than that for an "exotic" bet (three or more horse bets).) Generally, from a bettor's perspective, the Takeout Rate is the same for wagers placed on a NYRA race "on-track" (meaning placed at one of the Debtor's racetracks or otherwise directly with the Debtor) as it is for wagers on a NYRA race placed "off-track" (meaning wagers placed from non-Debtor sites, including Off Track Betting ("OTB") locations and other racetracks) with agreements to simulcast and allow customers to bet on NYRA races. However, the percentage of the Takeout a racetrack retains depends on where the wager was placed. The Debtor's share of the Takeout on an "on-track" wager is significantly higher (9.9%) than its share of the Takeout on an "off-track" wager (2.5% on average) because the Takeout on an "off track" wager must be shared with the OTB or other racetrack taking the bet.

As of the Petition Date, the Debtor employed in the aggregate approximately 1,419 employees, of whom approximately 816 are members of unions. During the summer racing season, the number of the Debtor's employees increases significantly, aggregating approximately 3,000. Prior to the Petition Date, the Debtor had entered into approximately nineteen (19) labor-related collective bargaining agreements (collectively, the "CBAs") with respect to the certain of its employees. Certain of the CBAs have expired pursuant to their terms; other CBAs will expire pursuant to their terms by December 31, 2007; and still other CBAs continue in effect pursuant to their terms. The Debtor intends to abide by the terms of the CBAs currently in effect or which may have expired but, by operation of law, remain in effect.

In addition to the Debtor's employees at the Racetracks, there are grooms, stable hands, exercise riders, and hotwalkers (collectively, the "Backstretch Employees") who make racing in New York possible. The Backstretch Employees are employed directly by trainers who stable their horses at the Racetracks. A significant percentage of Backstretch Employees reside, free of charge, at the Racetracks. Up to 900 Backstretch Employees occupy 83 year round residential cottages at Belmont. Saratoga, which offers seasonal accommodation, has 108 bunkhouses that are home to as many as 1,000 Backstretch Employees during the Saratoga meet. There are currently approximately 150 Backstretch Employees at Saratoga. Aqueduct lodges up to 150 Backstretch Employees in three dormitories. All of these Backstretch Employees rely on NYRA's facilities for their shelter.

Thoroughbred racing contributes $1.7 billion annually to New York State's economy. It employs 35,000 people across the state, supports a large variety of small businesses, and is the reason for the existence of more than 400 New York State breeding farms. The Debtor provided the State of New York with more than $14 million in revenue in each of 2003, 2004, and 2005. The Debtor has paid more than $470 million in local taxes and more than $2.631 billion in direct tax revenue to the State of New York since its inception in 1955.

The Debtor provides the best racing quality in the country and makes a strong contribution to New York State's tourism industry, attracting national and international visitors to major events, including the Breeders' Cup World Thoroughbred Championships, the Belmont Stakes, and the Saratoga summer race meet. The Debtor's races account for approximately twenty percent of $15 billion in annual pari-mutuel handle in North America.

C.     **The Debtor's Capital Structure and Prepetition Financing**

For the ten-month period ending on the Petition Date, NYRA recorded gross operating revenue of approximately $243 million and a net loss of approximately $10.2 million. As of the Petition Date, NYRA's books and records, prepared in accordance with Generally Accepted Accounting Principles, reflected assets totaling approximately $137.3 million (based on book value) and liabilities totaling approximately $300.8 million. However, the market values, as of September 2006, of the fee simple interest of the underlying real estate for Aqueduct and Belmont were appraised by Brown Harris Stevens Appraisal & Consulting, LLC ("Brown Harris") to be $383.1 million and $512 million, respectively. Due to its historic landmark designation, Saratoga was appraised by Brown Harris as an operating racetrack. Its appraised value, as of April 2007, was $105.9 million.

In 1995, the Debtor entered into an agreement with the New York State Urban Development Corporation ("UDC") to borrow $8,500,000 (the "UDC Loan"). The UDC Loan is payable on December 31, 2007, bears interest at the rate of four percent per annum, and is secured by a co-equal first lien with the CIF Loans (as defined below) on the Aqueduct property. As of the Petition Date, there was approximately $8,783,000 outstanding in principal and interest under the UDC Loan.

As noted above, in 1983, the Racing Law was amended to, among other things, create the CIF to make available secured loans to the Debtor for capital expenditures. As of the Petition Date, the

Debtor had secured loans payable to the CIF of $49,733,620 (the "CIF Loans"). The CIF Loans bear interest at the rate of four percent per annum and are secured by a co-equal (with the UDC Loan), prorated first mortgage on the Aqueduct property. In addition, as of the Petition Date, the Debtor had accrued interest payable with respect to the CIF Loans in the amount of approximately $26,436,578. The Debtor is required to make debt service payments to the CIF in an amount equal to "adjusted net income" as defined, less $2 million.

Effective July 23, 2003, the Debtor entered into an agreement (the "Bridge Note") with MGM Grand (New York) LLC ("MGM"), whereby MGM agreed to advance NYRA an amount not to exceed $35 million. Advances under the Bridge Note were for the exclusive purpose of funding, on an interim basis, the expenses incurred by MGM on behalf of the Debtor in connection with the financing, development, design, and construction to accommodate proposed gaming activities at Aqueduct (described below in greater detail). As of the Petition Date, the Debtor owed MGM an unsecured debt of approximately $5,741,775 in principal and interest under the Bridge Note.

As described more fully in Section IV.D.5. below, prior to the Petition Date, NYRA also received, and accrued unsecured liabilities for, $1 million from the Port Authority of New York and New Jersey (the "Port Authority") and $5 million from the Empire State Development Corporation (the "ESDC," the umbrella organization for the UDC).

The Debtor has five defined benefit pension plans covering its union and administrative employees. PBGC, a federal government agency created pursuant to ERISA, may insure certain benefits under the Benefit Plans up to statutory limits. As of the Petition Date, the Debtor was in arrears in the approximate amount of $12,300,000 plus interest in respect of its minimum pension contribution for 2005 as required under the provisions of the Employee Retirement Income Security Act of 1974. The Debtor requested a deferral of payment of its contribution for 2005, which was due on September 15, 2006, to March 15, 2006. Prior to the Petition Date, the PBGC had recommended that the IRS approve the deferral. The IRS had not issued a determination prior to the Petition Date, but denied the deferral on June 29, 2007. As a result, the Debtor became liable for an additional approximately $1,200,000 in penalties payable to the IRS. The Debtor's minimum funding requirement for 2006, due September 15, 2007, was approximately $15,200,000. In calendar year 2007, the Debtor made payments totaling $13,800,000, as payment for the 2005 plan year. The Debtor assents that as of December 31, 2007, the Debtor will owe approximately Seventeen Million Four Hundred Thousand Dollars ($17,400,000.00) on account of the plans, attributable to (1) funding deficiencies for the years ended on or prior to December 31, 2006 (the accumulated amount of required minimum contributions for such years) and (2) normal costs for the year ended December 31, 2007 (the present value of the benefits accruing during 2007). PBGC asserts that the amounts of accumulated funding deficiencies with respect to the Benefit Plans for the plan year ending December 31, 2007, will be approximately $28,100,000. As of the Petition Date, the PBGC had perfected liens on certain property in the approximate amount of $6,640,762 related to certain unpaid minimum funding contributions. PBGC asserts that, from and after the Effective Date, statutory liens will arise against the Reorganized Debtor's real and personal property in the event that the amount of missed minimum funding contributions (including interest) exceeds $1 million. PBGC further asserts that it maintains the right to initiate termination of the Benefit Plans pursuant to 29 U.S.C. § 1342 before the Effective Date.

In addition to those discussed above, the primary prepetition creditors of NYRA consist of trade creditors, utilities, simulcast outlets (including OTBs and other racetracks), and customers holding uncashed winning tickets and/or deposits on account of certain of NYRA's customer programs.

### D.  Significant Events Leading to Commencement of the Chapter 11 Case

1.  **New Management.** In 2003, the Debtor entered into a Deferred Prosecution Agreement (the "DPA") with the United States Attorney's Office for the Eastern District of New York

(the "USAO") arising out of an indictment of the Debtor relating to tax evasion activity of its pari-mutuel tellers. Additionally, in response to certain concerns of the USAO and other regulatory bodies, the Debtor undertook to overhaul its management structure. This overhaul included the creation of the Office of the Chairman, to which, in 2004, C. Steven Duncker and Peter F. Karches were elected as Co-Chief Operating Officers. Mr. Duncker and Mr. Karches were subsequently elected Co-Chairmen of the Board of Trustees. The Board of Trustees also appointed Charles E. Hayward as its President and Chief Executive Officer, effective November 4, 2004. All three individuals had extensive prior experience in business, with the Debtor, and with the horseracing industry, and all three played a significant role in the Debtor's operational and organizational restructuring.

In connection with the DPA, the law firm of Getnick & Getnick was appointed Federal Independent Monitor of the Debtor (the "Monitor"). On September 13, 2005, the Monitor's Final Report (the "Report") was issued (in which the Monitor found the Debtor had complied with the DPA), and the USAO moved to dismiss the indictment and stated that the Debtor's new management had weeded out corruption. The Monitor further praised the Debtor's new management, stating that "[i]n 2005, NYRA has gone beyond its specific problems. NYRA has addressed industry-wide issues and in the process has emerged as an industry leader. In a dramatic series of specific steps, NYRA has taken us out of the talking phase and into the action stage….Simply put, NYRA has unequivocally said yes to racing integrity and just as resoundingly said no to horse drugging, computer batch betting, tax evasion, and money laundering. NYRA has an unmatched record of achievement in taking on these issues." Report, at 7-8.

2.      **Revenues and Expenses.** One of the major challenges facing the Debtor was the migration of customers from the Racetracks, where, as described above, on average, the Debtor retains 9.3% of each wager, to off-track establishments where, on average, the Debtor retains only 2.5% of each wager. As a result of the migration and drastic difference in retention rates, over the ten-year period prior to the Petition Date, the Debtor's revenues were virtually flat despite a 65% increase in overall Handle. The competitive relationship between racetracks and OTBs is unique to New York. In other jurisdictions, OTBs are owned by racetracks, operate as joint ventures with racetracks, or otherwise have their interests aligned. The Debtor's liquidity was further impaired by the fact that a number of New York OTBs were facing financial difficulties of their own. As a result, at times in 2006, the Debtor was unable to collect as much as $11,500,000 from New York City OTB for the Debtor's share of the Takeouts and use of the Debtor's simulcast signals.

During the ten-year period prior to the Petition Date, the Debtor's expenses increased 20%. As a result, after earning almost $20 million in 1995, the Debtor's profitability began to decline and, since 2001, the Debtor sustained losses every year, including a loss of almost $16 million in 2004 and approximately $15 million in 2005.

To increase revenues and stabilize its business, on May 6, 2005, the Debtor (together with two New York OTBs) submitted for approval to the Racing and Wagering Board a customer loyalty and rewards program, which would provide, among other things, rebates or discounts for high volume customers. Without customer benefits such as these, the Debtor was at a competitive disadvantage in attracting and retaining high volume bettors as other racetracks offer similar programs or have arrangements with "rebate shops." In addition, the rewards program would contribute additional net revenue to the State of New York, the Racing and Wagering Board, prize money, known as "Purses," and breeders awards. On March 28, 2006, the Racing and Wagering Board approved the Debtor's players rewards program, and the Debtor launched its "NYRA Rewards" program on May 3, 2006.

Many of the Debtor's expenses are fixed or contractual, such as real estate taxes, labor and benefits, pension payments, and utility charges. The Racetracks require constant repair and maintenance to ensure the safety of the Debtor's customers, employees, and horsemen. In addition to the

aforementioned increased costs faced by many businesses, the Debtor has faced unique challenges in controlling costs. Approximately 46% of the Debtor's gross revenue is allocated for statutory payments. In 2003, a new statutory fee (in the amount of 0.39% of the Debtor's Handle) for the support of the Racing and Wagering Board was introduced. In 2004, the statutory rate for stakes and Purses increased from 5.40% to 5.94% of Handle. In 2005, the statutory rate for the Racing and Wagering Board was increased from 0.39% to 0.50%. The new statutory fee and the increases discussed in this paragraph increased the Debtor's costs in 2005 by almost $4 million.

        **3.**        **The VLT Process.** Following enabling legislation in 2001, in order to increase revenues and address the issues discussed above, the Debtor decided to implement and construct a video lottery terminal ("VLT") facility at Aqueduct (the "VLT Facility"). The proceeds from the VLT Facility were anticipated to be approximately $657 million annually, of which approximately $45 million of net cash benefit would flow to the Debtor and $50 million to breeders' awards and Purses, while $454 million would flow to the State of New York (including approximately $66 million to the Lottery).

        After a thorough review of the financial and legal considerations, the Debtor concluded (i) the Debtor did not have experience in developing or operating a non-racing VLT business and required an operator with casino gaming experience to design, develop, and operate the VLT Facility and (ii) the Debtor's corporate structure did not allow the Debtor to access capital for the construction of improvements, and it would be necessary for the VLT operator to provide or arrange for the required financing. After an extensive search and bidding process, the Debtor selected MGM as the developer operator of the VLT Facility.

        As discussed above, effective July 23, 2003, the Debtor and MGM entered into the Bridge Note. Although construction commenced shortly thereafter, it was halted and the project was temporarily put on hold pending favorable legislative and judicial developments which later occurred. On June 15, 2005, the Debtor and MGM entered into a Consulting and Management Agreement (the "Consulting and Management Agreement"), pursuant to which MGM agreed to finance (through a $170 million loan from Mirage Resorts, Incorporated, an affiliate of MGM), develop, and manage a 4500-unit VLT Facility. Per the custom and practice of the State of New York, the Debtor and MGM had expected the Lottery to approve MGM as licensee in 30-60 days, i.e., mid-August 2005, but, as described below, the Lottery did not approve the Consulting and Management Agreement until December 30, 2005. Despite the best efforts of the Debtor and MGM, as of the Petition Date, the project remained stalled because of inabilities to obtain the requisite approvals.

        **4.**        **Ancillary Asset Sales.** In an effort to avert the liquidity crisis it was facing, the Debtor attempted to sell certain non-operating and non-racetrack related assets. Specifically, in early September 2005, NYRA identified and determined to sell approximately 70 parcels of non-operational vacant land in the vicinity of Aqueduct Racetrack (the "Ancillary Property") with an estimated value of approximately $15 - $20 million. In addition to providing the Debtor with a large amount of cash to help it operate until the VLT Facility would come online, the sale of the Ancillary Property would reduce the Debtor's operating expenses by approximately $450,000 in property taxes and other carrying costs, including maintenance, insurance, and violations.

        In accordance with statutory guidelines, the Debtor commenced a request for proposal (or RFP) process to select a broker to sell the property for the best price and the best terms and mailed RFPs to approximately 28 brokers. On or about September 21, 2005, as that process was getting underway, the Oversight Board sent the Debtor a letter in which it asserted that the Debtor could not proceed with the sale of the Ancillary Property without regulatory approval. The Chairman of the Oversight Board also made statements to the media in which it was asserted that the Debtor could not sell the Ancillary Property without the approval of the Oversight Board, the Racing and Wagering Board, and possibly the State Legislature. Although the Debtor disagreed with these positions, the Debtor determined to place the

sale on hold as the uncertainty would certainly reduce the proceeds of any sale, if not make a sale impossible.

In a further effort to raise cash, the Debtor consigned nineteen pieces of sporting art (the "Sporting Art") to Sotheby's New York ("Sotheby's") for auction on December 2, 2005.  Based on appraisals done by Christie's, the Debtor estimated that the proceeds of the sale would yield approximately $2 million.  By letter, dated November 15, 2005, the Racing and Wagering Board demanded that the Debtor remove the Sporting Art from sale until NYRA applied for and received approval for such sale from the Racing and Wagering Board and the Oversight Board.  Further, by letter, dated November 29, 2005, the Racing and Wagering Board advised Sotheby's that it objected to the sale of the Sporting Art and threatened legal action against Sotheby's if it did not remove the Sporting Art from the auction.  That same day, Sotheby's withdrew the Sporting Art from the auction.

5.        **2005 Memorandum of Understanding with the State of New York.**  On December 27, 2005, the Board of Trustees determined it was desirable and in the best interests of the Debtor, its creditors, employees, and other interested parties to seek relief and commence a case under chapter 11 of the Bankruptcy Code.  With the Debtor's filing imminent, the State of New York approached the Debtor with approvals of the VLT Facility and a financial assistance package designed to enable the Debtor to continue racing operations through the end of 2006, at which point, the VLT Facility was expected to be completed and providing the Debtor with additional revenues.

Consistent with such agreement and promises, on December 30, 2005, the Debtor, the Oversight Board, and the New York State Division of Budget entered into a memorandum of understanding (the "2005 MOU"), pursuant to which, the Debtor was to receive $30 million, as follows: (i) $5 million from the sale of land at Aqueduct to the Port Authority; (ii) $5 million as a loan from the ESDC; and (iii) $20 million as an advance of anticipated future VLT vendor fees from the Lottery (the "Advance").  On the same day, the Lottery approved the Consulting and Management Agreement and the Debtor's agreement with an architect for the design of the VLT Facility.

In accordance with the 2005 MOU, on December 30, 2005, the Debtor received $1 million from the Port Authority in anticipation of the sale of land at Aqueduct.  If the parties failed to consummate the sale, the Debtor would repay the principal plus interest at the rate of 6% from the date of the cancellation of the agreement.  On January 11, 2006, the Debtor received $5 million as a loan from the ESDC.  The loan bears interest at the rate of 4% per annum.  In addition, beginning in March 2006, principal payments of $96,000 were due monthly.  On February 1, 2006, the Debtor requested a deferral of all principal payments until January 1, 2007.  As of the Petition Date, the ESDC had not responded to this request.

On March 1, 2006, the State of New York enacted legislation to provide the Debtor with the Advance.  The purpose of the Advance was to finance services and expenses associated with the Debtor's operations and to facilitate the timely opening of the VLT Facility.  The Advance would bear interest at the rate of 4% per year, and would be repaid from vendor fees and marketing allowances beginning with the first day of operation of the VLT Facility, pursuant to a plan developed by the Oversight Board.  The payment plan would require the vendor of the VLT Facility to return to the Lottery a reasonable percentage of the vendors fee and marketing allowance fee until such time as the full amount advanced plus interest was returned to the Lottery, with the total amount due and owing no later than December 31, 2007.

On March 23, 2006, the Lottery issued the Debtor a temporary video gaming lottery license which remains in effect unless it is suspended or revoked.  Before the Lottery could make any advances to the Debtor, the Lottery must receive a written determination from the Chairman of the Oversight Board that the Debtor has and continues to satisfactorily fulfill its commitments under the 2005 MOU.

6.  **Prepetition Franchise RFP Process.**  As discussed above, the Franchise expires on December 31, 2007.  The legislation that established the Oversight Board also accelerated the formation of the Ad Hoc Committee on the Future of Racing (the "Ad Hoc Committee"), which entity was responsible for recommending a future operator of the Franchise.  On June 13, 2006, the Ad Hoc Committee released an RFP seeking bids from entities interested in conducting racing and operating pari-mutuel wagering at the Racetracks under the Franchise (the "Franchise RFP Process").  To participate in the Franchise RFP Process, bidders were required to submit proposals by August 15, 2006.  The Debtor and a number of other groups, each a for-profit organization, submitted proposals for the Franchise.  The Ad Hoc Committee was scheduled to return its report to Governor George E. Pataki and the State Legislature by September 15, 2006.  These deadlines were extended to August 29, 2006, and September 29, 2006, respectively.  Although no new deadlines had been established, as of the Petition Date, the Ad Hoc Committee had failed to issue its recommendation.  On October 26, 2006, the Ad Hoc Committee disqualified a bidder due to a failure to adhere to certain of the details of the Franchise RFP Process.

7.  **State Approvals.**  On June 23, 2006, Governor Pataki approved a budget bill (Chapter 108 of the Laws of 2006) that re-appropriated the unallocated portion of the Advance under the 2006-07 New York State budget and substituted an additional $5 million in vendor fee advances to NYRA in place of the provision in the 2005 MOU contemplating a sale of land at Aqueduct to the Port Authority.  Accordingly, the Debtor became obligated to repay the $1 million advance from the Port Authority.

The budget bill also eliminated the requirement contained in the original appropriation that all Advances be repaid in full on or before December 31, 2007.  As a result of the bill, all Advances were to be repaid by the Debtor or any subsequent operator of the VLT Facility pursuant to a repayment schedule to be developed by the Debtor and the Lottery and approved by the Oversight Board.

On March 30, 2006, the Debtor and MGM entered into a First Amendment to the Consulting and Management Agreement (the "First Amendment").  The First Amendment reflected changes in the permanent financing documents increasing the project cost to account for inflationary increases, and also clarified the formula that is the basis for MGM's management fee.  Specifically, the First Amendment increased the total amount of the financing MGM would provide NYRA to an amount not to exceed $190 million.  The First Amendment also provided that, if at any time applicable law was changed in a manner that reduces NYRA's share of revenues attributable to gaming other than pari-mutuel racing, MGM's management fee would be calculated as if no such change in the laws had occurred.  The Lottery objected to the language of this later provision.  Accordingly, on August 2, 2006, the Debtor and MGM entered into an Amended and Restated First Amendment (the "Amended and Restated Amendment").  Consistent with the First Amendment, the Amended and Restated Amendment increased the total amount of financing to an amount not to exceed $190 million.  However, the Amended and Restated Amendment replaced the language in the First Amendment for the calculation of MGM's management fee with a formula that both addressed the Lottery's concerns and ensured that MGM's fee would not decrease as a result of a statutory changes to the Debtor's revenues.

In September 2006, the Chairman of the Oversight Board questioned whether the Debtor should be allowed to obtain funds from the Advance before MGM committed to the VLT project, and the Oversight Board requested further evidence of MGM's willingness and ability to go forward with its plans to construct the VLT Facility.  By letter, dated September 13, 2006, MGM reconfirmed that it was ready, willing, and able to go forward as planned.  MGM also noted that its continued participation with the VLT Facility was an assumption incorporated into the Ad Hoc Committee's Franchise RFP Process.

On October 30, 2006, the Oversight Board passed a resolution to release the $19 million agreed to in the 2005 MOU and previously appropriated by the State Legislature.  At the same time, however, additional conditions to the release of such funds were created.

As of the Petition Date, the Lottery had not yet given final approval to the Consulting and Management Agreement and the Oversight Board has not yet approved a related subordination agreement among the PBGC and MGM. Construction of the VLT Facility was estimated to take up to one year.

E.    **The Chapter 11 Case**

1.    **Commencement of the Chapter 11 Case.**  On November 2, 2006, with insufficient funds to finance its operations, the Debtor commenced its Chapter 11 Case to stabilize and protect its business pending the completion and implementation of the VLT Facility and to address with the State of New York the extension of the Franchise and the implementation of changes to the Racing Law and regulatory framework that are generally recognized as necessary in the industry. The Chapter 11 Case was assigned to and presided over by the Honorable James M. Peck, United States Bankruptcy Judge. The Debtor continues to manage its properties and operate its businesses as a debtor in possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.

2.    **"First-Day" Orders.**  On the Petition Date, the Debtor in Possession requested and obtained a series of orders from the Bankruptcy Court designed to ensure a smooth transition into chapter 11 and minimize any disruption of its business operations. The Bankruptcy Court entered orders authorizing the Debtor in Possession to, among other things, maintain its existing bank accounts and business forms; pay certain prepetition wages, compensation, tax withholding obligations, and employee benefits; pay prepetition sales and use taxes; provide adequate assurance to utility companies; and honor certain prepetition customer programs.

The Bankruptcy Court also authorized the Debtor in Possession to employ Weil, Gotshal & Manges LLP as attorneys for the Debtor in Possession and, among others, Hinman Straub PC as special counsel to NYRA. The Bankruptcy Court further authorized the Debtor in Possession to continue to employ professionals utilized in the ordinary course of business to render services to the Debtor in Possession similar to those services rendered prior to the Petition Date.

3.    **Appointment of the Creditors' Committee.**  Section 1102 of the Bankruptcy Code requires that as soon as practicable after the commencement of a chapter 11 case, the United States Trustee shall appoint an official committee of unsecured creditors. On November 9, 2006, the Office of the United States Trustee for the Southern District of New York appointed the following members to form the Creditors' Committee: PBGC; MGM; Forum Services Group, Inc.; Jockeys Guild, Inc.; Service America Corporation, d/b/a Centerplate; Sports Publications Production LLC; and United Tote Company.

The Creditors' Committee retained Kirkpatrick & Lockhart Preston Gates Ellis LLP as its attorneys and Mahoney Cohen & Company, CPA, P.C. as financial advisors. The Creditors' Committee also retained FTI Consulting, Inc. as consultant and expert in connection with the VLT Facility.

4.    **DIP Financing.**  On the Petition Date, the Debtor in Possession sought entry of an order authorizing the Debtor in Possession to obtain postpetition financing pursuant to sections 363 and 364 of the Bankruptcy Code by entering into a credit facility with Kimco Capital Corporation and SB Capital Group LLC and granting, among other things, liens upon and security interests in the Debtor in Possession's assets in support of repayment thereof. In response, the State of New York offered to provide the Debtor in Possession with a postpetition credit facility in the amount of Eight Million Dollars ($8,000,000.00) (the "Initial State Facility"). As a result, and due to the existence of equal or better financing terms than otherwise being offered, the Debtor in Possession determined to accept the Initial State Facility. On November 3, 2006, the Initial State Facility was approved from the bench by the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, and the State of New York advanced funds to the Debtor in Possession. By order, dated December 19, 2006, the Bankruptcy Court approved the Initial State Facility on an interim basis. The Bankruptcy Court approved the Initial State Facility on

a final basis on January 9, 2007.  The Bankruptcy Court memorialized such ruling and approved the corresponding credit agreement by order, dated February 22, 2007.

As a limited financing, the Initial State Facility was premised on providing the Debtor in Possession with funds necessary to operate through January 2007.  Understanding such limitation, and desiring to provide financial and operational stability through the balance of the Chapter 11 Case, on December 12, 2006, the Debtor in Possession sought approval of that certain Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated December 11, 2006 (together with all related documents, the "GE DIP Agreement"), with General Electric Capital Corporation ("GECC"), as administrative agent and lender, and GE Capital Markets (together with GECC, "GE") as lead arranger.  Pursuant to the proposed GE DIP Agreement, GE would provide the Debtor in Possession with Fifty Million Dollars ($50,000,000.00) of postpetition financing, secured by a security interest in and lien upon all of the Debtor in Possession's existing and after-acquired personal and real property, including, without limitation, the Racetracks.  Objections to the GE DIP Motion were interposed by, among others, the State of New York and the Oversight Board.  A hearing to consider the GE DIP Agreement was continued from time to time in an effort to promote continued discussions among NYRA and the State of New York.  In order to ensure the continued availability of financing pursuant to the GE DIP Agreement, the parties, including the State of New York, agreed to, and, by order, dated February 22, 2007, the Bankruptcy Court authorized, the payment of certain fees and the reimbursement of certain expenses to GE.

On or about January 31, 2007, Governor Eliot Spitzer proposed to the State Legislature a Budget Bill (the "Deficiency Budget"), the purpose of which was to amend the legislation that made appropriations for the 2006-2007 fiscal year, to meet the essential obligations for which funding was not previously appropriated or which proved to be insufficient.  The Deficiency Budget proposed, in relevant part, authorizing Twenty-Three Million Dollars ($23,000,000.00) in postpetition, debtor in possession financing for the Debtor in Possession (the "Deficiency Appropriation Funding"), on terms consistent with the terms of Initial State Facility.

After an extensive series of negotiations among the parties, NYRA and the State of New York agreed to a four-part proposal designed to provide the Debtor in Possession with certainty of postpetition financing (the "State Proposal").  On February 23, 2007, the Debtor in Possession sought Bankruptcy Court approval of the State Proposal, which included (a) initial financing in the form of a loan in the amount of Two Million Dollars ($2,000,000.00) prior to the availability of the Deficiency Appropriation Funding and, to the extent provided, would reduce the amount available under the Deficiency Appropriation Funding; (b) interim financing up to an agreed upon portion of an additional Nineteen Million Dollars ($19,000,000.00) out of the Advance previously appropriated to the Debtor by the State of New York (see Section IV.D.5. supra) to cover any additional liquidity shortfalls prior to availability of the Deficiency Appropriation Funding and, to the extent provided, would reduce the amount available under the Deficiency Appropriation Funding; (c) use of the State of New York's best efforts to have the Deficiency Budget, containing the Deficiency Appropriation Funding, passed by the State Legislature and enacted into law on or before March 31, 2007 (it was contemplated that the terms of the Deficiency Appropriation Funding would be incorporated into an amended and restated credit agreement with the State of New York but that if the Deficiency Appropriation Funding was not approved by the State Legislature and enacted by March 31, 2007, the State of New York would make available the balance of the Advance); and (d) supplemental funding of up to an additional Nine Million Dollars ($9,000,000.00) in postpetition financing from a "dry appropriation" to be available for specified purposes under agreed upon circumstances if necessary.

After a hearing on February 23, 2007 and by order, dated March 16, 2007, the Bankruptcy Court approved the State Proposal and authorized NYRA to obtain supplemental postpetition financing from the State of New York pursuant to the terms and conditions of that certain Amended and Restated Debtor-in-Possession Loan and Security Agreement, dated as of March 16, 2007.  On April 6,

2007, NYRA received a transfer of Twenty Three Million Dollars ($23,000,000.00) from the State of New York.

      **5.**     **The State Motion to Dismiss the Chapter 11 Case.** On December 29, 2006, the State of New York and the Oversight Board filed the State Motion to Dismiss and asserted therein that the Bankruptcy Court should dismiss the Chapter 11 Case because (i) only "persons" are eligible to be debtors under chapter 11, (ii) the Bankruptcy Code defines "persons" to exclude "governmental units," (iii) the Bankruptcy Code defines "governmental unit" to include an "instrumentality" and a "municipality," which in turn is defined to include a "public agency," and (iv) the Debtor is both an instrumentality and a public agency. The State of New York and Oversight Board argued that because the Debtor is not eligible to be a debtor under the Bankruptcy Code, the Bankruptcy Court lacked jurisdiction over the Chapter 11 Case.

      The New York Thoroughbred Horsemen's Association, Inc. ("NYTHA"), Lien Games Racing, LLC ("Lien Games"), and Excelsior Racing Associates, LLC ("Excelsior") each subsequently filed joinders to the State's Motion to Dismiss the Chapter 11 Case. NYTHA additionally argued that the Chapter 11 Case should be dismissed because the Debtor in Possession refused to engage in discussions with NYTHA regarding claims of the horsemen. Lien Games argued that the Debtor in Possession's behavior in asserting ownership over certain funds was cause to dismiss the Chapter 11 Case. NYTHA and Lien Games both argued that the Debtor in Possession's use of certain funds was an unauthorized use of cash collateral.

      On February 27, 2007, and February 28, 2007, the Creditors' Committee and the Debtor in Possession filed omnibus objections to the State Motion to Dismiss and joinders thereto. The Debtor in Possession's objection contained an exhaustive discussion of the relevant facts and applicable law arguing that the Debtor is neither an "instrumentality" of the State of New York nor a "public agency," but rather, is a "corporation" of the type that Congress envisioned and courts have interpreted to be entitled to the benefits of chapter 11. The Debtor in Possession argued that chapter 11 protection was necessary to prevent actions by the State of New York and the Oversight Board to cause the Debtor in Possession's loss of the Franchise and possible foreclosure of the Racetracks. The Debtor in Possession argued that the joinders to the State Motion to Dismiss should be denied to the extent they adopted the State of New York's and Oversight Board's arguments. The Debtor in Possession additionally argued that NYTHA and Excelsior lacked standing in the Chapter 11 Case and that neither NYTHA nor Lien Games had established cause to dismiss the Chapter 11 Case.

      The State of New York and Oversight Board, NYTHA, and Excelsior each filed a reply to the Debtor in Possession's and the Creditors' Committee's objection. After an initial status conference, the hearing to consider the State Motion to Dismiss has been adjourned from time to time, most recently on June 20, 2007, to a date to be determined and noticed. In the interim, NYRA served a number of parties with discovery requests, including requests for documents and interrogatories and certain parties responded by filing objections to such requests.

      The State Motion to Dismiss will be resolved pursuant to the State Settlement Agreement, described in Section V.B. below.

      **6.**     **Adversary Litigation Commenced By the Debtor in Possession.** On December 12, 2006, NYRA filed a complaint (the "Adversary Complaint") and commenced the Adversary Litigation in the Bankruptcy Court against George E. Pataki as governor of the State of New York, the Oversight Board as successor in interest to the CIF, Carole E. Stone as Chair of the Oversight Board, the Lottery, Robert J. McLaughlin as Director of the Lottery, and Does 1 through 100 (collectively, the "State Defendants").

The Adversary Complaint alleged that, beginning in the early 1980s and continuing through the pendency of the Chapter 11 Case, various New York State officials asserted, without any basis in fact or law, that the State of New York owned the Racetracks and that, upon the expiration of the Franchise, the Debtor will cease to have any rights or interests in the Racetracks. Thus, the State Defendants contended the Racetracks could be operated by a new franchisee without any involvement or interest on the part of the Debtor, or indeed, without any payment to the Debtor by the State of New York or the new franchisee as just compensation for the Racetracks.

The Adversary Complaint alleged that the State Defendants had engaged in a deliberate pattern and practice intended ultimately to destroy the Debtor and to seize all of its assets. The Adversary Complaint alleged that, by impairing the Debtor's finances in furtherance of this scheme, the State Defendants drove the Debtor into bankruptcy and, by continuing to falsely assert that the State of New York, and not the Debtor, owns the Racetracks, the State Defendants hindered the Debtor in Possession's abilities to obtain mortgage financing and, thus, impeded the Debtor in Possession's efforts to reorganize in an orderly fashion.

The Adversary Complaint sought: (a) a declaration of the Debtor's rights with respect to the Racetracks; (b) a declaration that certain statutory and regulatory provisions that purport to provide (i) for the termination of the Debtor's corporate charter upon the expiration of the Debtor's franchise, and (ii) the taking of the Racetracks under color of New York State law without just compensation are unconstitutional and unenforceable; (c) an order enjoining the State Defendants from taking any actions pursuant to the aforesaid statutory and regulatory provisions that would interfere with the Debtor's title to the Racetracks or otherwise infringe upon the Debtor's property and constitutional rights; (d) a declaration that the State Defendants' refusal to approve the Debtor's contract for the construction and operation of the VLT Facility was discriminatory, arbitrary, capricious, and without a rational basis, and is, thus, unconstitutional and unlawful; (e) an order enforcing the automatic stay and awarding damages for violations thereof; and (f) an order requiring the State Defendants immediately to take all necessary steps to allow the VLT Facility to proceed. The State of New York vigorously disputes the allegations and claims in the Adversary Complaint.

On January 19, 2007, the Bankruptcy Court approved a stipulation among NYRA and the State Defendants, dated January 18, 2007, which extended the deadline for the State Defendants to file an answer or otherwise move with respect to the Adversary Complaint to the date that is 30 days after the Bankruptcy Court's entry of an order disposing of the State Motion to Dismiss.

On January 30, 2007, the Bankruptcy Court approved the Creditors' Committee's request to intervene in the Adversary Litigation. Two non-creditor competitors of NYRA in NYRA's bid for the Franchise, Excelsior and Empire Racing, also sought to intervene in the Adversary Litigation. The Bankruptcy Court's consideration of their motions was adjourned to a date after the Bankruptcy Court has considered the State's Motion to Dismiss the Chapter 11 Case.

The Adversary Litigation will be resolved pursuant to the State Settlement Agreement, described in Section V.B. below.

**7.    Adversary Proceedings Brought Against NYRA.** During the pendency of the Chapter 11 Case, two adversary proceedings were commenced against the Debtor in Possession relating to the Debtor in Possession's use of funds in its possession.

a.    <u>NYTHA.</u> NYTHA is an organization that purports to represent and negotiate collectively on behalf of licensed owners and trainers of thoroughbred race horses that run at one or more of NYRA's Racetracks. As described below, the Debtor disputes the extent of NYTHA's authority and representative capacity, however.

The Racing Law requires that the Debtor use specified percentages of the Handle (and other sources of revenue) to pay Purses generally on an annual basis. The Racing Law also requires the Debtor to withhold one percent of all Purses and to pay such one percent interest to NYTHA or another horsemen's association to be used exclusively for the benefit of those horsemen racing in New York State, benevolent activities on behalf of stable employees, and the promotion of equine research. The Debtor, in its sole discretion, establishes and advertises Purses for each race it runs in advance of each race. In fact, Purses are advertised, in part, to attract horsemen to enter and participate in the races. Thus, the Debtor's obligations to individual, identifiable horsemen are not functions of a calculation of percentage of the Handle. The difference between what the Debtor is statutorily obligated to pay out in Purses in general and what the Debtor pays to individual horsemen that win races is what is referred to as the "Cushion." The Cushion can best be described as statutorily accrued, but not yet carded or won, Purses. The Racing Law contains no "per race" requirement to fund or pay the Cushion. NYTHA and related types of guilds would prefer the Cushion be fully-funded and held by the Debtor in a segregated trust account, separate from the property of the Debtor in Possession's estate. However, that is neither the reality, nor required by the Racing Law, nor feasible in light of NYRA's financial situation.

On November 30, 2006, NYTHA filed a complaint against the Debtor in Possession and commenced an adversary proceeding (Adversary Proceeding No. 06-01937) in the Bankruptcy Court. NYTHA amended its complaint once on December 26, 2006, and again with a second amended complaint (the "Amended NYTHA Complaint"), which was deemed filed on May 17, 2007. The Amended NYTHA Complaint contained claims by NYTHA on behalf of horsemen, generally, a claim on behalf of NYTHA itself, a class action component, named plaintiffs, Castle Village Farm 1999 Partnership, Castle Village Farm Timonium Partnership, and Stephen A. Zorn, and the Creditors' Committee, in its representative capacity, as an additional defendant. The Amended NYTHA Complaint contained eight counts for declaratory relief: (i) that NYTHA is authorized to represent the horsemen in the Chapter 11 Case; (ii) that the portion of the Handle which is delineated by the Racing Law to go to Purses be used exclusively for Purses and not for the Debtor's general operating expenses; (iii) that such funds and additional funds purportedly owed to NYTHA do not constitute property of the Debtor in Possession's estate; (iv) that the Debtor may only use funds comprising the Cushion for the purpose of funding Purses or paying amounts purportedly due to NYTHA; (v) that funds comprising the Cushion do not comprise property of the Debtor in Possession's chapter 11 estate; (vi) that funds which are allocated to Purses or the Cushion or are directly or indirectly traceable to, derived from, or products thereof are held in a constructive or statutory trust for the sole benefit of the horsemen and NYTHA; (vii) that upon the request of NYTHA, the Debtor in Possession be required to pay NYTHA's dues to The National Thoroughbred Racing Association ("NTRA") from funds earned and retained for Purses; and (viii) that the Debtor in Possession use funds to pay NYTHA's dues to the NTRA because such funds do not comprise property of the Debtor in Possession's estate. Based on the foregoing, the Amended NYTHA Complaint requested a permanent injunction against NYRA. The Second Amended Complaint also requested adequate protection of the plaintiffs' interest in the Cushion in the form of administrative claims and security for their claims in the form of liens.

On June 11, 2007, NYRA filed a motion to dismiss, in part, the Amended NYTHA Complaint, arguing that NYTHA lacked standing to sue in a representative capacity and that the plaintiffs failed to state a claim upon which relief could be granted. On the same date, the Creditors' Committee filed an answer to the Amended NYTHA Complaint, denying knowledge and information sufficient to form a belief as to the allegations set forth therein, asserting as affirmative defenses the failure to state a claim upon which relief could be granted, lack of standing, and statutes of limitations, and reserving the Creditors' Committee's right to amend its answer. On September 5, 2007, the plaintiffs filed an objection to NYRA's motion to dismiss, in part, the Amended NYTHA Complaint. The hearing to consider the Debtor's motion and the plaintiffs' objection has been adjourned from time to time upon consent of the parties, most recently to December 12, 2007.

b.    <u>Lien Games.</u>  Lien Games is one of approximately 150 entities that operate multiple, in- and out-of-state, off-track betting locations that receive simulcast signals of and accept wagers on races at, among other racetracks, the Racetracks.  Such off-track betting locations are customers of the Debtor that act as retailers, reselling to their customers the pari-mutuel tickets that they purchase from the Debtor.  Customers of such off-track betting locations have no contractual relationship with the Debtor, cannot redeem their winning tickets with the Debtor and can only cash their tickets through and receive monies from the off-track entity that sold them their tickets.

In general, off-track betting locations pay to the Debtor a percentage of the total amount wagered at their locations on races run at the Racetracks.  And, in general, the Debtor pays to the off-track locations the amounts owed on account of the winning tickets purchased through the off-track locations.  The net result is that, at various points in time, the Debtor may owe money to off-track locations whose customers win more than the off-track locations are obligated to pay the Debtor, and off-track locations may owe money to the Debtor when their customers win less than the off-track location is obligated to pay the Debtor.  Lien Games has asserted that it is a creditor of the Debtor in Possession's estate.

On February 6, 2007, Lien Games filed a complaint against the Debtor in Possession and commenced an adversary proceeding (Adversary Proceeding No. 07-01471) in the Bankruptcy Court.  Lien Games subsequently transferred its claims against the Debtor in Possession to Trackside, Inc. ("<u>Trackside</u>"), as agent for Ernest Dahlman.  By order, dated August 14, 2007, the Bankruptcy Court granted a Lien Games the right to amend its complaint to substitute Trackside as plaintiff in the adversary proceeding, and on August 27, 2007, Trackside filed an amended complaint (the "<u>Lien Games' Complaint</u>"), as assignee of Lien Games.

The Lien Games' Complaint alleged four overlapping causes of action: (i) that the Racing Law requires the Debtor to distribute the net Handle to off-track operators for subsequent payment to the holders of winning tickets, and, as a result, that Trackside is entitled to a declaratory judgment finding that the Debtor is merely a stakeholder for trust funds, which are not property of the Debtor in Possession's estate; (ii) that the Debtor in Possession has violated the Racing Law in failing to distribute the net Handle to off-track operators for subsequent payment to the holders of winning tickets, and, as a result, that Trackside is entitled to a declaratory judgment finding that the Debtor in Possession's actions constitute a violation of Lien Games' rights under the Racing Law; (iii) that the Debtor in Possession's withholding of prepetition amounts owed to Lien Games and utilization thereof for other purposes constitutes conversion and a breach of fiduciary obligationsand that the Debtor in Possession should be directed to turnover prepetition funds that have been allegedly converted; and (iv) that the Debtor's Trustees and officers have failed in their obligations to oversee the Debtor's activities and require that it function in conformity with the requirements of the Racing Law.

On August 31, 2007, the Debtor filed a motion to dismiss the Lien Games' Complaint in its entirety, with prejudice, arguing both that Trackside lacked standing to sue the Debtor in Possession and that the Lien Games' Complaint lacked citation to statute of caselaw that could support a judicially cognizable right of action.  NYRA viewed the Lien Games' Complaint as nothing more than an attempt by a prepetition creditor to collect on account of its prepetition claim.  On September 14, 2007, Trackside ojected to the Debtor's motion to dismiss the Lien Games' Complaint.  The hearing to consider the Debtor's motion to dismiss and the plaintiffs' objection thereto has been adjourned from time to time upon consent of the parties, most recently to December 12, 2007.  The Debtor believes that this adversary proceeding will be resolved with the payment of Lien Games' Claims as Class 3 Unsecured Claims pursuant to the Plan.

**8.**    <u>Postpetition Franchise Selection Process.</u>  On February 21, 2007, the Ad-Hoc Committee released its recommendation regarding the Franchise, recommending Excelsior as the future Franchise operator.  However, the Franchise RFP Process had been initiated by Governor Pataki, whose

term ended on December 31, 2006, and on January 1, 2007, Governor Eliot Spitzer was sworn into office as the fifty-fourth (54th) governor of the State of New York. The Ad Hoc Committee's recommendation was neither binding on the Governor nor the State Legislature, and neither the Governor nor the State Legislature acted on the Ad-Hoc Committee's recommendation.

On January 9, 2007, NYRA filed a motion (the "<u>MGM Motion</u>") to authorize the assumption of the Management and Consulting Agreement with MGM, and to incur postpetition financing in connection therewith. On March 22, 2007, the Creditors' Committee filed an objection to the MGM Motion. Amid extensive negotiations and discovery between the parties, MGM decided to withdraw and terminate discussions and business dealings with the Debtor.

On February 28, 2007, Governor Spitzer announced that he would convene a panel to publicly evaluate proposals from the potential operators of the Franchise (the "<u>New RFP Process</u>"). The panel included representatives from the Racing and Wagering Board, ESDC, the New York State Division of the Budget, the State Senate and the Assembly and was chaired by Richard Rifkin, Special Counsel to the Governor. On March 13, 2007, NYRA and five other entities were informed that entities interested in the Franchise were required to submit proposals to the new panel by March 31, 2007, and to be prepared to make a public presentation to the panel. NYRA, Empire Racing Associates, Excelsior, and Capital Play Inc., each submitted proposals and made presentations to the panel in April of 2007.

Under the original RFP Process, integrity was one factor to be considered in the overall evaluation of each potential Franchise operator. The subsequent announcement of the process set forth by Governor Spitzer indicated that the primary standard for selection would be an organization's integrity and its ability to advance New York horseracing and the State of New York's interests. In March 2007, the Governor requested the State of New York's Office of the Inspector General (the "<u>IG</u>") review the integrity of the entities that had identified themselves as Franchise bidders. On June 1, 2007, the IG issued a formal report to the Governor, entitled "Report to the Governor on the Integrity of Those Seeking to Operate the Racetracks at Aqueduct, Belmont Park and Saratoga." The report made no conclusions as to which entity should be awarded the Franchise, but instead, detailed findings with respect to each applicant.

On September 4, 2007, the Governor issued his recommendation that the Debtor be awarded the Franchise for a 30-year term. Legislative approval of this is required. In connection with the Governor's recommendation, NYRA and the State of New York entered into the 2007 MOU (as defined and described in Section IV.E.9. below).

In October 2007, the Senate Committee on Racing, Gaming and Wagering conducted hearings regarding the Franchise. As of the date of this Disclosure Statement, no recommendations have been issued with respect to a VLT franchisee or operator, but six separate entities have expressed interest in operating such a franchise. Additionally, legislative approval of NYRA as the future Franchise operator remains pending.

**9.** **<u>2007 Memorandum of Understanding with the State of New York</u>.** On September 4, 2007, the Debtor in Possession and the State of New York entered into a memorandum of understanding (the "<u>2007 MOU</u>"). The 2007 MOU was a non-binding agreement that set forth the expectations of the parties with respect to thoroughbred racing in the State of New York and VLT gaming at Aqueduct. The 2007 MOU anticipated that, subject to the enactment of legislation by the State Legislature, the parties would, at a later date, enter into a binding agreement memorializing the terms set forth in the 2007 MOU and implementing the purposes therein. In the event appropriate legislation was not signed into law and a binding agreement was not entered into by December 31, 2007, then the 2007 MOU would be deemed null and void. The salient terms of the 2007 MOU are as follows:

a.     The Reorganized Debtor.  Pursuant to the terms of the Racing Law, as it is to be amended, the Reorganized Debtor will incorporate as a New York State not-for-profit corporation, under the supervision of the New York State Attorney General's office.  The terms of the certificate of incorporation, by-laws, governance and operation  must be acceptable to the State of New York and subject to the Racing Law, as it is to be amended.  The Reorganized Debtor will be governed by a nineteen-member board of directors, thirteen of whom will be designated by the Debtor in Possession, two by the Governor, and one each by the State Senate Majority Leader, the State Assembly Speaker, NYTHA, and The New York Thoroughbred Breeder's Association.

b.     The Franchise.  The State of New York will award the Reorganized Debtor a 30-year thoroughbred racing franchise, effective as of January 1, 2008.  The 2007 MOU provides that the Reorganized Debtor and its members adopt a corporate governance code of conduct on terms acceptable to the State of New York.  As a franchise fee, the Reorganized Debtor will remit to the State of New York, on an annual basis, all net revenues received from racing operations; provided however, that the Reorganized Debtor will be permitted to maintain an operating reserve fund in amount equal to projected operating expenses (including Purses) for a 45-day period following such payment.

c.     VLT Facilities at Aqueduct.  The State of New York, in consultation with NYRA, will select a gaming entity to develop VLT facilities at Aqueduct.  That entity will be granted a license to operate not more than 4,500 VLTs and will be required, at its sole cost and expense, to construct and maintain the VLT facilities.

d.     Funding.  The State of New York, with funds received from the gaming entity, or otherwise, shall provide the Debtor with sufficient funds, not to exceed $75 million, to permit the Debtor in Possession to satisfy all of its obligations under the Plan.  In addition, until such time that VLT revenues are made available to the Reorganized Debtor, the State of New York, directly, or through the gaming entity, shall provide reasonable and necessary funds to meet the Reorganized Debtor's operating obligations.  Further, the State of New York will make available, or cause to be made available by the gaming entity, from VLT revenues, the following: (i) 4% of VLT revenues annually for capital expenses in maintaining and upgrading the Racetracks; (ii) 3% of VLT revenues annually for general racing operations; (iii) 6.5% of VLT revenues for the first year of VLT operations, and annual payments increasing 6% per year thereafter, with a maximum of 6.5% of annual VLT revenues, to fund racing Purses; and (iv) and 1% of VLT revenues for the first year of VLT operations, and annual payments increasing 3.5% per year thereafter, with a maximum of 1% of annual VLT revenues for breeders.

e.     Repayment/ Forgiveness of State Debt.  The State of New York will forgive any existing obligations that the Debtor currently has to the State of New York, provided that the State of New York may require the gaming entity to reimburse the State of New York for such forgiven obligations.

f.     Ownership of the Racetracks.  The Debtor and the Reorganized Debtor will irrevocably relinquish any present or future rights that it might have, or might claim, with respect to the Racetracks, including any property interest therein, and satisfy any liens, encumbrances and claims that may exist with respect to the same.  The Debtor and the Reorganized Debtor will each take all appropriate action to ensure that the State of New York is vested with unencumbered ownership in the real estate for the Racetracks, including all improvements thereon.  The State of New York, as lessor, shall ground lease, for $1 a year, the Racetracks to the Reorganized Debtor, for a term coterminous with the racing franchise.  The Reorganized Debtor shall be solely responsible for each of the Racetracks, including, but not limited to, security, maintenance, and any all capital improvements. Without the approval of the State of New York, the Reorganized Debtor shall not be permitted to mortgage or otherwise encumber the leases for the premises.

**10. Claims Process.** On January 2, 2007, the Debtor in Possession filed Schedules. Pursuant to an order of the Bankruptcy Court, dated March 14, 2007, NYRA retained The Garden City Group, Inc. (the "Voting Agent") as its official claims and noticing agent. Pursuant to an order, dated April 13, 2007, the Bankruptcy Court established the deadline for all persons and entities to file proofs of claim against the Debtor for claims that arose on or prior to the Petition Date as June 4, 2007 at 5:00 p.m. (the "Bar Date").

Over 650 proofs of claim have been filed in the Chapter 11 Case, claiming a total in excess of $3.95 billion. The Debtor in Possession has begun the claims reconciliation process. This process includes identifying particular categories of proofs of claims that may be targeted for disallowance and expungement, reduction and allowance, or reclassification and allowance. To avoid possible double or improper recovery by claimants and to reduce the number of claims, the Debtor in Possession began filing a series of objections to various categories of Claims. On October 15, 2007, the Debtor in Possession filed its First Omnibus Objection to Proofs of Claim, objecting to duplicative and amended and superceded proofs of claim, proofs of claim inconsistent with liabilities listed on the Schedules, Claims for which a contingency has been resolved and there no longer exists any basis for liability to the holders of such Claims, Claims arising from prepetition customer programs that have been satisfied, and Claims filed after the Bar Date. On November 2, 2007, the Debtor filed its Second Omnibus Objection to Proofs of Claim and objected to additional claims on those bases and, among others, certain contingent claims where the contingency which could give rise to liability has not arisen and no liability is owed to the claimants, certain claims which are the subject of pending litigation (see Section VII.B.1. below). Additionally, as described in more detail in Section VII.B.1. below, the Debtor has filed an objection to and motion to estimate proofs of claim filed by the IRS. The Debtor in Possession anticipates filing additional objections to Claims and motions with respect to Claims, including motions to reclassify certain Claims as Penalty Claims and motions to estimate Claims pursuant to section 502(c) of the Bankruptcy Code.

# V. THE PLAN OF REORGANIZATION

This section of the Disclosure Statement summarizes the Plan, a copy of which is set forth as Exhibit A hereto. This summary is qualified in its entirety by reference to the Plan.

## A. Chapter 11 Generally

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan by a bankruptcy court binds, amongst others, the debtor, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor whether or not such creditor or equity holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, the order approving confirmation of a plan of reorganization discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

## B. Compromise and Settlement with the State of New York

The Plan incorporates, and is expressly conditioned upon effectiveness of, a proposed compromise and settlement of certain issues disputed by the Debtor and the State of New York including,

among other issues, resolution of (a) the State Motion to Dismiss, (b) the Adversary Litigation and (c) the State Claims, which, upon the Effective Date, shall be binding upon the Debtor, the State of New York, all Creditors, and all Entities receiving any payments or other distributions under the Plan. The terms of the compromise and settlement shall be explicitly set forth in the State Settlement Agreement, which shall be filed as an exhibit to the Plan Supplement no later than five (5) days prior to the Ballot Date. Without limiting the foregoing, the following describes certain of the principal provisions of the State Settlement Agreement; but the terms of the State Settlement Agreement shall in all events control to the extent of any inconsistencies between the Plan, Confirmation Order, or any other document, and the State Settlement Agreement:

1. **Franchise Agreement.** On or prior to the Effective Date, the State of New York and the Debtor shall enter into the Franchise Agreement providing NYRA with the Franchise for the period from January 1, 2008 up to and including December 31, 2037, as the same may be extended, pursuant to the Racing Law, as the same may be amended; provided, however, that the Governor and the Debtor may waive the execution and delivery of the Franchise Agreement in the event that the terms of the Franchise awarded to NYRA are set forth in legislation or otherwise.

2. **Resolution of the Adversary Litigation.** On the Effective Date, the Adversary Litigation shall be dismissed with prejudice.

3. **Resolution of the Motion to Dismiss.** On the Effective Date, the Motion to Dismiss shall be withdrawn with prejudice.

4. **Transfer of the Racetracks and Other Property.** On the Effective Date, and to the extent set forth in the State Settlement Agreement, NYRA shall convey all of its right, title and interest in, to and under the Racetracks and other property to the State of New York, an affiliate or agency of the State of New York or a public benefit corporation incorporated by the State of New York.

5. **NYRA Obligations.** On the Effective Date, (1) the State of New York shall provide the Debtor with funds, not to exceed Seventy-Five Million Dollars ($75,000,000.00), to enable the Debtor to satisfy Allowed Claims, (2) except as set forth in the State Settlement Agreement, the State of New York shall waive for the benefit of the Debtor's estate and the Reorganized Debtor any entitlement to receive distributions pursuant to the Plan with respect to the Allowed State Claims, except with respect to the New York State Tax Claim, and (3) the State of New York, directly or otherwise, shall provide reasonable and necessary funds to meet the Reorganized Debtor's operating obligations until such time that revenues associated with the operation of video lottery terminals at one or more of the Racetracks are available and delivered to NYRA, all as more fully set forth in the State Settlement Agreement; provided, however, that in the event that the amounts projected to be advanced by the State of New York and set forth in the State Settlement Agreement are in excess of amounts necessary to satisfy Allowed Claims or to support the Reorganized Debtor's operating and capital expenditure obligations, such amounts shall be reduced to the extent appropriate.

6. **Sale of Ancillary Property.** From and after the Effective Date, the Reorganized Debtor shall use its reasonable best efforts to sell the Ancillary Property (described in Section IV.D.4. above) in one or more arms' length transaction(s) and use the proceeds thereof to satisfy, in its sole and absolute discretion, either (i) operating and capital expenditure obligations of the Reorganized Debtor or (ii) obligations arising from or relating to the promissory note to be issued in connection with the Allowed IRS Claim, if any, in accordance with Section 11.1 of the Plan; provided, however, that in the event that such proceeds exceed amounts necessary to satisfy the Allowed IRS Claim, if any, or to support the Reorganized Debtor's operating and capital expenditure obligations, such excess proceeds shall reduce future obligations of the State of New York to support the Reorganized Debtor's operating and capital expenditure obligations prior to the operation of video lottery terminals at one or more of the Racetracks.

C.    **Administrative Expense Claims and Priority Tax Claims**

To confirm the Plan, Allowed Administrative Expense Claims and Allowed Priority Tax Claims must be paid in full or in a manner otherwise agreeable to the holders of such Claims.

1.    **Administrative Expense Claims.**  Administrative Expense Claims are any Claims constituting a cost or expense of administration of the Chapter 11 Case asserted or authorized to be asserted in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estate of the Debtor, any actual and necessary costs and expenses of operating the businesses of the Debtor in Possession, any costs and expenses of the Debtor in Possession for the management, maintenance, preservation, sale or other disposition of any assets, the administration and implementation of the Plan, the administration, prosecution or defense of Claims by or against the Debtor and for distributions under the Plan, any Claims for reclamation in accordance with section 546(c)(2) of the Bankruptcy Code allowed pursuant to Final Order, any Claims for compensation and reimbursement of expenses arising during the period from and after the Petition Date and prior to the Effective Date and awarded by the Bankruptcy Court in accordance with sections 328, 330, 331 or 503(b) of the Bankruptcy Code or otherwise in accordance with the provisions of the Plan, whether fixed before or after the Effective Date, and any fees or charges assessed against the Debtor's estate pursuant to section 1930, chapter 123, Title 28, United States Code.

On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtor shall (a) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim or (b) satisfy and discharge such Allowed Administrative Expense Claim in accordance with the terms and conditions of the agreements with respect thereto.

2.    **Professional Compensation and Reimbursement Claims.**  All Entities awarded compensation or reimbursement of expenses by the Bankruptcy Court in accordance with sections 328, 330 or 331 of the Bankruptcy Code or entitled to the priorities established pursuant to section 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, shall be paid in full, in Cash, the amounts allowed by the Bankruptcy Court (a) on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date upon which the Bankruptcy Court order allowing such Claim becomes a Final Order.

3.    **Payment of Priority Tax Claims**:  Priority Tax Claims are any Claims of a governmental unit against the Debtor entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

On the Effective Date, and except as provided in Article XI of the Plan, each holder of an Allowed Priority Tax Claim, including, without limitation, the holder of the New York State Tax Claim, shall be entitled to receive distributions in an amount equal to the full amount of such Allowed Priority Tax Claim.  At the option and discretion of the Debtor, which option shall be exercised, in writing, on or prior to the commencement of the Confirmation Hearing, such payment shall be made (a) in full, in Cash, on the Effective Date, (b) in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, in full, in Cash, in equal quarterly installments, commencing on the first (1st) Business Day following the Effective Date and ending on the fifth (5th) anniversary of the commencement of the Chapter 11 Case, together with interest accrued thereon at a rate to be determined by the Bankruptcy Court and set forth in the Confirmation Order, or (c) by mutual agreement of the holder of such Allowed Priority Tax Claim, including, without limitation, the holder of the New York State Tax Claim, and the Debtor or Reorganized Debtor, as the case may be.

4.    **Debtor in Possession Financing**:  On the Effective Date, in accordance with the State Settlement Agreement, (a) the Debtor shall be relieved of any and all obligations to satisfy or

otherwise repay the outstanding DIP Obligations, and (b) all Liens and other encumbrances granted pursuant to the DIP Orders with respect to property and interests in property claimed by the Debtor shall be deemed released.

### D.    Classification and Treatment of Claims and NYRA Equity Interests

Claims and NYRA Equity Interests are classified into nine (9) Classes under the Plan and the proposed treatment of Claims and NYRA Equity Interests in each Class is described in the Plan and in the discussion below.  The classification takes into account the different nature and priority of the Claims and NYRA Equity Interests.

**1.    Class 1: Priority Non-Tax Claims.**  Priority Non-Tax Claims are any Claims against the Debtor, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment in accordance with sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code, but only to the extent entitled to such priority.

Unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and the Reorganized Debtor, each holder of an Allowed Priority Non-Tax Claim shall receive in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Priority Non-Tax Claim, Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is possible.

Class 1 is unimpaired by the Plan.  The holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.  The Debtor estimates that the aggregate Allowed Priority Non-Tax Claims will be nominal.

**2.    Class 2: Secured Claims.**  Secured Claims are Claims, other than a State Claim, against the estate of the Debtor (a) secured by a Lien on Collateral or (b) subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Collateral or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or as otherwise agreed to, in writing, by (1) the Debtor and the holder of such Claim, subject to the consent of the State of New York and the Creditors' Committee, or (2) the Reorganized Debtor and the holder of such Claim, subject to the consent of the State of New York, as the case may be; provided, however, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as an Unsecured Claim unless, in any such case, the Class of which such Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

On the Effective Date, each holder of an Allowed Secured Claim shall receive in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Secured Claim one of the following distributions:  (a) the payment of such holder's Allowed Secured Claim in full, in Cash; (b) the sale or disposition proceeds of the property securing any Allowed Secured Claim to the extent of the value of their respective interests in such property; (c) the surrender to the holder or holders of any Allowed Secured Claim of the property securing such Claim; or (d) such other distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code.  The manner and treatment of each Secured Claim shall be determined by the Debtor and transmitted, in writing, to each holder of a Secured Claim at least five (5) days prior to the commencement of the Confirmation Hearing.

Class 2 is unimpaired by the Plan.  The holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

3. **Class 3: Unsecured Claims.** Unsecured Claims are Claims against the Debtor, other than an Administrative Expense Claim, a Secured Claim, a Priority Non-Tax Claim, a Priority Tax Claim, an Insured Litigation Claim, a State Claim, an IRS Claim, a PBGC Claim or a Penalty Claim.

Commencing on the Effective Date, each holder of an Allowed Unsecured Claim shall be entitled to receive on account of such Allowed Unsecured Claim distributions of Cash in an amount equal to one hundred percent (100%) of such holder's Allowed Unsecured Claim.

Class 3 is impaired by the Plan. The holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. **Class 4: Insured Litigation Claims.** Insured Litigation Claims are any Claims or causes of action against the Debtor for which the claimant or the Debtor may recover under an Insurance Policy.

a. _Assumption of Insurance Policies._ On the Effective Date, the Debtor shall assume and assign to the Reorganized Debtor all Insurance Policies relating to the period up to and including the Effective Date and each Insurance Carrier providing insurance pursuant to an Insurance Policy shall continue to provide coverage to the Reorganized Debtor in accordance with the terms and provisions set forth therein, including, without limitation, remitting to the Reorganized Debtor such amounts of excess collateral or surplus premiums as permitted in accordance with the Insurance Policy.

b. _Treatment of Allowed Insured Litigation Claims._ Unless otherwise mutually agreed upon by the holder of an Allowed Insured Litigation Claim and the Debtor or Reorganized Debtor, as the case may be, each holder of an Allowed Insured Litigation Claim shall be entitled, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Insured Litigation Claim, to proceed with the liquidation of such Claim, including any litigation pending as of the Petition Date, and seek recovery from the applicable Insurance Carrier; provided, however, that, except with respect to the payment of a deductible which may be required thereunder, under no circumstances, shall the holder of an Allowed Insured Litigation Claim recover from the Reorganized Debtor any amounts with respect to such Allowed Insured Litigation Claim.

c. _Impaired Class to Vote on the Plan._ Class 4 is impaired by the Plan. The holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. **Class 5: State Claims.** The State Claims are any and all Claims of the State of New York or proof of claims filed by the State of New York against the Debtor in the Chapter 11 Case.

On the Effective Date, and except as provided pursuant to the terms of the State Settlement Agreement, (a) all State Claims shall be deemed Allowed State Claims and (b) each holder of an Allowed State Claim, other than the holder of the New York State Tax Claim, shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Allowed State Claims under the Plan. To the extent that proofs of claim filed by the State of New York in this Chapter 11 Case exceed those set forth in the State Settlement Agreement, all such State Claims shall be deemed amended without any further act or action to conform to the amounts set forth in the State Settlement Agreement.

Class 5 is impaired by the Plan. The holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. **Class 6: PBGC Claims.** PBGC Claims are Claim asserted by the PBGC with respect to one or more of the Benefit Plans. (See also, Section IV.C. above.)

a. _Assumption of Benefit Plans._ On the Effective Date, the Reorganized Debtor shall assume the Benefit Plans and the obligations of contributing sponsor under ERISA,

including, without limitation, the obligation to make required minimum funding contributions pursuant to such Benefit Plans and ERISA.

b.  <u>Payments</u>.  On or prior to the Effective Date, the Debtor or the Reorganized Debtor, as the case may be, shall make payments into the Benefit Plans identified in Sections 1.23 (a)-(e) of the Plan, which, together with all such payments made during the period from the Petition Date up to and including the Effective Date, shall be attributable to, and in amount sufficient to satisfy (1) funding deficiencies for the years ended on or prior to December 31, 2006 (the accumulated amount of required minimum funding contributions for such years) and (2) normal costs for the year ended December 31, 2007 (the present value of the benefits accruing during 2007); <u>provided</u>, <u>however</u>, that, to the extent of any excess funds paid during the period up to and including the Effective Date, such excess funds shall be attributable to and shall reduce accumulated funding deficiencies, if any, for the plan year ending on December 31, 2007.

c.  <u>Satisfaction of Claims</u>.  On the Effective Date, and upon assumption of the Benefit Plans and payment of the amounts set forth in Section 10.1 (b) of the Plan, the PBGC Claims shall be deemed withdrawn, without prejudice to the rights of the PBGC or the true party in interest with respect to the Benefit Plans to take such action as may be appropriate with respect to future actions or inactions, as the case may be, of the Reorganized Debtor, as contributing sponsor, with respect to the Benefit Plans, during the period subsequent to the Effective Date in accordance with the terms and provisions of the Benefit Plans and ERISA.

d.  <u>Unimpaired Class</u>.  Class 6 is unimpaired by the Plan.  The holders of Claims in Class 6 are not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

**Class 7: IRS Claim.**  The IRS Claim is any and all Claims of the IRS or proofs of claim filed by the IRS against the Debtor in the Chapter 11 Case.

On the later to occur of the Effective Date and the first (1st) Business Day following the entry of a Final Order with respect to the allowance of the IRS Claim, the Reorganized Debtor shall execute and deliver to the IRS a promissory note in the amount of the Allowed IRS Claim, which promissory note shall bear interest at the rate of eight percent (8%) per annum, payable quarterly in arrears, payable in fifteen (15) equal quarterly installments commencing on March 31, 2008; <u>provided</u>, <u>however</u>, that, in the event that the IRS Claim does not become an Allowed Claim until subsequent to March 31, 2008, such equal quarterly installments shall commence on the earliest to occur of June 30, September 30, December 31 or March 31 thereafter and conclude on September 30, 2011; and, <u>provided</u>, <u>further</u>, that such promissory note may be prepaid, in whole or in part, at any time by the Reorganized Debtor, without penalty or premium, and any such prepayment shall be applied in the direct order of maturity thereof.

Class 7 is impaired by the Plan.  The holders of Claims in Class 7 are entitled to vote to accept or reject the Plan.

7.  **Class 8: Penalty Claims.**  Penalty Claims are any Claims for a fine, penalty, forfeiture, multiple, exemplary or punitive damages or otherwise not predicated upon compensatory damages and that is subject to subordination in accordance with section 726(a)(4) of the Bankruptcy Code or otherwise, as determined pursuant to a Final Order.

Commencing on the Effective Date, and provided that Allowed Unsecured Claims have been paid in full, each holder of an Allowed Penalty Claim shall be entitled to receive such holder's Pro Rata Share of Cash Available for Distribution.

Class 8 is impaired by the Plan.  The holders of Claims in Class 8 are entitled to vote to accept or reject the Plan.

8.      **Class 9: NYRA Equity Interests.**  NYRA Equity Interests are any equity interests in the Debtor represented by duly authorized, validly issued and outstanding shares of common stock or any interest or right to convert into such an equity interest or acquire any equity interest of the Debtor which was in existence immediately prior to or on the Petition Date.

On the Effective Date, the NYRA Equity Interests shall be cancelled and the holders of NYRA Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such NYRA Equity Interests under the Plan.

Class 9 is impaired by the Plan.  The holders of Claims in Class 9 are deemed to reject the Plan and are not entitled to vote to accept or reject it.

9.      **Controversy Concerning Impairment.**  In the event of a controversy as to whether any Class of Claims or NYRA Equity Interests is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

E.      **Provisions for the Treatment of Disputed Claims**

1.      **Objections to Claims and Prosecution of Disputed Claims.**  The Reorganized Debtor shall object to the allowance of Claims or NYRA Equity Interests filed with the Bankruptcy Court with respect to which they dispute liability, priority or amount, including, without limitation, objections to Claims which have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses and counterclaims shall be litigated to Final Order; <u>provided</u>, <u>however</u>, that the Reorganized Debtor (within such parameters as may be established by the Board of Directors of the Reorganized Debtor) shall have the authority to file, settle, compromise or withdraw any objections to Claims or NYRA Equity Interests.  Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtor shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than thirty (30) days following the Effective Date or such later date as may be approved by the Bankruptcy Court.  The Reorganized Debtor shall consult with the State of New York on a regular basis concerning the investigation, prosecution and proposed settlement of Disputed Claims and shall provide written reports to the State of New York on a quarterly basis regarding the status of the Disputed Claims.

2.      **Estimation of Claims.**  Unless otherwise limited by an order of the Bankruptcy Court, the Reorganized Debtor may at any time request the Bankruptcy Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or the Reorganized Debtor previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; <u>provided</u>, <u>however</u>, that, if the estimate constitutes the maximum limitation on such Claim, the Debtor or the Reorganized Debtor, as the case may be, may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, <u>provided</u>, <u>further</u>, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

**3. Payments and Distributions on Disputed Claims.**

a. _Disbursing Agent_. NYRA has designated the Reorganized Debtor, solely in its capacity as agent of the Debtor to effectuate distributions pursuant to the Plan, to be the Disbursing Agent. NYRA anticipates that the Confirmation Order will appoint the Reorganized Debtor as Disbursing Agent without requiring the Reorganized Debtor to obtain a bond.

b. _Disputed Claims Reserve_. From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by Final Order, the Disbursing Agent shall reserve and hold in escrow for the benefit of each holder of a Disputed Claim, Cash, in an amount equal to the distributions which would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the Disputed Claim Amount, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim may ultimately become an Allowed Claim or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Reorganized Debtor. Any Cash reserved and held for the benefit of a holder of a Disputed Claim shall be treated as a payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash in the event the Disputed Claim ultimately becomes an Allowed Claim. No payments or distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

c. _Allowance of Disputed Claims_. At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the Disbursing Agent shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan together with any interest which has accrued on the amount of Cash (net of any expenses, including any taxes of the escrow, relating thereto), but only to the extent that such interest is attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order but in no event more than ninety (90) days thereafter. The balance of any Cash previously reserved shall be included in Cash Available for Distribution and be included in future calculations of Cash to holders of Allowed Penalty Claims in accordance with the terms and provisions of the Plan.

**F. Distributions Pursuant to the Plan**

**1. Establishment of Disbursement Account(s).** On or prior to the Effective Date, the Debtor shall establish one or more segregated bank accounts in the name of the Reorganized Debtor as Disbursing Agent under the Plan, which accounts shall be trust accounts for the benefit of Creditors pursuant to the Plan and utilized solely for the investment and distribution of Cash consistent with the terms and conditions of the Plan. On or prior to the Effective Date, and periodically thereafter, the Debtor shall deposit into such Disbursement Account(s) all Cash of the Debtor, less amounts reasonably determined by the Debtor or the Reorganized Debtor, as the case may be, as necessary to fund the ongoing implementation of the Plan and operations of the Reorganized Debtor.

**2. Time and Manner of Distributions.** Distributions under the Plan shall be made to each holder of an Allowed Unsecured Claim as follows:

a. _Initial Distributions of Cash_. On or as soon as practicable after the Effective Date, but in no event later than January 31, 2008, the Disbursing Agent shall (i) distribute to each holder of an Allowed Administrative Expense Claim, Allowed Priority Claim, Allowed Secured Claim and Allowed Unsecured Claim (or cause to be distributed to each holder of a Disputed Claim in accordance with Section 14.3 of the Plan) an amount equal to such holder's Allowed Claim and (2) distribute to each holder of an Allowed Penalty Claim, an amount equal to such holder's Pro Rata Share,

if any, of the Cash Available for Distribution; provided, however, that, under no circumstances, shall any distributions be made, or caused to be made, on account of Allowed Penalty Claims until such time as Allowed Unsecured Claims have been paid in full, or provisions have been made to pay such Claims in full.

        b.      Subsequent Distributions of Cash. On the first (1st) Business Day that is after the close of one (1) full calendar quarter following the date of the initial Effective Date distributions, and, thereafter, on each first (1st) Business Day following the close of two (2) full calendar quarters, the Distributing Agent shall distribute to each holder of an Allowed Penalty Claim, an amount equal to such Creditor's Pro Rata Share, if any, of Cash Available for Distribution.

        c.      Manner of Payment under the Plan. Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Reorganized Debtor shall be made, at the election of the Reorganized Debtor, by check drawn on a domestic bank or by wire transfer from a domestic bank; provided, however, that no Cash payments shall be made to a holder of an Allowed Claim until such time, if ever, as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

        **3.**      **Setoffs.** The Reorganized Debtor may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim (except the New York State Tax Claim) and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim), the claims, rights and causes of action of any nature the Debtor or the Reorganized Debtor may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, Debtor in Possession or the Reorganized Debtor of any such claims, rights and causes of action that the Debtor, Debtor in Possession or the Reorganized Debtor may possess against such holder; and, provided, further, that nothing contained in the Plan is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559 or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment.

        **4.**      **Allocation of Plan Distributions Between Principal and Interest.** To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

      **G.**      **Prosecution of Claims Held by the Debtor**

        From and after the Effective Date, the Reorganized Debtor shall, as a representative of the estate of the Debtor, litigate any claims or causes of action that constituted assets of the Debtor or Debtor in Possession, including, without limitation, any avoidance or recovery actions under sections 541, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code and any other causes of action, rights to payments of claims that may be pending on the Effective Date or instituted by the Debtor or Debtor in Possession thereafter, to a Final Order, and the Reorganized Debtor may compromise and settle such claims, upon approval of the Bankruptcy Court. The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be remitted to the Disbursing Agent for distribution in accordance with the terms and provisions of the Plan. At this time, however, the Debtor is unaware of and does not anticipate commencing any such actions.

      **H.**      **Executory Contracts, Unexpired Leases and Benefit Plans**

        **1.**      **Assumption of Executory Contracts and Unexpired Leases.** On the Effective Date, the Debtor shall assume all executory contracts and unexpired leases that have not expired by their own terms on or prior to the Confirmation Date, which have not been assumed and assigned or rejected

with the approval of the Bankruptcy Court, or which are not the subject of a motion to assume the same pending as of the Confirmation Date; provided, however, that any executory contracts or unexpired leases set forth on Exhibit A to the Plan shall be deemed rejected by the Debtor in Possession on the Confirmation Date and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

        2.      **Cure of Defaults.**  Any monetary amounts required as cure payments on each executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or upon such other terms and dates as the parties to such executory contracts or unexpired leases otherwise may agree.  In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of the Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption arises, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be subject to the jurisdiction of the Bankruptcy Court and made following the entry of a Final Order resolving such dispute.

        3.      **Rejection Damage Claims.**  If the rejection of an executory contract or unexpired lease by the Debtor in Possession under the Plan results in damages to the other party or parties to such contract or lease, any claim for such damages, if not already evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor, or its properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon attorneys for the Debtor on or before thirty (30) days after the latest to occur of (a) the Confirmation Date, and (b) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or unexpired lease.

        4.      **Indemnification and Reimbursement Obligations.**  For purposes of the Plan, (a) the obligations of the Debtor to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Petition Date shall be assumed by the Reorganized Debtor and (b) indemnification obligations of the Debtor arising from services as officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims to the extent previously authorized by a Final Order.

        5.      **Termination of Benefit Plans**:  Notwithstanding anything contained in the Plan to the contrary, from and after the Effective Date, the Debtor or the Reorganized Debtor, as the case may be, shall be entitled to terminate any and all Benefit Plans in accordance with the terms and provisions of the documents and instruments relating thereto and applicable law; provided, however, that, until the termination of any such Benefit Plan, the Debtor or the Reorganized Debtor, as the case may be, shall (i) continue to perform any and all of their administrative obligations thereunder and (ii) with respect to the Benefit Plans, continue to perform its obligations under ERISA and the IRC, including the satisfaction of minimum funding contributions and the payment of statutory insurance premiums.  (See also, Section IV.C. above.)

**I.**      **Reservation of "Cram Down" Rights**

        In the event that any impaired Class of Claims or NYRA Equity Interests shall fail to accept, or be deemed to reject, the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtor reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or amend the Plan.

**J.**      **Conditions Precedent to the Effective Date of the Plan**

        The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent.  To the extent practicable or legally

permissible, each condition may be waived, in whole or in part, by the Debtor with the consent of the Governor and the Creditors' Committee. Any such waiver may be effected at any time by filing a notice thereof with the Bankruptcy Court.

        **1.**      **Entry of the Confirmation Order.** The Clerk of the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtor, the State of New York and the Creditors' Committee, and the effectiveness of the Confirmation Order shall not have been stayed within the ten (10) days following the entry thereof.

        **2.**      **Execution of Actions Relating to the Granting of the Franchise.** The Legislature shall have passed legislation granting the Franchise to the Debtor for the period from January 1, 2008 up to and including December 31, 2037, and the Governor shall have enacted such legislation into law.

        **3.**      **Execution of the Franchise Agreement.** The State of New York and the Debtor shall have entered into the Franchise Agreement; provided, however, that the Governor and the Debtor may waive the execution and delivery of the Franchise Agreement in the event that the terms of the Franchise awarded to NYRA are set forth in legislation or otherwise.

        **4.**      **Execution of the State Settlement Agreement.** The State of New York and the Debtor shall have entered into the State Settlement Agreement, which agreement shall have become effective in accordance with its terms.

        **5.**      **Execution of Documents; Other Actions.** All other actions and documents necessary to implement the Plan and/or required by the Racing Law, as it shall be amended, shall have been effected or executed, including without limitation, adoption of the Code of Conduct, the Reorganized Debtor By-laws and the Reorganized Debtor Certificate of Incorporation and the execution and delivery of one or more leases for the leasing of the Racetracks and other property to the Reorganized Debtor for the length of the Franchise awarded.

        **6.**      **Allowed Claim Threshold.** The aggregate amount of Allowed Unsecured Claims shall be equal to or less than Twenty Six Million Dollars ($26,000,000.00).

        **7.**      **IRS Claim.** The IRS Claim shall be allowed or estimated for purposes of allowance in accordance with section 502(c) of the Bankruptcy Code in an amount equal to or less than Twenty Five Million Dollars ($25,000,000.00).

        **K.**      **Dissolution of the Creditors' Committee**

        On the Effective Date, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the reorganization, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

        **L.**      **The Reorganized Debtor**

        **1.**      **Provision for Management.**

        a.      Reorganized Debtor's Trustees: From and after the Effective Date, and as set forth in the Racing Law, as it shall be amended, NYRA's Board of Trustees shall be comprised of nineteen (19) members: thirteen (13) of which shall be elected by the Board of Trustees, two (2) of which shall be appointed by the Governor, and one (1) of which shall be selected by each of the following Entities; the Speaker of the Assembly, the Majority Leader of the Senate, NYTHA and the New York Thoroughbred Breeder's Association. Each elected Trustee (a) must be over the age of eighteen (18) and

be a citizen of the United States of America, and (b) must be approved by the Racing and Wagering Board, which approval shall not be required for re-election of incumbent nominees to the Board of Trustee. Except as set forth herein, provisions regarding members of the Board of Trustees and voting requirements of the Board of Trustees shall be as set forth in the Reorganized Debtor By-Laws.

        b.    <u>Reorganized Debtor's Committees</u>:  From and after the Effective Date, the majority of the Board of Trustees may appoint committees, including an executive committee, and the existence and powers and responsibilities of such committees shall be consistent with those set forth in the Reorganized Debtor By-laws.  Without limiting the foregoing, the Board of Trustees shall establish (a) a compensation committee to fix salary guidelines, such guidelines to be consistent with the operation of other first class thoroughbred racing operations in the United States, (b) a finance committee to prepare annual operating and capital budgets for each of the Racetracks, and (c) a nominating committee to nominate any new directors to be designated by the Debtor or the Reorganized Debtor to replace the existing directors designated by the Debtor or the Reorganized Debtor; <u>provided</u>, <u>however</u>, that each of the aforementioned committees shall include at least one of the Trustees designated by the Governor.

        c.    <u>Reorganized Debtor's Officers</u>:  From and after the Effective Date, the Reorganized Debtor shall determine all officers of the Reorganized Debtor.

    **2.**    **<u>Corporate Form.</u>**

        a.    <u>Amendment of Articles of Incorporation/Charter</u>:  On or prior to the Effective Date, the Debtor shall file such documents with the State of New York as are necessary to cause the conversion of the Debtor on the Effective Date from a non-profit corporation to a New York State not-for-profit corporation, under the general supervision of the Office of the Attorney General, pursuant to and as set forth in the Racing Law, as it shall be amended, or such other applicable law.

        b.    <u>Corporate Action</u>:  On the Effective Date, the adoption of the Reorganized Debtor's Certificate of Incorporation and the Reorganized Debtor's By-laws shall be authorized and approved in all respects, in each case without further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtor or the Reorganized Debtor.  Subject to the Racing Law, as it shall be amended, the cancellation of all NYRA Equity Interests, employment agreements, and other matters provided under the Plan involving the corporate structure of the Reorganized Debtor or corporate action by the Reorganized Debtor shall be deemed to have occurred, be authorized, and shall be in effect without requiring further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtor or the Reorganized Debtor.  Without limiting the foregoing, from and after the Confirmation Date, the Debtor, and the Reorganized Debtor may take any and all actions deemed appropriate in order to consummate the transactions contemplated herein.

    **M.**    **<u>Retention of Jurisdiction</u>**

    The Bankruptcy Court shall retain and have exclusive jurisdiction over, among other specified matters, any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Case or the Plan unless any such agreements or documents contain express enforcement and dispute resolution provisions to the contrary, in which case, such provisions shall govern.

    **N.**    **<u>Miscellaneous Provisions</u>**

    **1.**    **<u>Title to Assets.</u>**  Except as otherwise provided in the Plan or the State Settlement Agreement, on the Effective Date, title to all assets and properties shall vest in the Reorganized Debtor free and clear of all Liens and in accordance with section 1141 of the Bankruptcy Code (subject to the transfers contemplated by the State Settlement Agreement), and the Confirmation Order shall be a judicial

determination of discharge of the liabilities of the Debtor and the Debtor in Possession except as provided in the Plan.

On the Effective Date, NYRA and the State of New York shall enter into one or more leases providing for the lease of the Racetracks and other property to NYRA. Without the prior written consent of the Governor, or as expressly set forth in the State Settlement Agreement, NYRA shall not be permitted to mortgage or otherwise encumber the lease of the Racetracks or other property. Notwithstanding the foregoing, in accordance with the terms and the provisions of the State Settlement Agreement, the Debtor and the Reorganized Debtor, in its sole and absolute discretion, may (a) incur indebtedness or (b) grant Liens on and security interests in the Reorganized Debtor's assets.

2.      **Exemption from Transfer Taxes.**  Pursuant to section 1146(c) of the Bankruptcy Code, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the sale of the Ancillary Property, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

3.      **Discharge of Debtor.**  Except as otherwise provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, on the latest to occur of (a) the Effective Date, (b) the entry of a Final Order resolving all Claims in the Chapter 11 Case and (c) the final distribution made to holders of Allowed Claims in accordance with Article XVIII of the Plan, all Claims against and NYRA Equity Interests in the Debtor and Debtor in Possession, shall be discharged and released in full; provided, however, that, the Bankruptcy Court may, upon request by the Reorganized Debtor, and notice and a hearing, enter an order setting forth that such Claims and NYRA Equity Interests shall be deemed discharged and released on such earlier date as determined by the Bankruptcy Court. All Persons and Entities shall be precluded from asserting against the Debtor, the Debtor in Possession, their successors or assigns, including, without limitation, the Reorganized Debtor, their agents and employees, or their respective assets, properties or interests in property, any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not the facts or legal bases therefor were known or existed prior to the Confirmation Date regardless of whether a proof of Claim or NYRA Equity Interest was filed, whether the holder thereof voted to accept or reject the Plan or whether the Claim or NYRA Equity Interest is an Allowed Claim.

4.      **Injunction on Claims.  Except as otherwise expressly provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, all Persons or Entities who have held, hold or may hold Claims or any other debt or liability that is discharged or NYRA Equity Interests or other right of equity interest that is terminated or cancelled pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or NYRA Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against the Debtor, the Debtor in Possession or the Reorganized Debtor, the Debtor's estate, the State of New York or their respective properties or interests in properties, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor, the Debtor in Possession or the Reorganized Debtor, the Debtor's estate, the State of New York or their respective properties or interests in properties, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor, the Debtor in Possession or the Reorganized Debtor, the State of New York or against their respective property or interests in property, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559 or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any**

kind against any obligation due from the Debtor, the Debtor in Possession or the Reorganized Debtor, the State of New York or against their respective property or interests in property, with respect to any such Claim or other debt or liability that is discharged or NYRA Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan; **provided, however,** that such injunction shall not preclude the United States of America, any state or any of their respective police or regulatory agencies from enforcing their police or regulatory powers; and, **provided, further,** that, except in connection with a properly filed proof of claim, the foregoing proviso does not permit the United States of America, any state or any of their respective police or regulatory agencies from obtaining any monetary recovery from the Debtor, the Debtor in Possession or the Reorganized Debtor or their respective property or interests in property with respect to any such Claim or other debt or liability that is discharged or NYRA Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan, including, without limitation, any monetary claim or penalty in furtherance of a police or regulatory power. Such injunction (y) shall extend to all successors of the Debtor and Debtor in Possession, the State of New York and the Creditors' Committee and its members, and their respective properties and interests in property; **provided, however,** that such injunction shall not extend to or protect members of the Creditors' Committee and their respective properties and interests in property for actions based upon acts outside the scope of service on the Creditors' Committee, and (z) is not intended, nor shall it be construed, to extend to the assertion, the commencement or the prosecution of any claim or cause of action against any present or former member of the Creditors' Committee and their respective properties and interests in property arising from or relating to such member's pre-Petition Date acts or omissions.

5. **Term of Existing Injunctions or Stays.** Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Case pursuant to sections 105, 362 or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until entry of an order closing the Chapter 11 Case or such other Final Order of the Bankruptcy Court.

6. **Limited Release of Directors, Officers and Employees.** No claims of the Debtor's estate against its present and former officers, directors, employees, consultants and agents and arising from or relating to the period prior to the Petition Date are released by this Plan. As of the Effective Date, the Debtor and the Debtor in Possession shall be deemed to have waived and released its present and former directors, officers, employees, consultants and agents who were directors, officers, employees, consultants or agents, respectively, at any time during the Chapter 11 Case, from any and all claims of the Debtor's estate arising from or relating to the period from and after the Petition Date; **provided, however,** that this provision shall not operate as a waiver or release of (a) any Person (i) named or subsequently named as a defendant in any action commenced by or on behalf of the Debtor in Possession, and (ii) adjudicated or subsequently adjudicated by a court of competent jurisdiction to have engaged in acts of dishonesty or willful misconduct detrimental to the interests of the Debtor or (b) any claim (i) with respect to any loan, advance or similar payment by the Debtor to any such person, (ii) with respect to any contractual obligation owed by such person to the Debtor, (iii) relating to such person's knowing fraud; and, **provided, further,** that the foregoing is not intended, nor shall it be construed, to release any of the Debtor's claims that may exist against the Debtor's directors and officers liability insurance.

7. **Exculpation.** The Debtor, the Reorganized Debtor, the State of New York, the Creditors' Committee, and any of their respective directors, officers, officials, employees, members, attorneys, consultants, advisors and agents (acting in such capacity), shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Chapter 11 Case, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any

compromises or settlements contained therein, the Disclosure Statement related thereto or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of Section 28.6 of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct. Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**8.** **Injunction on Actions.** **Except as provided in the Plan, as of the Effective Date, all non-Debtor entities are permanently enjoined from commencing or continuing in any manner, any action or proceeding, whether directly, derivatively, on account of or respecting any claim, debt, right or cause of action of the Debtor, the Debtor in Possession or the Reorganized Debtor which the Debtor, the Debtor in Possession or the Reorganized Debtor, as the case may be, retain sole and exclusive authority to pursue in accordance with Section 15.1 of the Plan or which has been released pursuant to the Plan, including, without limitation, pursuant to Sections 2.1 and 28.5 of the Plan; provided, however, that, except as provided in Section 28.3 of the Plan, such injunction is not intended, nor shall it be construed to, apply to any proceeding not involving property of the Debtor's estate that a non-Debtor Entity may bring against another non-Debtor Entity.**

**9.** **Post-Effective Date Fees and Expenses.** From and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, retain such professionals and pay the reasonable professional fees and expenses incurred by the Reorganized Debtor related to implementation and consummation of the Plan.

The Confirmation Order will provide that the Debtor or the Reorganized Debtor, as the case may be, will be responsible for the filing of all disbursement reports and the payment of fees and charges under 28 U.S.C. § 1930, and, if applicable, any interest under 31 U.S.C. § 3717, until the entry of a final decree closing the Chapter 11 Case.

**O.** **Modification, Revocation or Withdrawal of the Plan**

**1.** **Modification of Plan.** The Debtor reserves the right to amend or modify the Plan, the Plan Supplement or any exhibits to the Plan at any time prior to the entry of the Confirmation Order. Upon entry of the Confirmation Order, the Debtor may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

**2.** **Revocation or Withdrawal.** The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtor. If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by the Debtor or any other Entity, including the State of New York, or to prejudice in any manner the rights of the Debtor or any other Entity in any further proceedings involving the Debtor or the State of New York.

# VI. FINANCIAL INFORMATION AND PROJECTIONS

## A. Purpose of and Responsibility for the Projections

As a condition to confirmation of a chapter 11 plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtor's management has, through the development of financial projections (the "Projections"), analyzed the ability of the Debtor to meet its obligations under the Plan while maintaining sufficient liquidity and capital resources to conduct its business. The Projections were also prepared to assist each holder of an Allowed Claim in determining whether to accept or reject the Plan.

The Projections should be read in conjunction with the assumptions, qualifications, and footnotes to tables containing the Projections set forth herein. The Projections were prepared in good faith based upon assumptions believed to be reasonable. While these Projections are representative of management's view as of the date of the Disclosure Statement, any future changes, particularly as a result of negotiations with the State of New York, may materially impact the ability of the Debtor to achieve the Projections.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTOR'S INDEPENDENT ACCOUNTANT HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE PROJECTIONS HAVE BEEN PREPARED EXCLUSIVELY BY THE DEBTOR'S MANAGEMENT. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL. THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

## B. Summary of Significant Assumptions

**1. Plan Terms and Consummation.** The Projections assume an Effective Date of December 31, 2007, with Allowed Claims and Equity Interests treated in accordance with the treatment provided in the Plan with respect to such Allowed Claims and Equity Interests. If consummation of the Plan does not occur on or before December 31, 2007, there is no assurance that, among other things, the Debtor will be capable of conducting business due to the expiration of the Franchise.

**2.    Assumptions Preceding the Effective Date.**  As a basis for the Projections, management has estimated the operating results for the period of time leading up to the Effective Date. Specifically, management has assumed that business will follow normal course up to the Effective Date.

**3.    Transfer of the Racetracks and Other Property.**  The Projections assume that, on the Effective Date, the Debtor will transfer all of its right, title, and interest in and to the Racetracks and other property more particularly described in the State Settlement Agreement to the State of New York and receive in return (a) the State of New York's agreement that it will not seek payment from the Debtor or the Reorganized Debtor with respect to the State Claims (except with respect to the New York State Tax Claim), (b) $75 million in cash, and (c) the advances referred to in Section VI.B.4. below. Additionally, the Projections assume that the Reorganized Debtor will retain title to approximately 17.5 acres of the Ancillary Property located adjacent to Aqueduct which will be disposed of in accordance with Section 2.1(f) of the Plan.  (See Section V.B.6. above.)  In the event that the projected amounts are in excess of that necessary to satisfy Allowed Claims or to support the Reorganized Debtor's operating and capital expenditure obligations, as the case may be, such amounts shall be reduced to the extent appropriate.

**4.    Franchise Agreement and State Support Payments.**  The Projections assume the Debtor receives a new 30-year franchise to conduct thoroughbred racing.  Prior to the projected opening of the VLT Facility, the Reorganized Debtor is projected to continue to incur operating losses. As a result, the Projections assume that the State of New York will provide the Reorganized Debtor with support advances in the form of a $30 million loan, subject to the terms of the State Settlement Agreement, of which $20 million will be advanced immediately after the Effective Date and the remaining $10 million will be advanced on or before June 30, 2008.  In the event that the VLT Facility opening is delayed beyond January 1, 2009, the Debtor would require additional support advances of approximately $2.5 million per month in order to continue operating its racing business without interruption.  In the event that the projected amounts are in excess of that necessary to support the Reorganized Debtor's operating and capital expenditure obligations, such amounts shall be reduced to the extent appropriate.

**5.    Ancillary Property Sale.**  The Projections assume that the Reorganized Debtor will sell the Ancillary Property and receive proceeds of $15 million on or before December 31, 2008.  In the event that such proceeds exceed amounts necessary to satisfy the IRS Note, see Section VI.B.13. below, or to support racing operations, such excess proceeds shall reduce future obligations of the State of New York to support NYRA's operating and capital expenditure obligations prior to the operation of video lottery terminals at one or more of the Racetracks.  (See Section VI.B.4. above.)

**6.    Handle Projections.**  Thoroughbred horse racing over the last decade has experienced a period of limited growth.  Across the industry, the total handle over this period has increased only approximately 2% annually, which is inline with inflation and represents zero growth in real terms.  Management has taken this into account and projects a 1.5% annual growth rate in Handle for the period between 2006 and 2012.  Management's projections are supported by a statistical analysis that projects total Handle using the average number of horses per race ("average field size") as the primary driver and the gross amount of Purses paid per race and the average number of races per day with at minimum seven participants ("efficiency of the race card") as lesser, but still significant, drivers.  The Debtor believes that the most significant factor behind the projected 1.5% increase between 2006 and 2012 will be the opening of the VLT Facility.  Because a significant portion of VLT revenue will be dedicated to Purses, the Debtor projects an appreciable increase (approximately 25% or $30 million in the first full year of VLT operation) in Purses that will be paid.

**7.    Revenue Mix.**  Over the last twenty years, the Debtor has experienced a significant decrease in on-track attendance and has become more and more reliant on off-track revenue

sources, such as exporting its signal to other racetracks and off-track betting parlors. Management's revenue Projections assume a continuation of this trend with a slight decrease in on-track handle. Simulcast rates, the amounts charged to receive the Debtors signal, are projected to rise modestly from 4.5% of simulcast handle in 2007 to 4.9% in 2012. The assumption of rising simulcast rates is based on the fact that several large industry participants have indicated that they intend to increase their simulcast rates as a result of the changing dynamics of the industry. The Debtor, having one of the most valuable signals in the country, expects to benefit from this trend in the form of higher rates. Additionally, online wagering represents a significant opportunity for the Reorganized Debtor to increase revenue. While management has made conservative projections for internet wagering via the Debtor's website (only 1.1% of total handle by 2012), there is the potential for improved results due to higher than anticipated growth in its online strategy.

        8.     **VLT Timing and Win Per Machine.** The Projections assume that the VLT Facility opens on January 1, 2009, with 4,500 VLT machines, each with an average win per machine per day starting at $275 in 2009 and growing to $503 by 2012. The projected amount of VLT monies available to NYRA to fund racing operations and increase purses is projected to be approximately $47 million in the first full year of operation. Management has based its estimate upon industry research and comparative analysis.

        9.     **Operating Expenses.** The Debtor's workforce is highly unionized and the majority of its operating expenses are fixed. Management projects operating costs to increase at 3% per year, plus a one-time $10 million increase over the first three years.

      10.     **Pension.** The Projections assume that the Debtor makes a $17.4 million payment on account of its Benefit Plans on or before the Effective Date and continues to pay its Benefit Plan obligations in the normal course as required under ERISA and IRC.

      11.     **Capital Investment.** The Debtor's current capital expenditure plan calls for an investment of approximately $107 million over a five-year period and is largely driven by the projected availability of funds. The Projections assume that the vast majority of these capital investments will be funded from VLT cash flows as outlined in the 2007 MOU, and therefore, these monies and capital improvements are not reflected in the Reorganized Debtor's projected financial statements. However, if the opening of VLT operations are delayed or are lower than projected, the Reorganized Debtor may be forced to decrease its capital investment plan. Conversely, if VLT cash flows exceed expectations or if the Reorganized Debtor is able to obtain financing for capital investments, the Reorganized Debtor's capital investment plan may be accelerated.

      12.     **Estimated Claims and Recoveries.** The Projections assume that the Debtor will have sufficient funds to pay all holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, Allowed Unsecured Claims, PBGC Claims, and the aggregate amount for which NYRA may be responsible pursuant to the applicable Insurance Policy with respect to the Allowed Insurance Litigation Claims in full at the Effective Date or at the time otherwise provided for in Articles V – X of the Plan.

      13.     **IRS Note.** The Plan provides that the IRS Claim will be satisfied through the issuance of an eight percent (8%) promissory note, payable in fifteen (15) equal, quarterly installments of principal and interest, with the final payment due September 30, 2011. While NYRA believes its exposure and the amount of the IRS Claim to be less, the Projections assume that such promissory note is issued in the amount of $15 million, subject to the opportunity to prepay such promissory note, without penalty or premium.

# THE NEW YORK RACING ASSOCIATION INC.
## PROJECTED BALANCE SHEET
### December 31, 2007
(Unaudited)

(in thousands of dollars)

| ASSETS | Estimated at Effective Date | | Reorganization Adjustments | | Reorganized |
|---|---|---|---|---|---|
| **CURRENT ASSETS** | | | | | |
| Cash (operating & vault) | $ 18,369 | $ | (7,500) | a | $ 10,869 |
| Segregated & restricted cash | 24,251 | | | | 24,251 |
| Accounts receivable net | 25,073 | | 1,871 | b | 26,944 |
| Prepaid expenses | 5,000 | | | | 5,000 |
| **Total current assets** | 72,693 | | (5,629) | | 67,064 |
| Property, plant and equipment, net | 56,391 | | (52,289) | c | 4,102 |
| Other assets | 17,345 | | (10,000) | c | 7,345 |
| **TOTAL ASSETS** | $ 146,429 | $ | (67,918) | | $ 78,511 |
| | | | | | |
| **LIABILITIES AND EQUITY** | | | | | |
| **LIABILITIES NOT SUBJECT TO COMPROMISE** | | | | | |
| **CURRENT LIABILITIES** | | | | | |
| Accounts payable & other accrued expenses | $ 43,345 | $ | (27,500) | d | $ 15,845 |
| Deferred income | - | | | | - |
| Horseman's & other restricted accounts | 24,251 | | | | 24,251 |
| Accrued stakes & purses | - | | 21,637 | e | 21,637 |
| **Total current liabilities** | 67,596 | | (5,863) | | 61,733 |
| **LONG TERM LIABILITIES** | | | | | |
| Pension & Other post retirement benefits | - | | 81,272 | f | 81,272 |
| IRS note | - | | 15,000 | g | 15,000 |
| Long term & state debt | 121,249 | | (121,249) | | - |
| **Total long term liabilities** | 121,249 | | (24,977) | | 96,272 |
| **LIABILITIES SUBJECT TO COMPROMISE** | 154,592 | | (154,592) | h | - |
| | | | - | | |
| **EQUITY** | (197,008) | | 117,514 | | (79,494) |
| | | | - | | |
| **TOTAL LIABILITIES AND EQUITY** | $ 146,429 | $ | (67,918) | | $ 78,511 |

**Notes:**

a  Cash from operations allocated to pay claims
b  Lien Games obligation  (currently reflected as an off-set to accounts receivable)
c  Net book value of land, buildings and related capitalized costs to be transferred to State
d  Estimated amount of pre-petition liabilities not subject to compromise to be satisfied under the Plan
e  Accrued stakes & purses to be assumed and paid in the normal course
f  Estimated book value of long term pension and other post retirement benefit liabilities to be assumed and paid in the normal course
g  IRS note
h  Book value of liabilities subject to compromise per August 2007 Monthly Operating Report

# THE NEW YORK RACING ASSOCIATION INC.
## PROJECTED BALANCE SHEETS
### December 31,
(Unaudited)

(in thousands of dollars)

| ASSETS | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| **CURRENT ASSETS** | | | | | |
| Cash (operating & vault) | $ 25,667 | $ 19,678 | $ 15,350 | $ 17,441 | $ 23,951 |
| Segregated & restricted cash | 24,251 | 32,463 | 33,542 | 34,911 | 35,793 |
| Accounts receivable net | 26,152 | 28,057 | 28,893 | 29,917 | 30,452 |
| Prepaid expenses | 5,000 | 5,150 | 5,305 | 5,464 | 5,628 |
| **Total current assets** | 81,070 | 85,348 | 83,090 | 87,733 | 95,824 |
| | | | | | |
| Property, plant and equipment - net | 9,871 | 11,377 | 12,783 | 14,089 | 15,295 |
| | | | | | |
| Other assets | 7,345 | 7,345 | 7,345 | 7,345 | 7,345 |
| | | | | | |
| **TOTAL ASSETS** | $ 98,286 | $ 104,070 | $ 103,218 | $ 109,167 | $ 118,464 |
| | | | | | |
| **LIABILITIES AND EQUITY** | | | | | |
| | | | | | |
| **CURRENT LIABILITIES** | | | | | |
| Accounts payable & other accrued expenses | $ 15,616 | $ 16,202 | $ 17,126 | $ 17,578 | $ 18,026 |
| Deferred income | 2,000 | 2,060 | 2,122 | 2,186 | 2,251 |
| Horseman's & other restricted accounts | 24,251 | 32,463 | 33,542 | 34,911 | 35,793 |
| Accrued stakes & purses | 20,637 | 20,637 | 20,637 | 20,637 | 20,637 |
| **Total Current Liabilities** | 62,504 | 71,362 | 73,427 | 75,312 | 76,707 |
| | | | | | |
| **LONG TERM LIABILITIES** | | | | | |
| Pension & other post retirement benefits | 72,472 | 67,272 | 61,872 | 56,172 | 52,972 |
| IRS note | 11,425 | 7,555 | 3,367 | - | - |
| Long term & state debt | 31,017 | 32,280 | 33,595 | 34,964 | 36,389 |
| **Total long term liabilities** | 114,914 | 107,107 | 98,834 | 91,136 | 89,361 |
| **EQUITY** | (79,132) | (74,399) | (69,043) | (57,281) | (47,604) |
| | | | | | |
| **TOTAL LIABILITIES AND EQUITY** | $ 98,286 | $ 104,070 | $ 103,218 | $ 109,167 | $ 118,464 |

# THE NEW YORK RACING ASSOCIATION INC.
## PROJECTED STATEMENTS OF OPERATIONS
### Years Ended December 31,

(Unaudited)

| (in thousands of dollars) | **2008** | **2009** | **2010** | **2011** | **2012** |
|---|---|---|---|---|---|
| Gross racing revenue | $ 272,730 | $ 292,591 | $ 301,313 | $ 311,992 | $ 317,569 |
| Gross VLT revenue | - | 47,427 | 54,293 | 60,985 | 64,755 |
| Ancillary property sale | 15,000 | - | - | - | - |
| **Gross revenue** | 287,730 | 340,018 | 355,606 | 372,977 | 382,324 |
| **Less:** | | | | | |
| Stakes & purses | 114,264 | 152,956 | 158,040 | 164,489 | 168,648 |
| Other statutory payments | 12,847 | 18,009 | 18,724 | 19,296 | 19,703 |
| **Total net revenue** | **160,619** | **169,053** | **178,842** | **189,192** | **193,973** |
| **Expenses:** | | | | | |
| Racing | 9,682 | 10,972 | 11,802 | 12,156 | 12,520 |
| Facilities | 45,423 | 46,786 | 48,689 | 50,150 | 51,654 |
| Security | 11,742 | 12,094 | 13,457 | 13,861 | 14,277 |
| Customer service | 9,255 | 10,533 | 11,849 | 12,204 | 12,570 |
| Advertising & promotion | 11,403 | 12,745 | 14,627 | 15,066 | 15,518 |
| Administration | 50,940 | 52,468 | 55,042 | 56,694 | 58,394 |
| **Total operating expenses** | **138,445** | **145,598** | **155,466** | **160,131** | **164,933** |
| Pension | 4,100 | 2,900 | 2,100 | 1,300 | 1,300 |
| Depreciation | 301 | 494 | 594 | 694 | 794 |
| Payment required under lease | 15,300 | 13,265 | 13,530 | 13,801 | 14,077 |
| Interest | 2,111 | 2,063 | 1,796 | 1,504 | 1,424 |
| **Total non-operating expenses** | **21,812** | **18,722** | **18,020** | **17,299** | **17,595** |
| **Total expenses** | **160,257** | **164,320** | **173,486** | **177,430** | **182,528** |
| **Income / (loss) before income tax** | **362** | **4,733** | **5,356** | **11,762** | **11,445** |
| **Provision for income taxes** | - | - | - | - | 1,768 |
| **Net income / (loss)** | **$ 362** | **$ 4,733** | **$ 5,356** | **$ 11,762** | **$ 9,677** |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

**THE NEW YORK RACING ASSOCIATION INC.**
**PROJECTED CASH FLOW  STATEMENTS**
**Years Ended December 31,**

(Unaudited)

| (in thousands of dollars) | **2008** | | **2009** | | **2010** | | **2011** | | **2012** |
|---|---|---|---|---|---|---|---|---|---|
| **Beginning cash** | $ | 10,869 | $ | 25,667 | $ | 19,678 | $ | 15,350 | $ | 17,441 |
| | | | | | | | | | |
| **Operating Activities:** | | | | | | | | | |
| Net income / (loss) | | 362 | | 4,733 | | 5,356 | | 11,762 | | 9,677 |
| Depreciation and amortization | | 301 | | 494 | | 594 | | 694 | | 794 |
| Pension payments in excess of accrual | | (8,800) | | (5,200) | | (5,400) | | (5,700) | | (3,200) |
| Decrease/(increase) in current assets | | 792 | | (10,267) | | (2,070) | | (2,552) | | (1,581) |
| Increase/(decrease) in current liabilities | | 771 | | 8,858 | | 2,065 | | 1,885 | | 1,395 |
| Net cash flows from operations | | (6,574) | | (1,382) | | 545 | | 6,089 | | 7,085 |
| | | | | | | | | | |
| **Investing Activities:** | | | | | | | | | |
| Capital investment | | (6,070) | | (2,000) | | (2,000) | | (2,000) | | (2,000) |
| Net cash flows from investment | | (6,070) | | (2,000) | | (2,000) | | (2,000) | | (2,000) |
| | | | | | | | | | |
| **Financing Activities:** | | | | | | | | | |
| Increase/(decrease) in long-term debt | | 31,017 | | 1,263 | | 1,315 | | 1,369 | | 1,425 |
| Increase/(decrease) in IRS note | | (3,575) | | (3,870) | | (4,189) | | (3,367) | | - |
| Increase/(decrease) in unsecured claims liability | | - | | - | | - | | - | | - |
| Net cash flows from financing | | 27,442 | | (2,607) | | (2,874) | | (1,998) | | 1,425 |
| | | | | | | | | | |
| Net increase/(decrease) in cash | | 14,798 | | (5,989) | | (4,329) | | 2,091 | | 6,510 |
| | | | | | | | | | |
| **Ending cash** | $ | 25,667 | $ | 19,678 | $ | 15,350 | $ | 17,441 | $ | 23,951 |

# VII. CERTAIN FACTORS TO BE CONSIDERED

### A.      Certain Bankruptcy Considerations

Although the Debtor believes that the Plan satisfies the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.  In addition, although the Debtor believes that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

The Bankruptcy Court may only confirm the Plan if at least one impaired Class of Claims votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class).  Thus, for the Plan to be confirmed, one of the impaired Classes must vote to accept the Plan.

### B.      Certain Risk Factors Relating to Confirmation of the Plan

**1.      Inability to Resolve or Cap Claim Amounts.**  While the Debtor continues its efforts to resolve or reach an agreement to limit the maximum amount (the "Cap") for each unliquidated Claim and each large liquidated Claim, there are several unresolved unliquidated Claims or liquidated Claims of significant magnitude that if left unresolved or without a Cap, would impede the Debtor's ability to confirm the Plan or delay distribution pursuant to the Plan.

a.      The IRS Claim.  The IRS filed two, duplicate proofs of claim in the Debtor's chapter 11 case, each claiming, for a total of $1,640,402,291.69, an unsecured priority claim of

$886,662,062.29 relating to <u>unassessed</u> taxes and interest thereon for tax years 2000 through 2005, and a general unsecured claim of $753,740,229.40 as related penalties. By its First Omnibus Objection to Proofs of Claim, dated October 15, 2007, the Debtor sought to, and did have expunged, one of the duplicate claims. On October 30, 2007, the Debtor filed (a) an objection to the remaining IRS Claim and (b) a motion pursuant to sections 105(a) and 502(c) of the Bankruptcy Code for an order to (i) estimate the remaining IRS Claim and (ii) establishing procedures to do so. In its objection, NYRA seeks to reduce a portion of the IRS Claim to an amount not exceeding $5 million and to re-classify a separate portion as a Penalty Claim. In its motion to estimate, NYRA seeks to estimate the IRS Claim to allow NYRA to meet a contingent precedent to the Effective Date of the Plan.

The IRS began auditing NYRA's prepetition federal tax returns prior to the Petition Date. NYRA has cooperated fully with the IRS and provided all requested and available information. NYRA has attempted to resolve its dispute with the IRS through meetings, telephone conferences and correspondence. Following the Petition Date, the IRS issued a series of Notices of Proposed Adjustment, proposing sixteen adjustments to NYRA's prepetition tax returns that the IRS believes would result in an increase of NYRA's taxable income by $1,330,482,375.00.

On November 2, 2007, the Debtor served the IRS with a notice of deposition and request for production of documents with respect to the various legal, factual, and statutory bases for the IRS Claim. On November 14, 2007, the IRS served NYRA with its interrogatories and a request for documents. A hearing to consider the Debtor's objection to and motion to estimate the IRS Claim was scheduled for December 6, 2007.

At the Disclosure Statement Hearing on November 28, 2007, NYRA and the Office of United States Attorney for the Southern District of New York representing the IRS announced that (1) the IRS had conceded all of its large proposed adjustments, (2) the IRS would withdraw its proof of claim for $1,640,402,291.69, and (3) the IRS would file an amended proof of claim for an amount no greater than $25 million, which claim would be subject to further reduction by agreement or by order of the Bankruptcy Court. As a result, NYRA has already satisfied one of the conditions precedent to the Effective Date of the Plan. (See Section V.J.7., above.)

As of the date hereof, the Debtor has conceded to three adjustments: one minor adjustment, for approximately $133,000.00, for unreported dividend income; approximately $15,783,000.00 for interest paid or accrued on the CIF Loans (see Section IV.C. above), which the IRS asserts, contrary to NYRA's books and records, were fully paid off at the times deductions were claimed; and approximately $11,679,447.00 in carryovers of net operating losses from taxable years closed by the statute of limitations on assessment of tax.

In light of the announced agreement referred to above, the hearing to consider the Debtor's objection and motion to estimate the IRS Claim has been adjourned, without date. The Debtor believes that it will be able to reach an agreement with the IRS regarding the following outstanding proposed adjustments:

i. $21,423,296.00 in repair expenses that the IRS asserts should be capitalized. NYRA agrees that approximately $1,300,000.00 of the expenses should have been capitalized, but the remainder was properly deducted by NYRA.

ii. $2,441,609.00 for NYRA's failure to report its distributive share of income from certain partnerships. However, when unreported losses are matched against unreported income, an adjustment in NYRA's favor of $477,729.00 is warranted.

iii. $2,766,327.00 in deductions taken between 1999-2003. The Debtor believes such amounts were properly deducted in the years originally claimed. If properly deducted in the earlier years, NYRA must include additional gross income in 2007.

In the event that an agreement is not reached, the balance of the Debtor's objection, or an amended objection in lieu thereof, shall be considered by the Bankruptcy Court.

In addition to the foregoing, the Debtor requested and the IRS has agreed to an adjustment in NYRA's favor in the amount of $8,654,929 for the taxable years 2000 through 2003 based upon a determination by the Racing and Wagering Board that NYRA must set aside additional amounts for stakes and purses based upon the gross Handle in those years.

b.      <u>Other Unresolved Claims</u>.  On November 2, 2007, the Debtor filed its Second Omnibus Objection to Proofs of Claim and objected to, among others, certain proofs of claim representing Claims which are disputed, contingent and/or unliquidated and which were filed for amounts that the Debtor believes grossly exceed the value of the Claim.  For example, three proofs of claim (numbers 467, 468, 473) which, together, claim $100 million, are related to a single litigation commenced in the Eastern District of New York by two backstretch workers whose social security numbers were allegedly improperly used to shield a total of approximately $45,000 in gambling winnings from federal income taxes.  Another proof of claim (number 579), related to both a federal and a state court class action, asserts NYRA is liable for up to $30 million for violations of various labor laws affecting approximately seventeen (17) putative class members.  NYRA objected to deny liability with respect to each of these Claims and requested the Court disallow and expunge the Claims in their entirety.  A hearing to consider the Debtor's objection is currently scheduled for December 12, 2007.  NYRA believes that, if these Claims are allowed, in part, that the Claims will be bifurcated so that only portions would be treated as Class 3 Unsecured Claims and the remainders as Class 8 Penalty Claims.  The Debtor does not believe it has any significant liability for the foregoing claims.

2.      <u>Necessity of Action by the State of New York</u>.  The Effective Date of the Plan is contingent on the State of New York, including, as necessary, the Legislature, implementing all significant aspects of the agreement described in the 2007 MOU.

C.      <u>Additional Risk Factors and Considerations</u>

1.      <u>Legislative Process</u>.  The Projections assume the economic terms contained in the 2007 MOU are enacted.  If the State of New York's legislative process produces significant changes to these terms, it will impact many of assumptions underlying the Projections contained in this Disclosure Statement.

a.      If the opening of the Aqueduct VLT Facility is delayed, the Reorganized Debtor will require additional support funding of approximately $2.5 million per month in order for the Reorganized Debtor to avoid a liquidity shortage.  Any delays or shortages in support payments would cause the Debtor to experience a significant liquidity shortfall and may impede the Reorganized Debtor's ability to continue racing operations.

b.      The 2007 MOU provides that the Reorganized Debtor will have the right to approximately 14.5% of the VLT net income per machine per day from the VLT Facility.  NYRA's projections assume these funds will be used to fund (i) increase in Purses, (ii) capital improvements to all three Racetracks, (iii) racing operations, and (iv) increased contributions to the New York State Breeders Fund.

c.      The 2007 MOU provides for a 30-year franchise and a $1 per year lease for the Racetracks.  Any change in this assumption may, among other things, materially impact the Reorganized Debtor's ability to operate racing or maintain the Racetracks.

d.      The 2007 MOU expires on December 31, 2007.  If consummation of the Plan does not occur on or around December 31, 2007, there is no assurance that, among other things, the Debtor will be capable of conducting racing due to the expiration of the Franchise.

**2.** **Risks Associated with Ancillary Property Sale.** The Projections assume that the Ancillary Property is sold for $15 million on or before December 31, 2008. While the Debtor believes the timing and estimated proceeds of this sale are achievable, the proceeds realized from a sale may be less then projected and/or may be received later than projected.

**3.** **Risks Associated with the Reorganized Debtor's Business.** The Reorganized Debtor may not be able to achieve its projected financial results. The Debtor cannot assure that, once reorganized, it will be able to achieve the revenue or cash flow it has relied upon to project its future business prospects or otherwise meet its projected financial results. If the Reorganized Debtor does not achieve these projected revenue or cash flow levels, it may lack sufficient liquidity to continue operating after the Effective Date.

The Projections represent management's current view based on known facts as to the Reorganized Debtor's projected operations at this time. However, while management believes the assumptions underlying its Projections are reasonable, these Projections do not attempt to demonstrate the viability of the business in a "worst case" environment.

a. <u>Timing of VLTs</u>. The Projections assume that on January 1, 2009, a 4,500-machine VLT Facility located at Aqueduct will open to the public. While the Debtor believes that through cooperation with the State of New York and potential VLT operators this date is an achievable goal, the potential for delay due to both physical construction and the potential for protracted negotiations between parties exists.

b. <u>VLT Projections</u>. The Projections of win per machine per day are based upon a combination of industry metrics and estimates of the State of New York and other interested parties. However, it is possible that actual revenues from VLTs will vary from the Projections and such variations may be material to the results of operations and cash flow of the Reorganized Debtor.

c. <u>Handle/Revenue Projections</u>. While the Debtor's projection of a compounded annual growth rate ("CAGR") in Handle of 1.5% over the period from 2006 through 2012 is consistent with historical industry-wide CAGR of approximately 2%, it is possible that actual results may be lower than the Debtor's forecast.

d. <u>Operating Expenses</u>. The Debtor's projected operating expenses are based on past performance and increased at an inflationary rate of 3%. While there is the risk that expenses will increase at a faster rate than projected, the operating expenses presented in these projections reflect management's current understanding of future operating costs.

e. <u>Weather</u>. The success of the Debtor's business is highly dependent on favorable weather conditions, specifically during the spring and summer months. Significant disruptions to the race schedule, particularly during the Saratoga and Belmont race meets, would negatively impact the Reorganized Debtor's revenue.

f. <u>Competition</u>. The Debtor competes with all other forms of legalized gambling, a source of competition that is increasing due to, among other things, more localities embracing gambling to increase local tax revenue.

g. <u>Capital Investments</u>. Though the Debtor believes that the increase in revenue from the Aqueduct VLT operation will enable the Reorganized Debtor to invest significantly in capital improvements, if VLT revenues are delayed or lower than projected, the Debtor will have to lower its current five-year capital plan or pursue outside financing. If the capital expenditure plan is reduced from its currently projected levels, it may have an adverse effect on racing operations.

h. <u>Statutory Changes</u>. The Projections assume that the statutory environment in which the Reorganized Debtor will operate does not materially change over the projection

period.  If significant changes to the statutes governing thoroughbred racing in New York State are made, it would directly impact the financial projections.

## VIII.     ALTERNATIVES TO THE PLAN

The Debtor has evaluated several alternatives to the Plan, including the liquidation of NYRA.  After studying these alternatives, the Debtor has concluded that the Plan, which encompasses the settlements and compromises contained in the State Settlement Agreement, is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  The following discussion provides a summary of the Debtor's analysis leading to its conclusion that a liquidation or alternative plan of reorganization would not provide the highest value to parties in interest.

In the event that the Plan is not confirmed and consummated, the Debtor intends to protect its rights and interests and the rights and interests of its creditors, including the protection of all of the Debtor's assets.

### A.     Liquidation Under Chapter 7 of the Bankruptcy Code

If no plan or reorganization can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtor for distributions to its creditors in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effect that a chapter 7 liquidation would have on the recover of holders of Allowed Claims and NYRA Equity Interests is set forth in Section XI.D. below.

The Debtor believes that liquidation under chapter 7 would result in less certainty with respect to the size and timing of distributions being made to creditors than those provided for in the Plan.  Liquidation under chapter 7 would also result in the absolute certainty of loss of future business for those creditors who continue to do business with the Debtor as a going concern.

### B.     Alternative Chapter 11 Plans

If the Plan is not confirmed, the Debtor or any other party in interest (to the extent the Debtor's exclusive period to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code expires) could attempt to formulate a different plan.  Such a plan might, to the extent that the Debtor retains or is granted the Franchise, involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of the Debtor's assets.

Conditions precedent to any plan of reorganization that would include the operation of the Debtor's business would, of course, be that (i) the Debtor or other plan proponent be (a) awarded the Franchise and (b) granted the requisite additional New York State approvals and (ii) the Racing Law be amended to allow such a operations.  For example, the Racing Law would need to be amended to allow a for-profit entity to be awarded the Franchise.  Currently only non-profit racing associations can hold the Franchise, and, currently, NYRA is the only duly incorporated non-profit racing association in the State of New York.

In a liquidation under chapter 11, the Debtor's assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Further, if a trustee were not appointed, because one is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than in a chapter 7 case.  Although preferable to a chapter 7 liquidation, the Debtor believes that a liquidation under chapter 11 is a much less attractive alternative to holders of Claims and NYRA Equity Interests than the Plan.

The Debtor believes that the Plan enables holders of Claims and NYRA Equity Interests to realize the greatest recovery under the circumstances.  Due to the risks described in Sections VIII.C.

and XI.D. below, the Debtor believes the Plan provides the most certainty of a recovery to holders of Allowed Claims, and a faster recovery than would be achieved under a chapter 11 liquidation.

### C.    Certain Risk Factors

The foregoing analyses of liquidation under chapter 7 of the Bankruptcy Code and alternative plans reorganization under chapter 11 of the Bankruptcy Code assume that the Debtor continues under the supervision of the Bankruptcy Court and the protections of the Bankruptcy Code. However, as described in Section IV.E.5. above, the State of New York has contested NYRA's eligibility to be a debtor under the Bankruptcy Code. Pursuant to the State Settlement Agreement, the State Motion to Dismiss will be withdrawn upon consummation of the Plan. If the Plan is not confirmed, however, there can be no assurance that the State of New York will not prosecute the Motion to Dismiss. If the Bankruptcy Court grants the State Motion to Dismiss and dismisses the Chapter 11 Case, NYRA and its creditors will be left without access to the Bankruptcy Court and the protections of the Bankruptcy Code. The Bankruptcy Court could also separately determine that the Chapter 11 Case may not be converted to a case under chapter 7 of the Bankruptcy Code. NYRA's secured creditors, including the State of New York, could then foreclose on NYRA's property, limiting the assets available for recoveries to unsecured creditors.

## IX.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to certain holders of Claims and NYRA Equity Interests.

The following summary is based on the IRC, Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, persons holding an equity interest as part of an integrated constructive sale or straddle, and investors in pass-through entities).

**Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.**

**IRS Circular 230 Notice:  To ensure compliance with IRS Circular 230, holders of Claims and NYRA Equity Interests are hereby notified that: (A) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or NYRA Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein; and (c) holders of Claims and NYRA Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.**

## A.    Consequences to the Debtor

In connection with the implementation of the Plan, the Debtor may recognize cancellation of debt ("COD") income.  Such COD income will be excluded from taxable income under a bankruptcy exception contained in the IRC, and will result in a reduction of certain tax attributes of the Debtor.  In addition, the Debtor will recognize gain or loss on the transfer to the State of New York, an affiliate or agency of the State of New York, or a public benefit corporation incorporated by the State of New York pursuant to the Plan based upon the difference between the fair market value of the property transferred and its adjusted basis, which is estimated to be approximately $88 million.  Some of this gain or loss will be capital gain or loss and some will be ordinary income; however, there will be no difference in the applicable U.S. federal income tax rates for either ordinary income or capital gain for corporations (such as the Debtor).

## B.    Consequences to Holders of Certain Claims and NYRA Equity Interests

**1.    Generally.**  The U.S. federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, upon the origin of the holder's Claim, when a holder's Claim becomes an Allowed Claim, when the holder receives payment in respect of such Claim, whether the holder reports income using the accrual or cash method of accounting, whether the holder has taken a bad debt deduction or worthless security deduction with respect to such claim and whether the holder's Claim constitutes a "security" for U.S. federal income tax purposes.

Generally, the holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim, in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income).  With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, see infra Section IX.B.5. ("Allocation of Consideration to Interest").

**2.    Holders of Unclassified Claims.**  Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims generally will be paid in full in Cash on, or subsequent to, the Effective Date.  Holders of such Claims who are taxpayers must include amounts received in excess of their adjusted tax basis in their Claim (if any) in gross income in the taxable year in which such amounts are actually or constructively received by them.  Where appropriate, income tax and employment tax will be withheld from such payments as required by law.  With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, see infra Section IX.B.5. ("Allocation of Consideration to Interest").

**3.    Holders of Secured Claims.**  Holders of Allowed Secured Claims will generally receive one of the following distributions:  (a)  the payment of such holder's Allowed Secured Claim in full, in Cash; (b) the sale or disposition proceeds of the property securing an Allowed Secured Claim to the extent of the value of their respective interests in such property; (c) the surrender to the holder or holders of any Allowed Secured Claim of the property securing such Claim; or (d) such other distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code.  Generally, the holder of an Allowed Secured Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim in an amount equal to the difference between (i) the sum of the amount of Cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest). With respect to the treatment of accrued but unpaid interest allocable thereto, see infra Section IX.B.5. ("Allocation of Consideration to Interest").

4. **Holders of Unsecured Claims.** Pursuant to the Plan, holders of Allowed Unsecured Claims will receive Cash in an amount equal to one hundred percent (100%) of such holder's Allowed Unsecured Claim in satisfaction and discharge of their Claims.

In general, each holder of such a Claim should recognize gain or loss in an amount equal to the difference between (x) the amount of Cash received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest and other than any amount treated as imputed interest as further discussed below) and (y) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest).

Distributions to such holders will be made subsequent to the Effective Date on the initial distribution date and may be made on any subsequent distribution date. Under the IRC, a portion of each distribution to such holders may be treated as imputed interest. In addition, it is possible that any loss and a portion of any gain realized by such holder may be deferred until such time as such holder has received its final distribution. All holders of such Claims should consult their tax advisors as to tax consequences of distributions subsequent to the Effective Date.

Where gain or loss is recognized by a holder of such a Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.

5. **Allocation of Consideration to Interest.** Pursuant to the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim, with any excess allocated to unpaid accrued interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. In general, to the extent any amount received, whether cash or other property, by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and deductibility of unpaid interest for tax purposes.

6. **Market Discount.** Where gain or loss is recognized by a holder in respect of its Allowed Claim, the character of such gain as capital gain or ordinary income will be determined by a number of factors, including whether the Claim was acquired at a market discount. A holder that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the IRC. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Allowed Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Allowed Claim as of the date of the exchange.

7. **NYRA Equity Interests.** Pursuant to the Plan, NYRA Equity Interests shall be cancelled and the holders of NYRA Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such NYRA Equity Interests. Accordingly, holders of NYRA Equity Interests will recognize a capital loss in an amount equal to their adjusted basis in such NYRA Equity Interests.

C. **Information Reporting and Withholding.**

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest,

dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. In addition, the Plan provides that the Disbursing Agent may require, as a condition to receipt of a distribution, that the holder complete either a Form W-8 or Form W-9, as applicable to each such holder, unless such holder includes its TIN and other requested information on the Ballot.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

> **The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the U.S. federal, state, local and foreign tax consequences applicable under the Plan.**

## X. VOTING PROCEDURES AND REQUIREMENTS

### A. Holders of Claims Entitled to Vote

The following Classes are the only ones entitled to vote to accept or reject the Plan.

| | |
|---|---|
| Class 3 | Unsecured Claims |
| Class 4 | Insured Litigation Claims |
| Class 5 | State Claims |
| Class 8 | Penalty Claims |

If your Claim or NYRA Equity Interest is not in one of these Classes, you are not entitled to vote and you will not receive a Ballot with this Disclosure Statement. If your Claim or NYRA Equity Interest is in one of these Classes, you should read your Ballot and follow the listed instructions carefully. Please use only the Ballot that accompanies this Disclosure Statement.

If a Ballot is damaged or lost, or if you have any questions concerning voting procedures, you may contact:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Garrett A. Fail, Esq.
(212) 310-8000

### B. Voting Deadlines

The Debtor in Possession has engaged The Garden City Group, Inc. as its Voting Agent to assist in the transmission of voting materials and in the tabulations of votes with respect to the Plan.

IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN CLASSES 3, 4, 5, 7, AND 8 TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT BEFORE THE "VOTING DEADLINE" OF 4:00 P.M. (NEW YORK TIME), ON DECEMBER 21, 2007, AT:

**The Garden City Group, Inc.**
**Attention: The New York Racing Association Claims Agent**
**P.O. Box 9000 #6486**
**Merrick, NY 11566-9000**

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.

C.      **Voting Procedures**

Detailed voting instructions are provided with the Ballot accompanying this Disclosure Statement. All holders of Claims in Classes 3, 4, 5, 7, and 8 as of the Ballot Date established for purposes of this solicitation may vote to accept or reject the Plan to the extent and in the manner provided in the Disclosure Statement Order or in any other order or orders of the Bankruptcy Court.

1.      **Acceptance by a Class.** The Bankruptcy Code defines "acceptance" of a chapter 11 plan by a class of creditors as acceptance by creditors holding at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims in such class (other than any such creditor designated under section 1126(e) of the Bankruptcy Code), but for that purpose only counts those creditors that actually cast ballots. Holders of claims that fail to vote are not counted as either accepting or rejecting.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with provisions of the Bankruptcy Code.

2.      **Withdrawal or Change of Vote.** Any voter that has delivered a valid Ballot may withdraw its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline. To be valid, the notice of withdrawal must be (a) signed by the party who signed the Ballot to be revoked, and (b) received by the Voting Agent by the Voting Deadline. The Debtor in Possession may contest the validity of any withdrawals. Any holder that has delivered a valid ballot may change its vote by delivering to the Voting Agent a properly completed subsequent Ballot so as to be received before the Voting Deadline. In the case where more than one timely, properly completed ballot is received, only the Ballot that bears the latest date will be counted.

# XI.      **CONFIRMATION OF THE PLAN**

A.      **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a Confirmation Hearing. The Confirmation Hearing with respect to the Plan has been scheduled for December 27, 2007, commencing at 2:00 p.m. (New York Time), before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Room 601, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10014. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further

notice except for the announcement of the continuation date made at the Confirmation Hearing or at any subsequent continued Confirmation Hearing.

### B. Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be made in writing, must conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or NYRA Equity Interest of the Debtor held by the objector. Any such objection shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case Filing System can be found at www.nysub.uscourts.gov., the official website for the Bankruptcy Court), by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard copy delivered directly to the chambers of the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Room 601, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10014) and shall be served in accordance with General Order M-242 upon: (i) Weil, Gotshal & Manges LLP, Attorneys for the Debtor and Debtor in Possession, 767 Fifth Avenue, New York, New York 10153, Attention: Brian S. Rosen, Esq.; (ii) Kirkpatrick & Lockhart Nicholson Graham LLP, 599 Lexington Avenue, New York, New York 10022, Attorneys for the Creditors' Committee, Attention: Jeffrey N. Rich, Esq.; (iii) Office of the New York State Attorney General, The Capitol, Albany, NY 12224, Attention: Nancy Hershey Lord, AAG; (iv) Paul, Weiss, Rifkind, Wharton & Garrison LLP, Attorneys for the Oversight Board, 1285 Avenue of the Americas, New York, NY 10019, Attention: Alan W. Kornberg, Esq; and (iv) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attention: Brian Masumoto, Esq., so as to be actually received by no later than December 21, 2007, at 4:00 p.m. (New York Time).

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### C. General Requirements for Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan (i) is accepted by at least one impaired class (without counting the votes of insiders), (ii) "does not discriminate unfairly" against any rejecting class, and (iii) is "fair and equitable" as to each rejecting class. In addition, among other provisions of section 1129(a), the Bankruptcy Court must find that the Plan is in the "best interests" of creditors and equity holders that are impaired pursuant to the Plan and that the Plan is feasible.

### D. Best Interests Test

With respect to each impaired Class of Claims and NYRA Equity Interests, confirmation of the Plan requires that each such holder either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

This analysis requires the Bankruptcy Court to determine what the holders of Allowed Claims and NYRA Equity Interests in each impaired Class would receive from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case. As described in Section

IV.E.5. above, however, the Debtor's eligibility to be a debtor under the Bankruptcy Code has been contested. Pursuant to the State Settlement Agreement, the State Motion to Dismiss will be withdrawn upon confirmation of the Plan. If the Plan is not confirmed, however, there can be no assurance that the State of New York will not prosecute the Motion to Dismiss. If the Bankruptcy Court grants the State Motion to Dismiss and dismisses the Chapter 11 Case, NYRA and its creditors will be left without access to the Bankruptcy Court and the protections of the Bankruptcy Code. The Bankruptcy Court could also separately determine that the Chapter 11 Case may not be converted to a case under chapter 7 of the Bankruptcy Code.

In a chapter 7 case, the cash amount which would be available for the satisfaction of unsecured claims and equity interests would consist of the proceeds resulting from the disposition of a debtor's unencumbered assets, augmented by the unencumbered cash held by the debtor at the time of the commencement of the liquidation case. Such cash amount would be reduced by the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the termination of the debtor's business and use of chapter 7 for the purpose of liquidation.

The Debtor believes that conversion to chapter 7 will cause substantial disruption in the Debtor's business, including immediate cessation of racing at all three of the Racetracks operated by the Debtor. In this case, under chapter 7, the Cash available for distribution to Creditors would consist of the proceeds from collection of the Debtor's accounts receivable and the sale of equipment and fixtures owned by the Debtor and either (i) the proceeds of the sale of the Debtor's real property, assuming a chapter 7 trustee (the "Chapter 7 Trustee") is able to obtain saleable title to such real property and that the Chapter 7 Trustee is able to sell the property without use restrictions which, if present, might significantly reduce the market value of the property or (ii) such other amounts as the State of New York may provide in the event that the State of New York obtains title to the real property. The Cash available would be reduced by the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the termination of the Debtor's businesses and the use of chapter 7 for purposes of liquidation, including the repayment of postpetition financing from the State of New York.

The Debtor has analyzed liquidation, both in and out of the context of chapter 7, and believes that the amount and timing of distributions to Creditors are highly dependent upon the resolution of the dispute between the Debtor and the State of New York concerning the ownership of the real property (i.e., the Racetracks). See Section IV.E.6. above for a greater description of the Adversary Litigation. Sale of the Debtor's accounts receivable, equipment and fixtures alone will not provide sufficient value to pay the expenses of the chapter 7 process and satisfy Creditors. A Chapter 7 Trustee would immediately commence a process to sell the real property for as high a value as possible. The Debtor believes that the real property has substantial value (particularly for uses other than thoroughbred horse racing) and that the sale of such property would yield proceeds well in excess of the amounts owed to Creditors. However, the Debtor also believes that the State of New York will vigorously contest any attempt by the Debtor or a Chapter 7 Trustee to sell the real property. Among other things, the State of New York may rely on Sections 208(a)(4) and 209-a of the Racing Law which may require the Debtor or the Chapter 7 Trustee to obtain (i) prior approval of the CIF and the Racing and Wagering Board and (ii) prior legislative approval to sell the real property. The State of New York may also rely on Section 202 of the Racing Law which states, in relevant part, that NYRA's certificate of incorporation should contain a provision that upon termination of NYRA's existence or its earlier liquidation, all of NYRA's assets "after payment of or provision for its liabilities" will be assigned, transferred and conveyed and distributed by the Governor. The Debtor's certificate of incorporation contains no such provision, and the Debtor has challenged the constitutionality of this provision in its Adversary Complaint. As a result, the sale process and distributions to creditors, to the extent the Debtor or the Chapter 7 Trustee is successful in the litigation, will be stalled pending extensive, time-consuming litigation of the issues. At the same

time, significant litigation costs will be expended by the chapter 7 estate, at the expense of the Debtor's Creditors.

To the extent that the State of New York prevails over the Debtor or the Chapter 7 Trustee in litigation and the property is transferred to the State of New York pursuant to Section 202 of the Racing Law, further litigation may ensue to determine the nature and the terms of the "payment of or provision for" the Debtor's liabilities. There is no certainty that the provision for Creditors will be sufficient to satisfy Allowed Claims in full, no certainty that the provision will provide Creditors with Cash, and no certainty of when the provision will be made. The ultimate determination of the amount to be paid under Section 202 may be subject to the same degree of uncertainty and delays as other issues that require decisions by the State of New York.

The following schedule illustrates the potential recovery of claimholders in each of three potential scenarios (for purposes of this illustration, it is assumed, although unlikely, that the litigation concerning ownership of the Racetracks is resolved finally late in 2009):

1.    **The Plan:**  The Debtor's proposed Plan – payments to holders of Allowed Claims are assumed to be made on or about December 31, 2007.

2.    **Conversion to Chapter 7 and Appointment of the Trustee:**  In the event the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code and a Chapter 7 Trustee is appointed:

a.    The Chapter 7 Trustee must decide whether to pursue the litigation with the State of New York to determine the ownership of the Debtor's assets. A key aspect of this decision is likely to be the whether or not the Chapter 7 Trustee can obtain sufficient funds (estimated to be at least $20 million) to fund the litigation. It is not clear that the Debtor's estate would have sufficient funds, that the Chapter 7 Trustee would be able to borrow funds without collateral or that the Chapter 7 Trustee would be permitted to use the Racetracks as collateral to borrow funds.

b.    The litigation will be protracted and difficult. The Debtor believes that such litigation will require not less than two (2) years to reach final resolution. For purposes of the following estimates, the Debtor has assumed that the litigation is resolved soon enough to allow distributions on December 31, 2009.

c.    Assuming the Chapter 7 Trustee determines to pursue the litigation, the potential outcomes include:

i.  The State of New York prevails in the litigation and obtains clear title to the real property (Scenario 1).

ii.  The Chapter 7 Trustee prevails in the litigation and obtains title to the real property, but, the State of New York is successful in maintaining or imposing conditions that effectively restrict bidders for the real property to the entity selected by the State of New York to run thoroughbred racing at the Racetracks (Scenario 2).

iii.  The Chapter 7 Trustee prevails in the litigation and is able to sell the real property to any bidder for any use (Scenario 3).

These scenarios are discussed more fully below. A table follows with the estimated present value of recoveries at the date of anticipated payments under the Plan.  **Please note that, although the table shows recoveries to Penalty Claims in connection with Scenarios 1, 2, and 3 the Debtor currently does not anticipate there will be any Allowed Penalty Claims.**

i. <u>Scenario 1</u>:  The State of New York prevails in litigation, all of the Debtor's assets are transferred to the State of New York and the State of New York subsequently provides

sufficient funds to pay all prepetition claims in full. In this scenario, the timing of distributions would be significantly delayed due to the litigation process. Additionally, Section 202 of the Racing Law does not specify the timing or form of payment required to satisfy the Debtor's liabilities and whether or not the State of New York would pay claimholders interest on account of their claims. This scenario assumes that the State of New York (a) pays holders' Allowed Claims on or about December 31, 2009, and (b) does not pay post petition interest on unsecured claims. The recovery to creditors may be reduced by the cost of the failed litigation and estate administration.

ii. <u>Scenario 2</u>: The Chapter 7 Trustee prevails in litigation and the assets are retained by the Debtor and subsequently sold. However, the use of the property is restricted to racing and can only be sold to the holder of the Franchise, effectively eliminating any competitive bids. The Debtor is currently unable to estimate the value of the properties under this scenario. The Debtor can provide no assurance that such value will be sufficient to pay all claims in full.

iii. <u>Scenario 3</u>: The Chapter 7 Trustee is able to raise sufficient funds to pursue the litigation, prevails in litigation, and use of the properties is expanded so that the properties can be sold for their highest and best value. The properties are subsequently sold to satisfy all claim holders, with interest. This scenario further assumes that holders of Allowed Unsecured Claims would be entitled to post-petition interest at an annual rate of 5%.

| | BEST INTEREST COMPARISON (All percentages are present values as of December 31, 2007 at a discount rate of 9%) | | | | | | |
|---|---|---|---|---|---|---|---|
| | **PLAN RECOVERY** | **SCENARIO 1 RECOVERY** | | **SCENARIO 2 RECOVERY** | **SCENARIO 3 RECOVERY** | |
| **Administrative Claims** | 100% | 100% | | Unknown | 100% | |
| **Secured Claims** (includes interest) | 100% | 100% | | Unknown | 100% | |
| **Priority Claims** | 100% | 84% | (1) | Unknown | 98% | (2) |
| **General Unsecured Claims** | 100% | 84% | (1) | Unknown | 98% | (2) |
| **Penalty Claims** | 0% | 84% | (1) | Unknown | 98% | (2) |

Notes:
Litigation under Scenarios 1, 2 and 3 is assumed to be resolved during the latter part of 2009 and distributions made on 12/31/09 to claims, including interest if applicable.
All scenarios assume 0% return to equity
(1)  Assumes 100% nominal recovery, no interest paid, discounted to 12/31/07 at 9%.
(2)  Assumes 100% nominal recovery, interest from Petition Date at 5% per annum, discounted to 12/31/07 at 9%.

In summary, the Debtor believes that, if a conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is possible, it would result, at a minimum, in a multi-year delay in returns to Creditors as compared with the timing of distributions under the Plan. The Debtor also believes that the distribution on account of Allowed Claims may be lower than those contemplated under the Plan due to the uncertainty of the interpretations surrounding Section 202 of the Racing Law.

Notwithstanding the foregoing, the Creditors' Committee believes that, under any circumstances, that holders of Allowed Unsecured Claims would receive payment in full and may also be entitled to recover post-petition interest.

### E.  No Unfair Discrimination / Fair and Equitable Test

In the event that any impaired Class of Claims or NYRA Equity Interests does not accept, or is deemed to reject, the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired Class of Claims or NYRA Equity Interests which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class of Claims or NYRA Equity Interests.

The "unfair discrimination" test applies to Classes of Claims or NYRA Equity Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or equity interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The "fair and equitable" test applies to Classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting Class, the test sets different standards, depending on the type of Claims or NYRA Equity Interests in such class:

1.  **Secured Creditors**. Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, or (ii) has the right to credit bid the amount of its claim if its property is sold and retain its lien on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) received the indubitable equivalent" of its allowed secured claim.

2.  **Unsecured Creditors**. Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

3.  **NYRA Equity Interests**. Either (i) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption prove, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan.

These requirements are in addition to other requirements established by case law interpreting the statutory requirements.

The Debtor believes the Plan satisfies the "fair and equitable" requirement.

### F.  Classification of Claims and NYRA Equity Interests Under the Plan

NYRA believes that the Plan meets the classification requirements of the Bankruptcy Code which requires that a chapter 11 plan place each claim or equity interest into a class with other claims or equity interests that are "substantially similar." The Plan establishes Classes of Claims and NYRA Equity Interests as required by the Bankruptcy Code and summarized above. Consistent with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified.

### G.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the bankruptcy court finds that the plan is feasible.  A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor.

To support the Debtor's belief in the feasibility of the Plan, the Debtor has relied upon pro forma financial projections covering the Reorganized Debtor's operations through December 31, 2012, as discussed in Section VI. of this Disclosure Statement.

## XII. CONCLUSION

NYRA believes the Plan is in the best interests of all creditors and urges the holders of impaired Claims in Classes 3, 4, 5, 7, and 8 to vote to accept the Plan and to evidence such acceptances by returning their Ballots so that they will be received no later than December 21, 2007.

Dated: New York, New York
       November 29, 2007

Respectfully submitted,

THE NEW YORK RACING ASSOCIATION, INC.

By:     /s/ C. Steven Duncker
       Name: C. Steven Duncker
       Title:  Chairman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0119
(212) 310-8000

Attorneys for the Debtor and Debtor in Possession

**EXHIBIT A**