**MORITT HOCK & HAMROFF LLP**
**Andrew B. Eckstein**
1407 Broadway, 39th Floor
New York, New York 10018
Telephone: (212) 239-2000
Facsimile: (212) 239-7277
aeckstein@moritthock.com

*Counsel for Getnick & Getnick LLP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ X
                                                                   :
In re:                                                             : Chapter 11
                                                                   :
**THE NEW YORK RACING ASSOCIATION INC.,**                          : Case No. 06-12618 (JLG)
                                                                   :
Debtor.                                                            : **REDACTED**
                                                                   :
------------------------------------------------------------------ X

**GETNICK & GETNICK'S SUPPLEMENTAL BRIEF
IN FURTHER OPPOSITION TO NYRA'S MOTION
TO "CLARIFY" OR "AMEND" THIS COURT'S 2007 ORDER**

Getnick & Getnick LLP ("G&G") submits this supplemental brief in further opposition to the motion of The New York Racing Association, Inc. ("NYRA") to "clarify" or "amend" this Court's 2007 Order appointing G&G as NYRA's independent business integrity counsel. NYRA drafted and persuaded the Court to enter the Order, which provided for a five-year engagement. NYRA then violated the plain terms of the Order by prematurely firing G&G without prior Court approval. Because the five-year term was an indispensable feature of the engagement, NYRA's motion seeks to nullify rather than "clarify" or "amend" the Court's Order. The motion should be denied, the Court's Order should be enforced as written, and the Court should determine in a further proceeding the appropriate remedies for NYRA's violation.

**INTRODUCTION**

1. NYRA and its counsel, Weil Gotshal, drafted the 2007 Order and urged the Court to adopt it. The Order provided for, among other things, (a) a five-year engagement; and (b) a guarantee of G&G's "maximum independence." (Ex. 1, Dkt. No. 543.)[1]

2. In violation of the Order and the underlying Retainer Agreement, NYRA summarily fired G&G three and a half years into the five-year engagement, without explanation and without seeking prior Court approval. More than a year later, NYRA filed the present motion to "clarify" or "amend" the 2007 Order. (Dkt. No. 1167.) According to NYRA's motion, the Order is unenforceable as written because it violates New York law and public policy. To this day, NYRA and its counsel have never explained why they drafted and submitted for the Court's approval what they now claim is a legally invalid order. Likewise, they have never explained why NYRA failed to seek "clarification" or "amendment" of the 2007 Order *before* terminating G&G's engagement. There was no urgency involved in firing G&G, yet NYRA acted unilaterally in disregard of the Court's Order.

3. The terms of G&G's engagement are enforceable as written. Sophisticated parties, represented by sophisticated counsel, knowingly and lawfully entered into a unique attorney-client relationship, which was designed – with the guidance of New York State authorities – to serve not just NYRA's private interests but the public interest as well. The engagement included two essential and inseparable provisions, both of which were critical to NYRA's success in winning the State's thoroughbred racing franchise. First, NYRA guaranteed G&G's "maximum independence" – a feature unheard of in ordinary attorney-client relationships. Second, NYRA guaranteed a five-year term for the engagement – a provision

---

[1] The Order provided that NYRA could terminate the engagement on 60 days' notice *before* plan confirmation, but *after* plan confirmation could terminate only upon loss of its franchise – an event that has never occurred.

essential to safeguarding G&G's "maximum independence." This allowed G&G to undertake independent investigations of NYRA's business practices in the public interest, without the threat of termination or other forms of interference. Subsequent events vividly demonstrated the necessity of such a provision. NYRA's premature firing of G&G interrupted important pending investigations by G&G, as described in a confidential post-termination report delivered by G&G to NYRA's Board of Directors (a report NYRA has declined to release). That is precisely the scenario that the guaranteed five-year term was designed to avoid. As shown below, the special features of the engagement are lawful and fully enforceable under the Court's 2007 Order.

4. The discovery in this case confirms these conclusions. Pursuant to the Court's discovery order (Dkt. No. 1203), the parties produced documents relating to "the nature of the relationship between NYRA and G&G." The discovery record conclusively demonstrates that the parties knowingly designed a unique attorney-client relationship that conforms to New York law and promotes the public interest, and that NYRA violated the Court's Order by firing G&G.

## BACKGROUND

A. **The Parties' Negotiations And NYRA's Application For Court Approval**

5. In the summer of 2007, NYRA was engaged in a heated competition for New York State's thoroughbred racing franchise. New York's Governor had emphasized that business integrity would be a key component in the State's decision-making process. NYRA approached G&G, which had previously served as NYRA's court-appointed Federal Monitor, with a proposal that G&G become NYRA's business integrity counsel. With NYRA's consent, Neil Getnick obtained the State's reaction to NYRA's proposal by consulting Richard Rifkin, the Governor's Special Counsel. As evidenced by Mr. Getnick's contemporaneous file memorandum, Mr. Rifkin stated that G&G's retention "would be seen as a positive," that G&G's

3

"[i]ndependence" would be "critical," and that the Governor and the State "would like you [G&G] to have complete and total independence." (Ex. 2.)

6. Shortly thereafter, Mr. Getnick sent to Steven Duncker, Chairman of NYRA's Board of Directors, a draft retainer agreement that outlined the basic structure of the engagement. The draft left blanks for certain key terms: the engagement's duration, the monthly retainer and minimum fee, and G&G's billing rates. The draft stated the parties' intent "to afford maximum independence to G&G" and required NYRA's full cooperation with G&G. (Ex. 3.) Mr. Duncker said that the draft "looks great to me" and forwarded it to Stuart Subotnick, Chairman of the NYRA Board's Special Oversight Committee. (Ex. 4.)

7. Mr. Duncker requested G&G's proposals for the terms left blank in the draft. Mr. Getnick proposed a five-year engagement, a $125,000 monthly minimum fee, and hourly billing rates deeply discounted from G&G's regular rates. (Mr. Getnick's own proposed rate, for example, was less than half his regular rate.) Mr. Getnick informed Mr. Duncker: "The above terms are designed to support sufficient hours over a sufficient time period allowing us to successfully carry out our mission pursuant to the Agreement. The highly favorable rate structure is designed to afford NYRA with maximum return on its expenditures for professional fees under the Agreement." (Ex. 5.)

8. In response to an inquiry by Mr. Duncker, Mr. Getnick addressed in detail the rationale for the proposed terms, citing the Governor's recent emphasis on the need for integrity and accountability in horse racing, and explaining how the proposed terms dovetailed with the Governor's agenda. In particular, Mr. Getnick pointed out that "we have agreed that G&G will be afforded maximum independence in performing its functions as business integrity counsel, including interacting with governmental entities and industry regulators," and that the proposed terms would provide "the critical mass of hours that need to be expended (i.e., sufficient hours

4

over a sufficient time period) allowing G&G to successfully carry out its mission pursuant to the Agreement." (Ex. 6.) The proposed "critical mass" consisted of a monthly minimum fee (providing for "sufficient hours") and a proposed five-year term ("sufficient time period").

9. A few days later, Mr. Getnick sent the draft retainer agreement to Brian Rosen at Weil Gotshal, NYRA's counsel in its Chapter 11 proceedings in this Court. (Ex. 7.) The next day, Mr. Rosen sent Mr. Getnick a mark-up of the draft, including his handwritten insertion of "five (5) years" as the engagement's duration. Immediately after this insertion, Mr. Rosen's mark-up also added a handwritten clause, proposed by NYRA, that allowed early termination in only one circumstance: if "NYRA does not maintain a franchise to conduct thoroughbred racing and a license to conduct pari-mutuel wagering in the State of New York." (Ex. 8.) Later this was modified slightly, so that the final agreement provided for a five-year term "unless NYRA does not maintain a franchise to conduct thoroughbred racing and a license to conduct pari-mutuel wagering in the State of New York (the 'Franchise'), in which case the Term will end as of the date NYRA no longer maintains the Franchise." (Ex. 9.) No other provision for early termination of the engagement was ever stated in any version of the agreement.

10. During the same period, Weil prepared an application to this Court for approval of the engagement. Drafts of the application and related papers, exchanged between Weil and G&G, show additions and deletions that were specifically designed to safeguard G&G's "maximum independence." For example, ███████████████████████████████████████████████████████████████████████████████████████████████████████████

5

███████████████████████████████████████ [Ex. 10, at WEIL_000543.][2]

███████████████████████████████████████

███████████████████████████████████████

**[REDACTED: See Note 2, below]**

11. The final version of the retainer agreement was executed on or about July 16, 2007 (the "Retainer Agreement"). (Ex. 11.) NYRA then submitted the Retainer Agreement to the Court for approval. (Ex. 12.) NYRA told the Court that "the term of G&G's representation will run for five (5) years, starting on the Effective Date, provided however, that, should NYRA cease to maintain the Franchise, the term of G&G's representation will automatically terminate." (*Id.* at G&G000021, ¶ 22.) No other provision for termination was stated.

**B. Discussion Of The Five-Year Term And The Interest Of New York State**

12. In late July 2007, the Official Committee of Unsecured Creditors filed an objection to the five-year engagement as "premature" and financially burdensome. (Ex. 13.) In a telephone call, Mr. Rosen suggested to Mr. Getnick a possible alternative: a ***two-year*** contract, with an "evergreen" two-year renewal. Mr. Getnick declined the suggestion, which proved to be unnecessary. Notably, discussion of this issue would have been moot if NYRA had a right to terminate the engagement at any time.[3]

13. In a meeting on August 8, 2007, Mr. Getnick and Mr. Rosen discussed New York State's interest in G&G's engagement and how the State's interest should be presented to the Court in support of NYRA's pending application for approval of the engagement. As reflected

---

[2] NYRA has designated Ex. 10 as "highly confidential." Accordingly, pursuant to Dkt. No. 1238 (Order ¶ 5(c)), which allows sealed filings without "further Court order," G&G has redacted in its ECF filing the description and quotation of this document and the corresponding exhibit, while submitting to the Court and serving on NYRA unredacted copies of this filing.

[3] Mr. Getnick's contemporaneous notes reflect Mr. Rosen's suggestion of a "2 year contract (w/ Evergreen 2 yr renewal) with 6 mo advance cancellation clause prior to evergreen renewal." (Ex. 14.)

in Mr. Getnick's contemporaneous notes, he and Mr. Rosen discussed "points for Gov[ernmen]t to make supporting b[an]kr[upt]cy applic[ation]," including "Retainer Agreement – Independence, Cooperation, Intensity, Duration." (Ex. 15.)

14.     Soon thereafter, Mr. Rosen reported to Patrick Kehoe, NYRA's General Counsel, that Assistant Attorney General Nancy Lord had called Mr. Rosen to discuss G&G's retention:

> She said she was calling about Getnick. She indicated that the State and the 2nd Floor [i.e., the Governor's Office] did not want to micro-manage the situation but that ***she felt that the retention was critical to the franchise process*** because all of the other bidders now have a similar mechanism. Additionally, she felt that ***any effor tby [sic] the [Creditors'] Committee to have Getnick keep his hours down was antithetical to the "independence" process***. She said that she would attend the hearing and make a supporting comment." [Ex. 16, emphasis added.]

15.     Also during this period, Mr. Getnick spoke again with Richard Rifkin, the Governor's Special Counsel, who said that he had spoken with Assistant Attorney General Lord. As shown by Mr. Getnick's contemporaneous notes, Mr. Rifkin and Mr. Getnick discussed the "need for someone to oversee integrity of horseracing [at] NYRA," and the "[n]eed for independence," which is a matter of "time (intensity and duration)." (Ex. 17.)

16.     In preparing for the hearing on NYRA's application to the Court, Weil drafted a proffer of Mr. Getnick's proposed testimony. Under the heading "Terms of Engagement" and the sub-heading "Length of Retention," Weil drafted the following:

> ***Mr. Getnick would testify that a 5-year term of engagement is necessary for the successful completion of the representation.*** Critical to any of G&G's business integrity representations is G&G's independence to conduct its investigations and operations free from interference or pressure from existing management or other outside forces. ***A 5-year term also provides the requisite continuity*** that will enable G&G to effectively coordinate with federal, state, and local regulatory agencies during the representation. [Ex. 18, at G&G000058, emphasis added.]

Under the sub-heading "Rate Structure," the draft proffer stated: "Mr. Getnick would testify that his normal hourly rate is currently $600 per hour, and that the rate of $290 per hour being charged to NYRA is less than half of his normal hourly rate." (*Id.*)

7

17.     During a NYRA/G&G conference call on September 11, 2007, Mr. Rosen reported on his recent conversation with Jeffrey Rich, counsel for the creditors' committee. According to Mr. Getnick's contemporaneous notes, Mr. Rosen said that he and Mr. Rich had discussed NYRA's "ability to cancel on 60 day notice prior to confirmation of plan *and no ability subsequent*." (Ex. 19, emphasis added.) Again, this discussion would have been wholly unnecessary if NYRA had a right to terminate the engagement at any time.

18.     The next day, Mr. Rich sent an email to Mr. Rosen asking whether the retention should be addressed "under 327" (11 U.S.C. § 327, "Employment of professional persons"). Mr. Rosen answered: "But what is the point [of the inquiry]? *The State does not want him [Mr. Getnick] limited by the number of hours he works!*" (Ex. 20, emphasis added.) Mr. Rosen's answer underscored the State's interest in maximizing G&G's independence.

19.     Ultimately the creditors' committee withdrew its objection, thus avoiding the need for a hearing and testimony on NYRA's application for approval. The agreed order submitted by NYRA to the Court contained the following termination provision:

> ORDERED that, notwithstanding anything contained in the Application, the Getnick Declaration and the Retainer Agreement to the contrary, (a) at any time prior to the entry of a final order confirming a chapter 11 plan in NYRA's chapter 11 case (the "Plan"), NYRA shall have the right to terminate the Retainer Agreement and G&G's services thereunder, without cause and the payment of penalty upon sixty (60) days prior written notice to G&G, and (b) *upon and after the entry of a final order confirming the Plan, the services to be provided pursuant to the Retainer Agreement may only be terminated in accordance with the terms and provisions of the Retainer Agreement[.]* [Ex. 21, at G&G000074-75, emphasis added.]

The Court signed the proposed order, without revision, on September 27, 2007. (Ex. 1, Dkt. No. 543.) Under its terms, NYRA *never* had the ability to terminate the engagement at will. Before plan confirmation, NYRA was required to provide 60 days' notice to G&G if NYRA sought to terminate. After confirmation, NYRA could terminate only if it lost its franchise.

8

**C.     NYRA's Representations To New York State Regarding G&G's Engagement**

20.     During this period, NYRA continued to press its bid for New York State's thoroughbred racing franchise. As an essential part of that effort, NYRA sought to amend its bid submission to highlight NYRA's commitment to integrity, as demonstrated by its retention of G&G. In response to NYRA's request for advice, Mr. Getnick recommended language that emphasized G&G's "maximum independence," which he noted was "consistent with the emphasis by Richard Rifkin [the Governor's Special Counsel] during my discussion with him before G&G entered into the business integrity counsel agreement with NYRA." (Ex. 22.)

21.     In its final form, NYRA's amended submission to the State included the following representations and commitments regarding G&G:

- "To ensure that NYRA continues to maintain the highest standards of integrity and transparency, NYRA has retained the law firm of Getnick & Getnick as business integrity counsel. In this role, ***Getnick & Getnick will act as an independent source of checks and balances*** . . . ." [Ex. 23, at NYRA_005643, emphasis added.]

- "NYRA has committed itself to providing ***maximum independence to and complete cooperation*** with Getnick & Getnick in its role as business integrity counsel." [*Id*., emphasis added.]

- "Getnick & Getnick's retainer agreement letter with NYRA speaks to these points, saying: 'NYRA agrees and acknowledges that it is the intent of both NYRA and G&G to afford ***maximum independence*** to G&G in performing its function as business integrity counsel, including, but not limited to, interacting with governmental entities and industry regulators, consistent with the underlying counsel relationship between NYRA and G&G. ***NYRA agrees to cooperate fully with G&G*** and to provide promptly all information known or available to it relevant to our representation of it.'" [*Id*. at NYRA_005643 n.2, emphasis added.]

- NYRA would provide the State with "[t]he highest standards of integrity, transparency, and corporate governance." [*Id*. at NYRA_005643.]

9

**D.  NYRA's Further Representations To New York State Regarding The Engagement**

22. The State awarded the franchise to NYRA in February 2008. NYRA then continued to assure the State that G&G's five-year engagement was non-terminable, and that this feature was essential to protecting G&G's "maximum independence." For example, in July 2010, less than a year before NYRA fired G&G, NYRA told New York State's Comptroller:

> The provisions in the Retainer [Agreement] are designed to ensure and maximize this independence. First, the Retainer [Agreement] specifies a non-exhaustive list of subject matter areas for Getnick & Getnick to address. Highlighting these areas – areas that were previously emphasized by the OSC [Office of the State Comptroller] – is intended to ensure that Getnick & Getnick is not prevented from continuing to address these important integrity matters. Second, *the agreement is in effect for a five-year period*. *This precludes a potential short-term strategy by management to impede, obstruct, or ignore integrity efforts.* Third, the Retainer contains a monthly minimum fee for professional services designed to ensure that the efforts of business integrity counsel can not be limited by having its funding restricted. [Ex. 24, at G&G000087, emphasis added; see also Exs. 25 & 26.]

23. NYRA never expressed a different view of the five-year term or the meaning of "maximum independence" at any point during G&G's engagement – including the day it fired G&G. The first time NYRA declared a different view was more than a year later, when it filed the pending motion to "clarify" or "amend" this Court's 2007 Order.

**ARGUMENT**

24. NYRA's motion to "clarify" or "amend" the Court's 2007 Order asks the Court to endorse retroactively NYRA's willful violation of the Order. Specifically, NYRA's motion asks the Court to declare that NYRA had "a unilateral right to terminate G&G." (Dkt. No. 1167, at 14.) But such a declaration would neither "clarify" nor "amend" the Order. Instead, it would nullify outright an essential provision of the Order.

10

25. Fed. R. Civ. P. 60(b), made applicable by Bankruptcy Code 9024, specifies six possible grounds for relief from a final judgment, order, or proceeding.[4] As set forth in detail in G&G's Further Response to NYRA's motion (Ex. 27, Dkt. No. 1172, at 15-16), NYRA has failed to satisfy any of the Rule's subsections. In particular, NYRA has failed to show that the Order is "void" or voidable under New York law. Indeed, even if it were assumed that the Order somehow conflicted with New York law, the relief NYRA seeks would still be unwarranted under Rule 60. *See, e.g., In re Enron Corp.*, 352 B.R. 363, 369 (Bankr. S.D.N.Y. 2006) ("an error in legal interpretation does not constitute 'extraordinary circumstances'" under Rule 60(b)); *In re Teligent, Inc.*, 306 B.R. 752, 761 (Bankr. S.D.N.Y. 2004) (Rule 60(b) relief would be unavailable even if the Court misinterpreted the business judgment rule).

## I. The Engagement In This Case Cannot Be Viewed As A Traditional Attorney-Client Relationship

### A. The Parties' Relationship Was Unique And A Matter Of Public Interest

26. The integrity of the organization that holds New York State's racing franchise is a matter of profound public concern. NYRA won the franchise only after promising that G&G would operate with "maximum independence" during a guaranteed five-year period. This type of arrangement is unheard of in traditional attorney-client relationships, but was essential to G&G's special role as independent business integrity counsel – an oversight role designed to serve not only NYRA's private interests but the public interest as well.

---

[4] The six grounds are:
    (1) mistake, inadvertence, surprise, or excusable neglect;
    (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
    (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
    (4) the judgment is void;
    (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
    (6) any other reason that justifies relief.

27. As shown in G&G's prior filings (see especially Ex. 27, Dkt. No. 1172), NYRA and the State entered into a Memorandum of Understanding ("MOU") while NYRA's application for Court approval of the engagement was still pending. The MOU required that NYRA retain "an *independent business integrity counsel*, acceptable to the State, who, among other things, will act as an *independent source of checks and balances*" to maintain the integrity of racing and betting operations. (Ex. 27, Dkt. No. 1172, at Exhibit J, emphasis added.) In addition, the State amended the New York Racing, Pari-Mutuel Wagering and Breeding Law ("Racing Law") to incorporate an express requirement that NYRA retain independent business integrity counsel. *See* Racing Law § 206 ("The franchised corporation shall comply with all applicable laws and regulations and retain an independent business integrity counsel, who, among other things, will act as an *independent* source to help ensure the integrity of the franchised corporation, its officers and employees, and its operations.") (emphasis added).

28. G&G's special functions also received judicial recognition in *Garcia v. New York Racing Ass'n, Inc.*, 2011 U.S. Dist. LEXIS 96614, at *10 n.4 (N.D.N.Y. Aug. 29, 2011). The court stated that NYRA's independent business integrity counsel is a "*statutorily-created, independent entity that is not subject to direct control by NYRA*, but its sole purpose is to 'ensure the integrity of the franchised corporation, its officers and employees, and it[s] operations'" (quoting Racing Law § 206(5), emphasis added).

29. These authorities confirm that G&G performed statutorily-recognized functions in the public interest pursuant to this Court's 2007 Order. Such functions have no counterpart in traditional attorney-client relationships. The Retainer Agreement, this Court's 2007 Order, the MOU, and New York's Racing Law all confirm that G&G was authorized to operate with "maximum independence," enabling it to conduct investigations and oversight without direction or interference by NYRA. An essential safeguard of G&G's "maximum independence" was the

12

guaranteed five-year term, which allowed G&G to conduct its investigations and oversight without the threat of premature termination. The five-year guarantee was a basis of the bargain that NYRA struck with G&G in the Retainer Agreement, as guided by State authorities, and as approved by this Court's Order.

30. In traditional attorney-client relationships, the period of service is ancillary to the fundamental nature of the relationship. Here, by contrast, G&G's essential functions depended on NYRA's inability to terminate the engagement. Nullification of the five-year guarantee would undermine the central purpose of the parties' relationship. Under these circumstances, enforcement of the guarantee is not only lawful but necessary as a matter of public policy.

### B. The Traditional "Discharge Rule" Is Inapplicable Here

31. NYRA's motion invokes the general "discharge rule" that governs traditional attorney-client relationships, under which the client may discharge the attorney at will. But that rule is inapplicable here. NYRA, a sophisticated party represented by sophisticated counsel, deliberately waived its rights under the traditional rule. NYRA did so to promote its own interests. NYRA knew that providing G&G with a guaranteed five-year term would maximize NYRA's chances of success in the competition for New York's racing franchise.

32. Moreover, the engagement was designed to serve not just NYRA's private interests, but the public interest as well. The "discharge rule" is inapplicable to this kind of special engagement. The rule developed in the context of purely private relationships, to prevent overreaching by attorneys, particularly with respect to unsophisticated clients who lacked other legal counsel. The policies underlying the rule are inapplicable here, where NYRA and its counsel, Weil Gotshal, were highly sophisticated and knew exactly what they were doing. The case law that NYRA's motion relies on – particularly *Matter of Cooperman*, 83 N.Y.2d 465 (1994) – has been distinguished on precisely this basis:

13

> The potential for overreaching by an attorney made all too likely by the type of nonrefundable retainer set forth in *Cooperman* is simply not an issue here, where ***the agreement in question was fully bargained for by a sophisticated client*** fully aware of its prospective legal needs, of the capabilities of the [attorneys] to fulfill those needs and of [the client's] rights and obligations under the retainer agreement.

*Atkins & O'Brien L.L.P. v. ISS Int'l Serv. Sys. Inc.*, 252 A.D.2d 446, 448-49 (1st Dep't 1998) (emphasis added); *see also Greenberg v. Jerome H. Remick & Co.*, 230 N.Y. 70, 74 (1920) (the "discharge rule" and its exceptions "do not extend to a case where it appears by the express terms of the contract or otherwise that a different rule was intended by the parties").

33. New York's Court of Appeals applied similar principles in *Matter of Lawrence*, 24 N.Y.3d 320 (2014), where the issue was whether a law firm's contingent fee agreement was unconscionable. The Court stated that "[t]he most important factor is whether the client was fully informed upon entering the agreement." *Id*. at 337. Finding that the client was fully informed and sophisticated, and had actively sought the terms of the agreement, the Court held that the agreement was enforceable as written: "[The client] was no naif. She was a competent and shrewd woman who made a business judgment that was reasonable at the time. . . . As a general rule, we enforce clear and complete agreements . . . according to their terms." *Id.* at 341; *see also Vermont Teddy Bear Co. v. 538 Madison Realty Co*., 1 N.Y.3d 470, 475 (2004) (cited in *Lawrence*) ("In the absence of any ambiguity, we look solely to the language used by the parties to discern the contract's meaning."). By the same reasoning, this Court's 2007 Order and the Retainer Agreement are "clear and complete" and enforceable "according to their terms."

**II.    Even If The Engagement In This Case Were Viewed As A Traditional Attorney-Client Relationship, The General "Discharge Rule" Would Not Apply**

34. Furthermore, enforcement of this Court's Order and the Retainer Agreement would be required even if G&G's engagement were viewed as a traditional attorney-client relationship. In *Martin v. Camp*, 219 N.Y. 170 (1916), for example, the Court held that the

14

"discharge rule" does not apply where the attorney "has changed his position or incurred expense" in entering into the relationship, or where the attorney "is employed under a general retainer for a fixed period to perform legal services in relation to matters that may arise during the period of the contract." 219 N.Y. at 176; *see also Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420, 446 (S.D.N.Y. 1998) (magistrate judge's report, adopted by district court); *Atkins & O'Brien,* 252 A.D.2d at 448-49.

35. Under *Martin*, G&G "changed [its] position or incurred expense" in entering into the parties' relationship. G&G committed its finite resources to an intensive and wide-ranging engagement for a five-year period. Most significantly, G&G accepted sharply discounted billing rates for its services. For example, as set forth in NYRA's application to the Court, Mr. Getnick's hourly rate under the Retainer Agreement was less than half his normal hourly rate. These circumstances provide still further justification for enforcement of the Court's 2007 Order.

## CONCLUSION

The Court should (a) deny NYRA's motion to "clarify" or "amend" the 2007 Order, (b) hold that the Order is enforceable as written and was violated by NYRA's termination of G&G, and (c) determine in a further proceeding the appropriate remedies for NYRA's violation.

Dated: New York, New York
       June 12, 2017

                            Respectfully submitted,

                            MORITT HOCK & HAMROFF LLP
                            Counsel for Getnick & Getnick LLP
                            1407 Broadway, Suite 3900
                            New York, New York 10018
                            (212) 239-2000

                            By: */s/ Andrew B. Eckstein*
                                Andrew B. Eckstein

15

-and-

**GETNICK & GETNICK LLP**
521 Fifth Avenue
33rd Floor
New York, NY 10175
(212) 376-5666

1169131v2