UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                   :
In re:                                             :   Chapter 11
                                                   :
THE NEW YORK RACING ASSOCIATION INC.,              :   Case No. 06-12618 (JLG)
                                                   :
     Debtor.                                       :
                                                   :
------------------------------------------------------------------x

# SUPPLEMENTAL BRIEF OF THE NEW YORK RACING ASSOCIATION INC. WITH RESPECT TO ITS MOTION (A) CLARIFYING AND, IF NECESSARY, AMENDING ORDER AUTHORIZING THE EMPLOYMENT OF GETNICK & GETNICK LLP AND (B) ADDRESSING CLAIMS ASSOCIATED THEREWITH

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the New York Racing Association, Inc.*

**TABLE OF CONTENTS**

Page

**INTRODUCTION**..................................................................................................................1

**BACKGROUND** ...................................................................................................................4

    **A.**    **The Relationship of the Parties Pursuant to the 2004 Retainer Agreement**.................................................................................................4

    **B.**    **The Attorney-Client Relationship of the Parties Under the Retainer Agreement**.................................................................................................5

    **C.**    **The Non-Binding Memorandum of Understanding Between NYRA and the State of New York** ......................................................................7

    **D.**    **The September 19, 2007 Getnick Order** ............................................8

    **E.**    **The Racing Law Requires New NYRA's Board of Directors To Retain Independent Business Integrity Counsel** ...............................9

    **F.**    **The State Approved Of the Replacement of Integrity Counsel By the Board**............................................................................................9

**ARGUMENT** .......................................................................................................................10

    **I.**    **NYRA, Acting Through Its Board, Had An Implied Right To Terminate The Retainer Agreement** ...................................................10

    **II.**    **The 2008 Racing Law Did Not Transform G&G Into A New Type of Counsel Outside the Control of Its Own Client** ................................13

    **III.**    **CONCLUSION** ...................................................................................15

i

## **TABLE OF AUTHORITIES**

                                                                                                                                **Page(s)**

**Cases**

*Atkins & O'Brien LLP v. ISS Int'l Serv. Sys., Inc.*,
    252 A.D.2d 446 (N.Y. Sup. Ct. 1998) .................................................................10, 11

*Campagnola v. Mulholland, Minion & Roe*,
    76 N.Y.2d 38 (1990) .........................................................................................................10

*Matter of Cooperman*,
    83 N.Y.2d 465 (N.Y. 1994) ................................................................................. 11-12

*Demov, Morris, Levin & Shein et al., v. Glantz*,
    53 N.Y.2d 553 (1981) .......................................................................................................10

*Garcia v New York Racing Ass'n, Inc.*,
    No. 1:10-cv-01092, 2011 WL 3841524 (N.D.N.Y. Aug. 29, 2011) ........................................15

*Greenberg v. Bar Steel Constr. Corp.*,
    22 N.Y.2d 210 (1968) .......................................................................................................13

*Hechter v. N.Y. Life Ins. Co.*,
    46 N.Y.2d 34, 385 N.E.2d 551 (1978) ................................................................................14

*Kelly v. MD Buyline, Inc.*,
    2 F. Supp. 2d 420 (S.D.N.Y. 1998) ...............................................................................11, 13

*Kramer v. Phoenix Life Ins. Co.*,
    15 N.Y.3d 539, 940 N.E.2d 535 (2010) ..............................................................................14

*Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc.*,
    20 F. Supp. 2d 645 (S.D.N.Y. 1998) ...................................................................................11

*Martin v. Camp*,
    114 N.E. 46 (N.Y. 1916) ...................................................................................................10

*Nat'l Grid Corp. Servs., LLC v. LeSchack & Grodensky, P.C.*,
    100 A.D.3d 721, 954 N.Y.S.2d 131 (2012) ........................................................................13

*Shaw v. Mfrs. Hanover Trust Co.*,
    68 N.Y.2d 172 (1986) ................................................................................................. 12-13

*Simon v. Usher*,
    17 N.Y.3d 625, 958 N.E.2d 540 (2011) ..............................................................................14

**Statutes**

N.Y. RAC. PARI-MUT. WAG. & BREED. §205(6) .............................................................. 13-14

N.Y. RAC. PARI-MUT. WAG. & BREED. §206(1) ....................................................................9

N.Y. RAC. PARI-MUT. WAG. & BREED. §206(5) ....................................................................9

# INTRODUCTION[1]

NYRA, acting through its Board of Directors, had an implied termination right under the Retainer Agreement, and, therefore, the Getnick Order. In the first instance, the Getnick Order clearly provides that, after plan confirmation, the termination of services being provided by G&G is to be determined under the terms and provisions of the Retainer Agreement. In turn, the Retainer Agreement provides that all disputes, including those concerning termination, are to be decided under principles of New York law. Every legal services contract governed by New York law, but for two inapplicable exceptions, contains an implied termination right exercisable by the client notwithstanding express terms to the contrary. If such right were exercised, the non-breaching client is obligated only to pay for the reasonable value of pre-termination services. This has been the law and public policy of New York for more than a century, and, in accordance with the Getnick Order, unequivocally applies to the Retainer Agreement.

G&G, however, seeks to overturn established non-bankruptcy law on the premise that a client could and, in this case, did, agree to a first-of-a-kind attorney-client relationship. Specifically, G&G claims that NYRA agreed to afford G&G, its counsel, with complete autonomy, including non-termination, i.e., it would be beyond the control even of NYRA's Board of Directors. In other words, G&G would have no client. G&G's novel construct cannot be reconciled with the fiduciary duties (including the duty of loyalty) owed by the attorney in every attorney-client relationship. For this reason alone, G&G's arguments fail.

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the meaning ascribed thereto within the Motion of The New York Racing Association, Inc. for Entry of an Order, Pursuant to Section 350(b) of the Bankruptcy Code and Rule 5010 of the Federal Rules of Bankruptcy Procedure, Reopening the Chapter 11 Bankruptcy Case for the Limited Purpose of (A) Clarifying and, If Necessary, Amending Order Authorizing the Employment of Getnick & Getnick LLP and (B) Addressing Claims Associated Therewith (the "Motion").

1

G&G's untenable position is even weaker under closer scrutiny. It is accurate that NYRA's Board of Directors had no control over G&G under the terms of the parties' <u>first</u> retainer agreement, which implemented a monitoring relationship. Such relationship ended in July 2005, when the presiding federal district court terminated the monitorship. In contrast, the second 'go round' of the parties was starkly different, as it created an attorney-client relationship. There, G&G sent NYRA's Chairman a draft retainer agreement in mid-2007 that required G&G to provide NYRA with legal services as business integrity *counsel*, and to have maximum independence *in performing its function as* business integrity *counsel, consistent with the underlying counsel relationship between NYRA and G&G.* In other words, as G&G has repeatedly admitted, it was agreed that G&G would have maximum independence in performing its duties as counsel from *NYRA's management,* while G&G reported to, and took direction from, representatives of NYRA's Board, i.e., the Chairman of NYRA's Board and the Board's Special Oversight Committee. The Retainer Agreement bears no resemblance to G&G's proposed departure from all prior attorney-client relationships.

During the subsequent and separate negotiations to obtain a non-binding agreement to extend NYRA's racing franchise, a representative of the State proposed language to require NYRA to retain an independent monitor. *G&G counseled and convinced NYRA's Chairman* to reject that language and, instead, use G&G's proposed language. That language permitted NYRA to continue to retain independent integrity *counsel*. The State's representatives accepted NYRA's proposal, which is memorialized in the non-binding Memorandum of Understanding Between New York State and NYRA, dated September 4, 2007 ("MOU"). Based on this fact alone, G&G's argument that the State required NYRA's Board to accept integrity oversight outside of even its control is clearly incorrect. Likewise, neither NYRA nor Mr.

2

Getnick in his declaration to the court in connection with the retention application, state or imply that G&G would be independent from NYRA's Board or be otherwise beyond its control in connection with the Getnick Order, which was so ordered after the MOU's execution. *See, e.g.*, Declaration of Robert S. Berezin (the "Berezin Declaration") Exhibit [1] (GG002435-2439.).

Furthermore, in 2008, the New York Racing, Pari-Mutuel Wagering and Breeding Law (the "Racing Law") was amended to authorize what would become New NYRA's Board of Directors to act on behalf of NYRA. It required the Board to retain independent integrity *counsel* to be an independent source to ensure the integrity of "the franchised corporation, its officers and employees and its operations." Section 206(5) plainly does not create a new kind of attorney-client relationship in which counsel does not answer to its client, NYRA, acting through its Board of Directors. Indeed, when the Chairman of NYRA's Board and the Board's Special Oversight Committee replaced G&G in 2011, the Office of the New York Comptroller, which is an important NYRA regulator, approved of such action and allowed it to address serious billing issues with respect to the G&G retention. NYRA's Board replaced integrity counsel again while the State of New York controlled NYRA's Board. Not a single regulator or other representative of New York State has claimed that NYRA's Board had no right to do so. In arguing the contrary, G&G has stood alone for nearly six years.

The reason for that is clear: The parties' attorney-client relationship was one in which integrity counsel would be an outside, non-NYRA lawyer, who would offer unbiased, impartial advice to NYRA's Board of Directors, and who would not be under the direct control of NYRA's *management*. That level of autonomy would relieve integrity counsel from reasonable concerns of inappropriate retaliation and allow it to "assess, report on, and provide counsel" to its client, NYRA, as represented by its Board of Directors. At the same time, like all

3

other lawyers, integrity counsel would owe fiduciary duties, including the duty of loyalty, to its client. The century old right of a client to replace counsel clearly also applied with equal force to NYRA, acting through its Board of Directors. That rule exists to ensure that clients remain free to obtain legal advice from a trusted source at all times, not just for part of a representation, even if it was originally intended to last five years. Accordingly, for these reasons and those set forth below, NYRA, acting through its Board, had an implied termination right under the Retainer Agreement and the Getnick Order.

## BACKGROUND

A.  **The Relationship of the Parties Pursuant to the 2004 Retainer Agreement**

NYRA was a private, non-profit racing association that owned and operated the three largest racetracks in New York. In 2003, NYRA entered into a deferred prosecution agreement, which required NYRA to retain a court-appointed federal monitor. Pursuant to the parties' retainer agreement, Neil Getnick, of G&G, had complete autonomy from NYRA's Board.[2] After G&G's final report praised NYRA's integrity, G&G's monitorship ended in July 2005. *See, e.g.*, Berezin Declaration, Exhibit [3](Disclosure Statement).

---

[2] *See* Berezin Declaration, Exhibit [2] (NYRA_005594-5596, at 5594) ("The New York Racing Association, Inc. ("NYRA") hereby retains the law firm of Getnick & Getnick ("G&G") as a Monitor in accordance with the terms of the December 10, 2003 "Deferred Prosecution Agreement" entered into between the United States Attorney's Office for the Eastern District of New York ("USAO") and in accordance with the terms of the March 1, 2004 "Order Appointing Monitor" issued by Hon. Arthur D. Spatt, United States District Judge, Eastern District Of New York ("Order.") . . .NYRA understands and acknowledges that the Monitor may withhold information from NYRA which it obtains during the course of the Monitorship. NYRA further understands and acknowledges that communications between G&G and NYRA will not be protected by the attorney-client privilege or work product doctrines. NYRA further understands and acknowledges that communications between those working under the direction of G&G (including auditors, investigators and other non-attorneys) and NYRA will not be protected by standards of confidentiality normally applying to those relationships . . . The term of this agreement is determined by the Order, and any subsequent related orders issued by the Court . . . In any event, NYRA may not terminate this retainer agreement and discharge G&G.").

4

### B. The Attorney-Client Relationship of the Parties Under the Retainer Agreement

NYRA's racing franchise, granted by the State of New York, was scheduled to expire on December 31, 2007. *See*, Berezin Declaration, Ex. [4] (G&G 9-48, at 17). On November 2, 2006, NYRA commenced a case under chapter 11. At that time, the Governor's office was engaged in a bidding process to determine the future operator of New York racing. *See*, Berezin Declaration, Ex. [4] (G&G 9-48, at 18). In January 2007, then Governor Spitzer pledged to make integrity a prerequisite to the final decision, and announced a new Request for Proposal ("RFP") process. *Id.* Under that process, NYRA, and three other candidates, made presentations based on their responses to the RFP in April 2007. *Id.*

To demonstrate its commitment to integrity, NYRA's Chairman of the Board sought to retain G&G as NYRA's integrity counsel. *See*, Berezin Declaration, Ex. [4] (G&G 9-48, at 19). He did so due to the positive working relationship with Neil Getnick and his firm, G&G, while it was NYRA's monitor and G&G's intimate familiarity with NYRA's business, personnel and operations. *See*, Berezin Declaration, Ex. [4] (G&G 9-48, at 16).

On June 22, 2007, G&G provided NYRA's Chairman a draft retainer agreement. *See, e.g.*, Berezin Declaration, Ex. [5, 6] (GGX011938-41; GGx004619-20). On June 26, 2007, an internal G&G draft filled in fee and term blanks in the draft. *See*, Berezin Declaration, Ex. [7] (GGx004659-62, at 4661). The next day, G&G provided the proposed fee and five-year term to NYRA's Chairman. *See*, Berezin Declaration, Ex. [8] (GG001402). In July, NYRA's bankruptcy counsel provided the following comments to G&G's draft: Adding G&G's fee and five year term proposal, an express termination right if NYRA no longer maintained the racing franchise and some minor changes. *See, e.g.*, Berezin Declaration, Ex. [9] (GG011154-

5

GG011157). G&G thus supplied most of the Retainer Agreement's terms, including those related to "independence."

The executed version created an attorney-client relationship. *See, e.g.*, Berezin Declaration, Ex. [10] (GG002432-002434, at 2432)( "We are pleased that The New York Racing Association Inc. ("NYRA") has *chosen to retain our law firm as business integrity counsel*. This letter will confirm *your engagement of our firm* and will discuss the basis on which *our law firm will provide legal services to NYRA . . .*).[3] In such context, NYRA agreed to afford G&G with "maximum independence" in performing its duties as counsel to NYRA consistent with the underlying counsel relationship between NYRA and G&G. *See*, Berezin Declaration, Ex. [10] (GG002432-002434, at 2432). Likewise, NYRA agreed to cooperate fully with G&G in providing information relevant to G&G's legal representation of NYRA. *Id.* The parties understood these terms to mean that G&G reported to the Chairman of the Board and the Board's Special Oversight Committee, not to management.[4]

---

[3] *See also*, Berezin Declaration, Ex. [10] (GG002432-2434, at 2432) ("It is understood and agreed that Getnick & Getnick ("G&G") shall perform those services necessary for it to *assess, report on, and provide counsel* in connection with matters affecting NYRA's business integrity . . . NYRA agrees that G&G has the right *to withdraw as counsel* for non-payment of fees and costs . . . It is the nature of *legal work* that we cannot predict what the outcome will be *of our legal efforts*. NYRA understands and acknowledges that G&G has not promised to achieve any general or particular results . . .*We look forward to representing NYRA as its business integrity counsel*.") The final version, like G&G's draft, also provided that "any dispute or controversy arising out of this retainer letter and agreement will be governed by and construed in accordance with the laws of the New York State . . ." *See*, Berezin Declaration, Ex. [10] (at GG002434).

[4] *See*, Berezin Declaration, Ex. [11] (G&G000615-628, at 622) ("The next item discussed was the retention of Getnick & Getnick (G&G) as NYRA's integrity counsel. Neil Getnick addressed the Trustees regarding the retention process, the necessary approval from the bankruptcy court and the scope of the work G&G intends to undertake. *G&G will report to the NYRA Chairman and to the Special Oversight Committee of the NYRA Board of Trustees.*"); Berezin Declaration, Ex. [12] (G&G002366-7, at 2367) Statement to Village Voice Reporter dated 9/15/07 ("Note, off the record: I am neither exasperated by that criticism or, following my retention by NYRA, am I "completely independent"; rather our retention agreement provides for maximum independence consistent with the underlying counsel relationship between NYRA and

6

       **C.**    **The Non-Binding Memorandum of Understanding Between NYRA and the State of New York**

A July 1, 2007 statement issued by then Governor Spitzer stated, among other things, that, "[a]s we go forward, we will need to examine the full range of available integrity tools, ranging from *private monitors* to enhanced regulatory powers, to ensure the continued integrity of racing and other gaming in New York State. *See*, Berezin Declaration, Ex. [17] (G&G11152) (emphasis supplied). New York State representatives thereafter introduced language in the draft MOU to require NYRA to retain an "independent integrity monitor." *See*, Berezin Declaration, Ex. [18](GG011287-11295, at 289). In response, G&G counseled NYRA to propose that new NYRA would only be obligated to "*continue the retention of* independent *business* integrity *counsel.*" *See*, Berezin Declaration, Ex. [18](GG011285-11286, at 11286). This proposal was adopted in the September 2007 MOU. *See*, Berezin Declaration, Ex. [20] (Docket No. 1180-7).

---

Getnick & Getnick."); Berezin Declaration, Ex. [13] (Draft Memorandum from "NVG" re Notes for call with Steve Duncker [Chairman of NYRA's Board])(9/4/08 GG011452)("Reporting to/oversight by Special Oversight Committee")); Berezin Declaration, Ex. [14] (1/30/09 Draft Report of Business Integrity Counsel to Special Oversight Committee of The New York Racing Association, Inc. Board of Directors, G&G 480-506) ("G&G's unique role as independent business integrity counsel is served by a dual reporting line whereby G&G reports to, and takes direction from, (i) the Chairman of the Board of Directors, and (ii) the SOC [Special Oversight Committee]."); Berezin Declaration [15] March 23, 2009 Special Oversight Committee Presentation GG011521-60 ("BIC [Business Integrity Counsel] Recommendations re: Reporting and Direction . .. Report to the Chairman of the Board of Directors and Chairman of the SOC on an active/ongoing basis . . .Chairman of the Board of Directors and/or SOC can, and should, direct BIC to report to Management those things that will assist Management in carrying out its duties."); Berezin Declaration, Ex. [16] (G&G102-107 Letter to Comptroller) ("Getnick & Getnick, in order to maintain its independence as NYRA's business integrity counsel, does not report to, nor take direction from, NYRA Management. Rather, Getnick & Getnick reports to the Chairman of the Board, C. Steven Duncker, and the Special Oversight Committee . . .").

7

### D. The September 19, 2007 Getnick Order

NYRA filed a Notice of Presentment of Order, Pursuant to Sections 327(e) and 328(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure, Authorizing the Employment of Getnick & Getnick, as Special Business Integrity Counsel ("Proposed Order") and associated documents, including an Application, declaration of Neil Getnick and proposed form of order on July 16, 2007. Berezin Declaration, Ex. [4] (G&G 9-48). In its Application, NYRA explained the importance of maintaining and enhancing its integrity, including in light of the State's franchise renewal process, and the reasons it believed G&G was uniquely qualified to assist NYRA in that regard. *Id.* at G&G-13-19; 20-21. Notably, neither NYRA's submission nor Neil Getnick's declaration stated that G&G was to be outside the control of NYRA's Board of Directors. *See*, Berezin Declaration, Ex. [4] (at G&G 31-44*).*

In connection with resolving a limited objection filed by the statutory committee of unsecured creditors, revisions were made to the draft Getnick Order that were accepted by the Court: "Ordered, that, notwithstanding anything contained in the Application, the Getnick Declaration and the Retainer Agreement to the contrary, (a) at any time prior to the entry of a final order confirming a chapter 11 plan in NYRA's chapter 11 case (the "Plan"), NYRA shall have a right to terminate the Retainer Agreement and G&G's services thereunder, without cause and the payment of penalty upon sixty (60) days prior written notice to G&G, and (b) upon an after entry of the final order confirming the plan, the services to be provided pursuant to the Retainer Agreement may only be terminated in accordance with the terms and provisions of the Retainer Agreement." Berezin Declaration, Ex. [21] (Docket No. 543, at 3).

### E. The Racing Law Requires New NYRA's Board of Directors To Retain Independent Business Integrity Counsel

The Racing Law was revised in 2008 to reflect the terms of New NYRA's racing franchise. In particular, New NYRA's Board of Directors was authorized to act on its behalf. *See* N.Y. RAC. PARI-MUT. WAG. & BREED 206(1). New NYRA also became, upon confirmation of Old NYRA's plan of reorganization, a type-C corporation subject to New York's not-for-profit corporation law and the provisions of the Racing Law (which controlled in the event of any conflict). *See* N.Y. RAC. PARI-MUT. WAG. & BREED 206(1). N.Y. RAC. PARI-MUT. WAG. & BREED 206(5) of the Racing Law also provides that New NYRA, acting through its Board of Directors, "shall comply with all applicable laws and regulations *and retain an independent business integrity counsel*, who among other things, will act as an *independent source* to help ensure the integrity of the franchised corporation, its officers and employees, and its operations." N.Y. RAC. PARI-MUT. WAG. & BREED 206(5).

### F. The State Approved Of the Replacement of Integrity Counsel By the Board

In 2010-11, disputes arose between G&G and New NYRA's Special Oversight Committee and Chairman. New NYRA's Chairman and Special Oversight Committee, on behalf of the Board of Directors, determined that NYRA should replace integrity counsel, which it did in March 2011.[5] *See*, Berezin Declaration, Ex. [23](NYRA_001156)*.* The Comptroller for the State of New York, a New NYRA regulator, specifically approved of its actions. In fact, New NYRA's Board of Directors has replaced integrity counsel twice (i.e., G&G was replaced by the

---

[5] *See e.g.*, Berezin Declaration, Ex. [22] (Letter to NYRA From State of New York Office of the Comptroller, January 24, 2012)(NYRA_005854-5859) (in connection with the Comptroller's recommendation that NYRA justify the need and price of contracts, and take corrective action, the Comptroller noted that NYRA had partially implemented the recommendation: However, *we note that NYRA officials did terminate NYRA's contract with its former integrity counsel and awarded a new, more cost-effective, contract to a different integrity counsel.*").

9

Morvillo firm in June 2011, which, in turn, was replaced by Herrick Feinstein in June 2014). *See*, Berezin Declaration, Ex. [24](Letter to NYRA from G&G, September 28, 2016). In the latter case, the State of New York controlled NYRA's Board of Directors and authorized the substitution of counsel. The State of New York has never indicated that NYRA's Board of Directors or its designees did not possess the right to replace its integrity counsel.

### ARGUMENT

**I. NYRA, Acting Through Its Board, Had An Implied Right To Terminate The Retainer Agreement**

As explained above, the Getnick Order provides that, after confirmation of the chapter 11 plan, G&G's services may be terminated in accordance with the terms and provisions of the Retainer Agreement, which are governed by New York law. With two exceptions, both of which G&G agrees are inapplicable here[6], a client has an implied, at-will termination right in legal service contracts governed by New York law. *See Martin v. Camp*, 114 N.E. 46, 48 (N.Y. 1916) (holding that the client's right to terminate the relationship at will "is a term of such [a] contract, implied from the peculiar relationship which the contract calls into existence, that the client may terminate the contract at any time with or without cause"); *Campagnola v. Mulholland, Minion & Roe*, 76 N.Y.2d 38, 43 (1990)("Thus it is well established that notwithstanding the terms of the agreement between them, a client has an absolute right, at any time, with or without cause, to terminate the attorney-client relationship by discharging the attorney."); *Demov, Morris, Levin & Shein et al., v. Glantz*, 53 N.Y.2d 553, 556

---

[6] The two exceptions are: (1) the attorney has "changed his position or incurred expense" as a result of entering in the contract, or (2) the contract is a general retainer which employs the attorney for a fixed period of time. *Atkins & O'Brien LLP v. ISS Int'l Serv. Sys., Inc.*, 252 A.D.2d 446, 448 (N.Y. Sup. Ct. 1998). *See,* Berezin Declaration [25](Transcript of April 28, 2017 Hearing, at 9-11).

10

(1981)(reaffirming "that a client may at anytime, with or without cause, discharge an attorney in spite of a particularized retainer agreement between the parties.").

As explained by New York's highest court, society benefits when clients trust and have confidence in their lawyer at all times, not just for part of a fixed-term engagement. This implied right eliminates a deterrent (e.g. a breach of contract claim) that could prevent clients from replacing counsel in whom they no longer have trust and confidence. *See Matter of Cooperman*, 83 N.Y.2d 465 (N.Y. 1994) *(*"Because the attorney-client relationship is recognized as so special and so sensitive in our society, its effectiveness, actually and perceptually, may be irreparably impaired by conduct which undermines the confidence of the particular client or the public in general. In recognition of this indispensable desideratum and as a precaution against the corrosive potentiality from failing to foster trust, public policy recognizes a client's right to terminate the attorney-client relationship at any time with or without cause").

Thus, as a matter of New York public policy, a client remains free to terminate a contract for legal services without cause notwithstanding any express terms to the contrary. *See e.g., Atkins & O'Brien LLP. v. ISS Int'l Serv. Sys., Inc.*, 252 A.D.2d 446, 447–48, (App. Div. 1998) (internal citations omitted) (discussing that even where retainer agreement was through 1996, "even as to the period of the contract subject to a specific duration, as a general rule, where there is a contractual relationship between a lawyer and client, the client has the right 'to terminate the attorney-client relationship *at any time with or without cause.*'").[7]

---

[7] S*ee also, Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc.*, 20 F. Supp. 2d 645, 649 (S.D.N.Y. 1998) (discussing where client terminated its attorney with the retainer set for a five-year period); *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420, 444–45 (S.D.N.Y. 1998) (discussing where client terminated its attorney with the retainer agreement set for three years)**.** Where a client exercises its right to terminate its attorney, the attorney may be entitled to recover the value of services already rendered. *See*, *Cooperman* 83 N.Y.2d at 473("We have recognized that permitting a discharged attorney 'to recover the reasonable value of services rendered in

NYRA's Board of Directors clearly entered into the Retainer Agreement with a high degree of trust and confidence in G&G and, indeed, G&G acted as counsel to NYRA for more than three years. Yet, New NYRA's Board also had an implied right to determine whether at some point in the future a new lawyer would better serve as NYRA's integrity counsel. G&G's incorrectly argues that the express terms of the Retainer Agreement granted it extraordinary authority in the form of complete independence from NYRA's Board of Directors. In the first instance, express terms cannot override New York's fundamental public policy implied in every legal services contract governed by New York law. Even if express terms could create a new exception to New York's public policy (which they cannot), G&G's contractual interpretation is patently unreasonable. The Retainer Agreement establishes an attorney-client relationship, and inherent in every such relationship is the duty of loyalty and associated obligation of counsel to report and answer to its client, i.e., NYRA, acting through its Board. Also, G&G was afforded "maximum independence" in the performance of its duties as counsel, consistent with the underlying counsel relationship. Indeed, the Retainer Agreement was understood over several years in practice to afford G&G independence from NYRA's management, while G&G was obligated to report to the Chairman of the Board and the Board's Special Oversight Committee.[8]   Even if G&G's interpretation were reasonable, it would still have to be rejected because "the law requires that an agreement between client and attorney be construed most favorably for the client." *See e.g., Shaw v. Mfrs. Hanover Trust Co.*, 68 N.Y.2d

---

*quantum meruit,* a principle inherently designed to prevent unjust enrichment, strikes the delicate balance between the need to deter clients from taking undue advantage of attorneys, on the one hand, and the public policy favoring the right of a client to terminate the attorney-client relationship without inhibition on the other'").

[8] *See, supra* note 4 and accompanying text.

172, 177 (1986)(construing an ambiguous retainer agreement against the drafting attorney, resulting in the attorney receiving no fees); *Greenberg v. Bar Steel Constr. Corp.*, 22 N.Y.2d 210, 213 (1968) (reiterating that "[u]nquestionably, it is the law of this State that an agreement between a client and his attorney will be construed most favorably for the client.")

Moreover, the terms of the September 4, 2007 MOU to extend NYRA's racing franchise required NYRA to continue to retain independent integrity *counsel*, not oversight by an entity wholly independent from NYRA's Board of Directors. As explained above, G&G itself specifically counseled NYRA to reject that extreme level of oversight. Nor does the Getnick Order, so ordered on September 19, 2007, or the filings made in connection with it, provide that G&G would be beyond the control or direction of NYRA's Board of Directors, acting through its Chairman and Special Oversight Committee.

## II. The 2008 Racing Law Did Not Transform G&G Into A New Type of Counsel Outside the Control of Its Own Client

Under the Racing Law, New NYRA would become a non-profit corporation under New York statutory law, and empowered its Board of Directors with the right exclusively to act for NYRA consistent with corporate and the Racing Law.[9] Section 205(6) of the Racing Law requires New NYRA's Board of Directors to retain independent integrity *counsel* who will act as an independent source of help to ensure NYRA's integrity and its "officers and employees, and its operations." The only reasonable interpretation of this provision is that it requires

---

[9] *Corporations* may terminate contracts for legal services without cause under New York law. *See, e.g., Nat'l Grid Corp. Servs., LLC v. LeSchack & Grodensky, P.C.*, 100 A.D.3d 721, 721, 954 N.Y.S.2d 131, 131 (2012)(applying the *Cooperman* standard to a claim brought by a law firm terminated by its corporate entity client); *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420, 444–45 (S.D.N.Y. 1998)(analyzing the termination of an attorney by a corporate entity client under the *Cooperman* framework)

13

NYRA's Board to retain outside counsel to offer unbiased, impartial advice, with independence from officers and employees, but certainly not from its client, as represented by the Board of Directors.

Indeed, in this context, one cannot reasonably construe "independent" to mean entirely free from the control of NYRA's Board of Directors. That interpretation fails because it would create an untenable conflict with the ordinary meaning of the term "counsel," which implies a duty of loyalty to, and thus control of, a client. *See, e.g.*, *Simon v. Usher*, 17 N.Y.3d 625, 628, 958 N.E.2d 540, 541 (2011)(internal citations omitted)("When construing a statute, we must begin with the language of the statute and give effect to its plain meaning.); *Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539, 550, 940 N.E.2d 535, 540 (2010) (internal citations omitted)("[W]here the language of a statute is clear and unambiguous, courts must give effect to its plain meaning.").

Nor is it proper to interpret a statute on this record to overrule a long-standing common law rule, particularly one set by the highest court more than 100 years ago. *Hechter v. N.Y. Life Ins. Co.*, 46 N.Y.2d 34, 39, 385 N.E.2d 551, 554 (1978)("it is a general rule of statutory construction that a clear and specific legislative intent is required to override the common law."). Indeed, the policy reasons underlying New York's rule granting client's an implied right to terminate a legal services contract without cause applies with great force to Section 205(6). This implied right allows a client to replace a lawyer in whom it no longer has trust and confidence, and therefore ensure that NYRA, acting through its Board, always has trusted counsel to maintain and enhance its integrity.

*Garcia v New York Racing Ass'n, Inc.*, No. 1:10-cv-01092, 2011 WL 3841524 (N.D.N.Y. Aug. 29, 2011), a case previously cited by G&G, is not to the contrary. That court

14

merely noted that integrity counsel was not subject to direct control by NYRA and was a statutorily created entity with the sole purpose to "ensure the integrity of the franchised corporation, *its officers and employees* and its operations." *Id. at* n. 4 (emphasis added). This decision pertained to actions taken by NYRA's management, not its Board of Directors, and does not address much less support G&G's contention that it did not answer to its client, as represented by the Board of Directors.[10]

### III. CONCLUSION

For the reasons set forth above, NYRA respectfully requests that the Court determine that, in accordance with New York law, NYRA had an implied termination right under the Retainer Agreement and grant NYRA such other and further relief as is just.

Dated: June 12, 2017
New York, New York

/s/ Brian S. Rosen
Brian S. Rosen, Esq.
Robert S. Berezin, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for The New York Racing Association, Inc.*

---

[10] In *Garcia,* the court rejected the plaintiff's argument that it was acting outside the normal internal grievance structure when it reported the policy violation to integrity counsel. *Id.* n. 8. The court ruled that "complaining to integrity counsel is no different from filing a complaint within NYRA's internal grievance structure."

15