**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| The New York Racing Association Inc., | : | |
| | : | Case No. 06-12618-JLG |
| Debtor. | : | |
| | : | |

------------------------------------------------------x

### Memorandum Decision and Order Resolving Dispute Regarding
### New NYRA's Termination of Retainer Agreement

*APPEARANCES:*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
By: Robert S. Berezin, Esq.

*Counsel for The New York Racing Association, Inc.*

GETNICK & GETNICK LLP
521 Fifth Avenue
33rd Floor
New York, New York 10175
By:     Neil V. Getnick, Esq.

          -and-

MORRITT, HOCK & HAMROFF, LLP
1407 Broadway, 39th Floor
New York, New York 10018
By:     Andrew B. Eckstein, Esq.

*Counsel for Getnick & Getnick LLP*

HON. JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE:

## Introduction[1]

On November 2, 2006 (the "Petition Date"), The New York Racing Association, Inc.

("NYRA" or the "Debtor") commenced a voluntary case in this Court under chapter 11, title 11

of the United States Code (the "Bankruptcy Code").  At that time, it was operating certain

Racetracks in New York State pursuant to a thoroughbred racing Franchise that was scheduled to

expire on December 31, 2007.  As of the Petition Date, NYRA was competing for the award of

the Franchise going forward.  In support of those efforts, NYRA retained Getnick & Getnick

LLP ("G&G") as its "business integrity counsel" under sections 327(e) and 328 of the

Bankruptcy Code, and pursuant to the terms and conditions of the parties' Retainer Agreement,

and the Court's Retention Order.  Briefly, the Retainer Agreement vests G&G with "maximum

independence" in "performing its function as business integrity counsel."  It calls for NYRA to

retain G&G for five years (beginning in July of 2007) at a monthly rate of $125,000, but states,

in substance, that it will terminate on the date, if any, during that period on which NYRA no

longer holds the Franchise.  The Retention Order provides that post plan confirmation, "the

Retainer Agreement may only be terminated in accordance with the terms and provisions of the

Retainer Agreement."

NYRA won the Franchise and on or about September 12, 2008, the effective date of

NYRA's Modified Plan, the State awarded the Franchise to "New NYRA," as the reorganized

debtor.  It did so through legislation that is reflected in amendments to New York's Racing, Pari-

---

[1]   Capitalized terms not identified in the Introduction are defined below.  Citations to "ECF No. ___" refer to
filings in this case on the Court's electronic docket, Case No. 06-12618.

Mutuel Wagering and Betting Law (the "Racing Law"). Under the Modified Plan, NYRA assumed and assigned the Retainer Agreement to New NYRA. It did so to ensure that New NYRA complied with section 206(5) of the Racing Law that calls for the holder of the Franchise to retain "an independent business integrity counsel." *See* N.Y. Racing Law § 206(5). In March of 2009, the Court closed NYRA's chapter 11 case.

In March of 2011 – within the five-year term of the Retainer Agreement – New NYRA purported to terminate that agreement and G&G's services thereunder, even as it was in possession and control of the Franchise.[2] At that time, G&G contested New NYRA's alleged termination of the agreement, and asserted that in purporting to terminate it, New NYRA violated the agreement, the Retention Order, and section 206(5) of the Racing Law. In addition, G&G contended that New NYRA was obligated to pay it both the fees and expenses then due and owing under the agreement, and the monthly $125,000 fee for each of the roughly 16 months then remaining under the five-year term of the agreement.

Approximately one year after it purported to terminate the agreement, New NYRA moved the Court for an order reopening the case for the limited purpose of (i) "clarifying," or, if necessary, "amending" the Retention Order, and (ii) addressing claims associated with the order (the "Motion").[3] Briefly, and in substance, as support for the Motion, New NYRA contends that under the State's so-called "discharge rule" applicable to attorney-client relationships, it had an implied unqualified right to terminate the agreement at any time (without financial penalty), and

---

[2]    After purporting to terminate G&G's services under the Retainer Agreement, New NYRA hired new business integrity counsel.

[3]    *See* Motion for an Order, Pursuant to Section 350(b) of the Bankruptcy Code and Rule 5010 of the Federal Rules of Bankruptcy Procedure, Reopening its Chapter 11 Case for the Limited Purpose of (A) Clarifying, and if Necessary, Amending Order Authorizing the Employment of Getnick & Getnick LLP, and (B) Addressing Claims Associated Therewith [ECF No. 1167].

that the Retention Order should be clarified or amended to acknowledge that right.  G&G consented to reopening the case but denies that New NYRA is entitled to any relief from the Retention Order, or otherwise.  In substance, G&G says that under the Racing Law, and as reflected in the terms of the Retainer Agreement, it had a "special" attorney-client relationship with New NYRA, as the holder of the Franchise, that is not subject to the discharge rule.  It says that the plain language of the Retainer Agreement and Retention Order clearly provides that during the five-year term of the agreement, New NYRA could terminate the agreement only if it lost the Franchise.  G&G says that since that did not happen, New NYRA is not entitled to any relief herein, because it violated the terms of the Retention Order and Retainer Agreement in purporting to terminate the agreement and G&G's services thereunder.

After the Court reopened the case, the parties attempted unsuccessfully to resolve their dispute out of Court.  Thereafter, they returned to this Court and conducted discovery regarding the nature of their attorney-client relationship.  In addition, they supplemented their pleadings to flesh out their respective positions relating to, among other things, New NYRA's right under the Retention Order to terminate the Retainer Agreement.  The issue that the parties have put before the Court is whether in March of 2011, New NYRA had an unqualified right under the Retention Order to terminate the Retainer Agreement and G&G's performance thereunder.  The order is clear that the resolution of that issue turns on whether the Retainer Agreement vested New NYRA with an unqualified right to terminate it.  As fully explained below, and without limitation, the Court finds that by application of the discharge rule, New NYRA had an implied, unqualified right under the Retainer Agreement, and therefore pursuant to the Retention Order, to terminate the agreement, and G&G's performance thereunder.

Jurisdiction

The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334(a) and 157(a), and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska, C.J.).  This is a core proceeding.  *See* 28 U.S.C. § 157(b)(2)(A).

Facts

On the Petition Date, NYRA was operating thoroughbred racing and pari-mutuel wagering at the Aqueduct Racetrack, Belmont Park, and Saratoga Race Course (collectively, the "Racetracks") under franchises (collectively, the "Franchise") controlled by New York State (the "State").  *See* Motion ¶ 4.  The State legislature (the "Legislature") granted the Franchise to NYRA in 1955, and, thereafter, renewed it from time to time.  As of the Petition Date, the Franchise was scheduled to terminate in accordance with State law on December 31, 2007.

Whether NYRA would control the Franchise after 2007 was one of two open issues central to the resolution of its chapter 11 case; the other was whether the State or NYRA owned the Racetracks.  *Id.* ¶ 3.  To address the former, as of the Petition Date, NYRA was competing for the award of the Franchise.  As to the latter, promptly after commencing this case, NYRA sued the Governor[4] and others, essentially for a determination that NYRA, not the State, owned the Racetracks (such action, the "Adversary Proceeding").  NYRA had to conclude both issues before it could propose a reorganization plan, and the successful resolution of those issues was dependent upon political action being taken among the Governor, the Speaker of the New York Assembly (the "Assembly") and the Majority Leader of the New York State Senate (the "Senate").  *Id.*

---

[4]    References to the "Governor" are to the sitting Governor of New York State at the time of the event.

<u>NYRA Is Among Several Entities Competing for The Franchise</u>

The Governor's office was overseeing the process for selecting the future operator of the Racetracks under the Franchise, and that process was well underway as of the Petition Date.  On June 13, 2006, the State's Ad Hoc Committee on the Future of Racing (the "Ad Hoc Committee") released a request for proposals (an "RFP") to solicit bids from entities interested in operating the Racetracks under the Franchise.  *See* Retention Application ¶ 14.[5]  Under the Ad Hoc Committee's procedures, one of several factors that it considered in assessing the fitness of an applicant for the Franchise was the applicant's "integrity."  NYRA was among the entities that responded to the RFP.  *Id.*  On February 21, 2007, the Ad Hoc Committee recommended that the Franchise be awarded to Excelsior Racing Associates, LLC ("Excelsior").  However, that recommendation was not binding on either the Governor or the Legislature and, ultimately, the Governor did not adopt it.  *Id.*

Instead, in 2007, the Governor announced a new RFP process and convened a panel to publicly solicit and review proposals from prospective Franchise operators.  In doing so, he made the prospective operators' integrity a gating issue.  That is, he pledged to make integrity a prerequisite for an applicant to be considered for the Franchise, not merely one of the factors that the State considered in awarding the Franchise.  *Id.* ¶ 15.  The new RFP process called for the Office of the Inspector General (the "IG Office") to assist the panel in its selection process by reviewing the integrity of each applicant (the "Integrity Review").  *Id.* ¶ 16.  On or about March 13, 2007, Richard Rifkin, the Governor's Special Counsel, sent a letter to each of NYRA, Excelsior, and others outlining the procedures the State would employ under the new RFP in

---

[5]    *See* Notice of Presentment of Order, Pursuant to Sections 327(e) and 328(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure, Authorizing the Employment of Getnick & Getnick, as Special Business Integrity Counsel, as of July 25, 2007 [ECF No. 456].

awarding the Franchise.  *Id.* ¶ 15.  NYRA responded to the new RFP and timely submitted a

proposal (the "Franchise Proposal") to the panel.  Like the other applicants, NYRA was subject

to an Integrity Review.  On June 1, 2007, the IG Office released its Report to the Governor on

the Integrity Of Those Seeking To Operate The Racetracks At Aqueduct, Belmont Park and

Saratoga (the "IG Report").  *Id.* ¶ 17.  That report detailed the findings of each integrity review.

From the Debtor's perspective at that time, the Integrity Review and IG Report "underscore[d]

the importance to the Governor and Legislature that any potential operator be engaged in a

constant effort to maintain not only its own integrity, but also, the integrity of racing in New

York State."  *Id.*

<u>NYRA Seeks to Retain G&G as Its Business Integrity Counsel</u>

In the summer of 2007, while the panel was vetting its Franchise Proposal, NYRA

reached out to G&G to retain it as its "business integrity counsel."  G&G Supplemental

Opposition ¶ 5.[6]  NYRA believed that G&G was particularly well suited to advise it on business

integrity matters because for approximately 18 months beginning in March of 2004, pursuant to

an order of the United States District Court for the Eastern District of New York (the "District

Court"), G&G served as NYRA's monitor (the "Federal Monitor") in accordance with a

Deferred Prosecution Agreement that NYRA reached with the United States Attorney for the

Eastern District of New York ("USAO").  *See* Retention Application ¶ 9.  Under that agreement,

NYRA resolved charges by the USAO that it had participated in a scheme in which pari-mutuel

clerks allegedly defrauded state and federal taxing authorities.  As the Federal Monitor, G&G

was responsible for overseeing every aspect of NYRA's operations, including its compliance

---

[6]    *See* Getnick & Getnick's Supplemental Brief in Further Opposition to NYRAs Motion to "Clarify" or "Amend"
This Court's 2007 Order [ECF No. 1245].

with the provisions of the Deferred Prosecution Agreement, the restructuring of NYRA's senior

management, and NYRA's adoption of a new company Code of Ethics. *Id.* ¶ 10. On September

13, 2005, G&G submitted both a final public report and a separate sealed report certifying to the

District Court that NYRA had maintained full compliance with the terms of the Deferred

Prosecution Agreement. After the submission of that report, the District Court dismissed all

charges against NYRA. *Id.* ¶ 11.

Before acting on NYRA's retention proposal, in mid-June of 2007, with NYRA's

consent, Neil Getnick, a member of G&G, spoke to Richard Rifkin, the Governor's Special

Counsel, to gauge the State's reaction to NYRA's potential retention of G&G as its business

integrity counsel. *See* G&G Supplemental Opposition ¶ 5. Mr. Getnick says that the Governor's

counsel advised him that the State would view G&G's retention "as a positive" and that if

retained, G&G's independence would be "critical" and that the Governor and the State "would

like G&G to have complete and total independence." *Id.*, Ex. 2. Thereafter, on or about June 22,

2007, G&G emailed a proposed Retainer and Letter Agreement to C. Steven Duncker, as a

member of NYRA's Board of Trustees (the "Board"). *Id.* ¶ 6, Ex. 3 (the "Proposed Retainer

Agreement"). The draft included all of the terms of the proposed agreement – including a

description of the services G&G would provide to NYRA – except that it left the following terms

blank: (i) the monthly retainer payment and minimum fee to be paid under the engagement; (ii)

G&G's billing rates for the engagement; and (iii) the length of the engagement (collectively, the

"Financial Terms"). *Id*. After NYRA's initial review of the agreement (*id.* ¶ 6, Ex. 4), Mr.

Duncker requested G&G to provide NYRA with its proposed Financial Terms. In an email dated

June 27, 2007 (the "June 27 email"), Mr. Getnick proposed the following: (i) a $125,000

minimum monthly fee; (ii) billing rates discounted from G&G's regular rates; and (iii) a five-

year term of engagement. *Id.* ¶ 7, Ex. 5.

In an email dated July 3, 2007, in response to an inquiry by Mr. Duncker, Mr. Getnick

"succinctly" set forth G&G's business rationale underlying the Proposed Retainer Agreement,

including the proposed Financial Terms. *Id.* ¶ 8, Ex. 6. In explaining that rationale, Mr. Getnick

highlighted a statement issued by the Governor upon the release of the IG Report. In that

statement, among other things, the Governor noted his efforts "to emphasize the need for

integrity and accountability" throughout the state racing franchise process, and to that end,

asserted that in order to be "scrupulous in monitoring and regulating activity[,]" the State would

"need to examine the full range of available integrity tools, ranging from private monitors to

enhanced state regulatory powers, to ensure the continued integrity of racing and other gaming in

New York State." *Id.*, Ex. 6.[7] Mr. Getnick explained that G&G's "key operating principle,

reflected in our federal monitorship of NYRA, as well as in our private integrity and

transparency counseling more generally, is that good conduct is good business" and that the

Governor's statement "lays out the framework for understanding the business rationale of the

[terms of the Proposed Retainer Agreement]." *Id.* From there, he explained, as follows:

---

[7]    In his email, Mr. Getnick attributes the following statement to the Governor:

> . . . Throughout [the state racing franchise] process, I have tried to emphasize the need for integrity
> and accountability. . .

> The IG's report released today illustrates why racing is one of the most heavily regulated
> industries in the nation. History has shown that large amounts of cash at stake in racing pose risks
> of illegal activities including money laundering at rebate shops, tax schemes and race fixing.

> This potential means that we must be scrupulous in monitoring and regulating activity. Indeed,
> this is why I required an integrity review in the first place. As we go forward, we will all need to
> examine the full range of available integrity tools, ranging from private monitors to enhanced state
> regulatory powers, to ensure the continued integrity of racing and other gaming in New York State.

G&G Supplemental Opposition, Ex. 6.

First, given the historical and continuing reality of the thoroughbred racing industry's business environment, it is essential to maintain strict scrutiny of the integrity and transparency reforms adopted by NYRA (see the description of services in the second paragraph of the [Proposed Retainer] Agreement[8]), which speak to the specific industry concerns articulated by the Governor.

Second, it is crucial to help build as well as cooperate with the enhanced state regulatory environment envisioned by the Governor.

Third, it is very important to facilitate and participate in cooperative activities designed to create a level playing field throughout the industry so that NYRA's good conduct practices do not put it at a competitive disadvantage.

*Id.* Mr. Getnick stated that to meet those goals, G&G and NYRA

have agreed that G&G will be afforded maximum independence in performing its functions as business integrity counsel, including interacting with governmental entities and industry regulators. The Terms provide for the critical mass of hours that need to be expended (i.e. sufficient hours over a sufficient time period) allowing G&G to successfully carry out its mission pursuant to the [Proposed Retainer] Agreement. At the same time, the highly favorable rate structure affords NYRA with maximum return on its expenditures for professional fees under the [Proposed Retainer] Agreement.

*Id.* He concluded that the "[Proposed Retainer] Agreement provides NYRA with the specific tools designed to translate good conduct into good business, while facilitating the agenda set forth by [the] Governor . . . in his statement." *Id.*

Thereafter, G&G forwarded the Proposed Retainer Agreement (without the Financial Terms) to NYRA's bankruptcy counsel. *Id*. ¶ 9, Ex. 7. The following day, counsel returned a

---

[8]    The second paragraph of the Proposed Retainer Agreement states that the services to be provided by G&G to NYRA

shall include, but not be limited to, monitoring and investigating NYRA's business practices and operations in the following areas: (i) living and working conditions on the backstretch; (ii) simulcast signal sales and rebate shops; (iii) horse drug testing and sanctions; (iv) pre-race horse monitoring; (v) segregation and maintenance of horsemen's funds; (vi) implementation of the company Code of Ethics; (vii) preparation and presentation of financial statements; and (viii) implementation of anti-money laundering policies and other financial system protections.

Proposed Retainer Agreement at 1.

marked-up copy of the proposed agreement in which, among other things, NYRA adopted the

Financial Terms proposed by G&G in the June 27 email, with one modification.  *Id.* ¶ 9, Ex. 8.

As drafted, the Proposed Retainer Agreement stated that "[t]he Term of this Agreement will be

[xxx] starting from [xxx] (the 'Effective Date')."   NYRA's bankruptcy counsel revised that

language to read, as follows:

> The term of this Agreement will be five (5) years from the entry of an order of the
> United States Bankruptcy Court for the Southern District of New York (the
> "Bankruptcy Court") authorizing the retention hereunder ("Effective Date");
> <u>provided, however,</u> that the terms of this Agreement and the obligations of NYRA
> and G&G hereunder shall cease on the date on which NYRA does not maintain a
> franchise to conduct thoroughbred racing and a license to conduct pari-mutuel
> wagering in the State of New York.

*Id.*, Ex. 8 at 2.  NYRA did not make substantive comments to any other provisions of the

proposed agreement.

<u>G&G and NYRA Execute the Retainer Agreement</u>

G&G accepted NYRA's proposed changes to the agreement, and on or about July 16,

2007, NYRA agreed to retain G&G as its business integrity counsel pursuant to the terms of the

Proposed Retainer Agreement, as revised (the "Retainer Agreement").  *See* Retention

Application, Ex. A.  As to the scope of the services that G&G would provide, the agreement

states, in part, that "[i]t is understood and agreed that [G&G] shall perform those services

necessary for it to assess, report on, and provide counsel in connection with matters affecting

NYRA's business integrity."  *Id*. at 1.  The parties agreed that those services would include, but

not be limited to:

> monitoring and investigating NYRA's business practices and operations in the
> following areas: (i) living and working conditions on the backstretch; (ii) simulcast
> signal sales and rebate shops; (iii) horse drug testing and sanctions; (iv) pre-race
> horse monitoring; (v) segregation and maintenance of horsemen's funds; (vi)
> implementation of the company Code of Ethics; (vii) preparation and presentation

of financial statements; (viii) implementation of anti-money laundering policies and other financial system protections.

*Id*. For its part, NYRA agreed to "cooperate fully with G&G and to provide promptly all information known or available to it relevant to [G&G's] representation of it." *Id.* NYRA also agreed and acknowledged,

> that it is the intent of both NYRA and G&G to afford maximum independence to G&G in performing its function as business integrity counsel, including, but not limited to, interacting with governmental entities and industry regulators consistent with the underlying counsel relationship between NYRA and G&G.

*Id.* The agreement called for G&G to be paid a monthly retainer and minimum fee for professional services of $125,000, to be billed against hourly billing (at discounted rates) by G&G, and persons working under the direction of G&G. *Id.* at 2. The parties agreed that it was their intent that the agreement would go into effect on July 25, 2007 (the "Effective Date"), which was the opening day of the 2007 Saratoga meet. *Id.* They also agreed that,

> [t]he the term of this Agreement will be five (5) years starting from the Effective Date (the "Term"), unless NYRA does not maintain a franchise to conduct thoroughbred racing and a license to conduct pari-mutuel wagering in the State of New York (the "Franchise"), in which case the Term will end as of the date NYRA no longer maintains the Franchise.

*Id*. at 2-3. The agreement also provided that "[a]ny dispute or controversy arising out of this retainer letter and agreement will be governed and construed in accordance with the laws of New York State, without reference to conflict of laws principles, solely within the jurisdiction of the courts of New York State." *Id.* at 3.

<u>NYRA Seeks Bankruptcy Court Authorization to Retain G&G as Its Integrity Counsel</u>

Promptly after finalizing the Retainer Agreement, and by Notice of Presentment of Order, NYRA sought this Court's authorization to retain G&G as its business integrity counsel pursuant to that agreement. *See* Retention Application. In its application, which was supported by a

declaration of Neil Getnick (the "Getnick Declaration"), NYRA sought (i) authorization under section 327(e) of the Bankruptcy Code, to employ G&G as its special business integrity counsel, as of July 25, 2007, pursuant to the terms of the Retainer Agreement; and (ii) approval pursuant to section 328(a) of the Bankruptcy Code, of the proposed compensation for the services performed by G&G.  *Id.* ¶ 18.

<u>The Creditors Committee Objects to G&G's Retention</u>

The Official Committee of Unsecured Creditors (the "Creditors Committee")[9] objected to the Retention Application (the "Committee Objection").[10]  Although the Creditors Committee questioned the need for NYRA to retain "special business integrity counsel" at all (*see* Committee Objection ¶ 2), the objection focused on the monthly fee and the length of the proposed retention.  The Creditors Committee contended that, given the uncertainty of whether the State was going to award NYRA the Franchise, it was premature for the Court to authorize NYRA to enter into the five-year agreement.  *Id.* ¶ 3.  It reasoned that there was no business justification for NYRA to pay counsel the sum of $125,000/month to enhance the integrity of NYRA's racing operations if ultimately, NYRA was not awarded the Franchise.  *Id.* ¶¶ 3, 14. Moreover, it contended that if NYRA was awarded the Franchise, it would be obligating itself to continue paying G&G $125,000/month for the next five years, effectively incurring a $7,500,000 administrative expense claim that would have to be paid before any recovery by NYRA's unsecured creditors – before NYRA had filed a reorganization plan.  *Id.* ¶¶ 4, 15.  The Creditors

---

[9]   On or about November 9, 2006, the Office of the United States Trustee appointed the Creditors Committee.  *See* ECF No. 41.

[10]   *See* Objection of the Official Committee of Creditors To Debtor's Application For An Order, Pursuant To Sections 327(e) and 328(a) Of The Bankruptcy Code and Rule 2014 Of The Federal Rules of Bankruptcy Procedure, Authorizing The Employment of Getnick & Getnick, As Special Integrity Counsel, As Of July 25, 2007 [ECF No. 477].

Committee argued that it was not in the best interests of NYRA's estate or creditors for NYRA to retain G&G at that time.  Accordingly, it asked the Court to deny the Retention Application, without prejudice to NYRA renewing it following the award of the Franchise to NYRA and the filing of a plan of reorganization.  *Id.* ¶¶ 5, 12.  Alternatively, the Creditors Committee argued that if the Court determined that it would not defer consideration of the application, it should not authorize NYRA to compensate G&G pursuant to section 328 of the Bankruptcy Code.  It argued that G&G's compensation should be assessed and awarded pursuant to sections 330 and 331 of the Bankruptcy Code.  *Id.* ¶¶ 6, 16.  Among other things, the committee noted that at the hourly rates in the application, G&G would have to render more than 430 hours of professional services each month to justify its minimum monthly fee of $125,000, and that based on the scope of G&G's anticipated services, it was unlikely that G&G would be required to invest such a substantial effort in the engagement.  *Id.* ¶¶ 17, 18.

NYRA Prepares for a Contested G&G Retention Hearing

To address the Committee Objection, NYRA explored with G&G whether it could shorten the five-year term in the Retainer Agreement, and otherwise limit the amount of time G&G could bill as business integrity counsel.  NYRA suggested that G&G agree to a two-year contract with an "evergreen" two-year renewal, subject to a six-month advance cancellation clause prior to renewal, but G&G rejected that proposal.  *See* G&G Supplemental Opposition ¶ 12, Ex. 14.  During this period, NYRA was in contact with representatives of the State on matters relating to its Franchise Proposal.  A State representative advised NYRA that its retention of business integrity counsel was "critical" to the success of its proposal because all NYRA's competitors made provision for the retention of such counsel in their proposals.  *Id.* ¶ 14, Ex. 16.  She also advised NYRA that any effort to limit the number of hours that G&G could

dedicate to its role as special counsel was "antithetical to the 'independence' process," and that, if necessary, she would attend the G&G retention hearing and make a comment in favor of G&G's retention under the terms of the Retainer Agreement.  *Id.*  NYRA rejected the Creditors Committee's suggestion that G&G be retained solely pursuant to section 327 of the Bankruptcy Code and prepared to move forward with the Retention Application on a contested basis.  As relevant, the proffer of Mr. Getnick's testimony prepared by NYRA's bankruptcy counsel in anticipation of a contested hearing addressed the "Terms of Engagement/Length of Retention," and provided, as follows:

> Mr. Getnick would testify that a 5-year term of engagement is necessary for the successful completion of the representation.  Critical to any of G&G's business integrity representations is G&G's independence to conduct its investigations and operations free from interference or pressure from existing management or other outside forces.  A 5-year term also provides the requisite continuity that will enable G&G to effectively coordinate with federal, state, and local regulatory agencies during the representation.

*Id.* ¶ 16.

The State and NYRA Execute a Memorandum of Understanding as to
the Resolution of the Adversary Proceeding and Award of the Franchise

On September 4, 2007, while the Retention Application was pending before this Court, NYRA and the State – acting through the Governor's office – executed a Memorandum of Understanding (the "MOU").  *See* G&G Further Response, Ex. J.[11]  The MOU is a "non-binding agreement" that set forth the "expectations" of the State and NYRA "with respect to thoroughbred racing in the State of New York[.]"  MOU at 1.  Among other things, it addressed the two issues central to the case.  It called for NYRA to create "New NYRA," as a New York

---

[11]    *See* Further Response of Getnick & Getnick LLP ("G&G") To The Motion Of The New York Racing Association, Inc. ("NYRA") To Re-Open The Case and "Clarify" or "Amend" this Court's [Getnick] Order Approving G&G's Employment As NYRA's Independent Business Integrity Counsel [ECF No. 1172].

not-for-profit corporation, to operate the new thoroughbred racing franchise. *Id.* at 2. The MOU

provided that based upon the responses it received to the RFP, the "State will award a

thoroughbred racing franchise to New NYRA, effective January 1, 2008." *Id.* at 3. As relevant,

it also provided that the "franchise agreement will provide that New NYRA, and its members,

adopt a corporate governance code of conduct, acceptable to the State, to ensure that New

NYRA is operated in an efficient and transparent manner, with the highest degree of integrity

and is fully accountable to the People of the State." *Id.* at 3. In addressing the subject of

"Racing Integrity," NYRA and the State agreed that:

> New NYRA will comply will [sic] all applicable laws and regulation [sic] and will
> continue the retention of an independent business integrity counsel, acceptable to
> the State, who, among other things, will act as an independent source of checks and
> balances to help New NYRA identify and counteract new and emerging threats to
> the sport of horseracing and transparency in pari-mutuel pools.

*Id*. at 3. To resolve the dispute over the ownership of the Racetracks (and with it, the Adversary

Proceeding), the MOU called for NYRA and New NYRA to irrevocably relinquish any present

or future rights they might have in the Racetracks, including any property interests, and to take

all appropriate action to ensure that the State is vested with unencumbered ownership in the real

estate for the Racetracks, including all improvements thereon. *Id.* at 2. The MOU provided

that, "subject to enactment of legislation by the State legislature," the parties would "enter into a

binding agreement memorializing the terms set forth in the [MOU] . . ." *Id.* at 1. The MOU also

stated that it would be deemed null and void if appropriate legislation was not signed into law

and a binding agreement was not entered by December 31, 2007. *Id.* at 7.[12]

---

[12]    That date was extended by agreement among the parties.

The Creditors Committee Withdraws Its Objection to The
Retention Application and the Court Approves G&G's Retention

To resolve the Committee Objection, NYRA and G&G agreed that prior to plan

confirmation, NYRA could terminate the Retainer Agreement without cause or penalty on sixty

(60) days prior written notice to G&G, but that after plan confirmation, NYRA could terminate

G&G's services only in accordance with the terms and provisions of the Retainer Agreement.

With that, the Creditors Committee withdrew its objection to the Retention Application.  The

parties did not revise the Retainer Agreement to incorporate the terms of the resolution of the

Committee Objection.  Rather, they included them in the proposed order submitted to the Court,

authorizing NYRA to retain G&G as its business integrity counsel.  The Court did not conduct a

hearing on the application and adopted the proposed order, as submitted.   By order dated

September 21, 2007 (the "Retention Order"),[13] the Court approved the retention of G&G as

NYRA's business integrity counsel, on the terms set forth in the Retainer Agreement, as

modified, as follows:

> ORDERED that, notwithstanding anything contained in the [Retention]
> Application, the Getnick Declaration and the Retainer Agreement to the contrary,
> (a) at any time prior to the entry of a final order confirming a chapter 11 plan in
> NYRA's chapter 11 case (the "Plan"), NYRA shall have the right to terminate the
> Retainer Agreement and G&G's services thereunder, without cause and the
> payment of penalty upon sixty (60) days prior written notice to G&G, and (b) upon
> and after the entry of a final order confirming the Plan, the services to be provided
> pursuant to the Retainer Agreement may only be terminated in accordance with the
> terms and provisions of the Retainer Agreement[.]

Retention Order at 3.

---

[13]    *See* Order Pursuant to Sections 327(e) and 328(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules
of Bankruptcy Procedure, Authorizing the Employment of Getnick & Getnick, As Special Business Counsel, As of
July 25, 2007 [ECF No. 543].

NYRA Amends Its Franchise Proposal to
Reflect Its Retention of G&G as Integrity Counsel

Shortly thereafter, NYRA filed its Amended Franchise Proposal[14] in which, among other things, it highlighted its retention of G&G as its business integrity counsel pursuant to the terms of the Retainer Agreement. In the "Integrity Update" portion of the proposal, NYRA advised, as follows:

> To ensure that NYRA continues to maintain the highest standards of integrity and transparency, NYRA has retained the law firm of Getnick & Getnick as its business integrity counsel. In this role, Getnick & Getnick will act as an independent source of checks and balances, to certify the reforms already implemented are observed and enforced, and to help NYRA identify and counteract new and emerging threats to the sport of horse racing and transparency in the pari-mutuel pools. In contrast to other potential franchisees that advertise integrity monitoring . . . NYRA has actually implemented a real and tangible plan for integrity monitoring.

Amended Franchise Proposal at 3. Further, NYRA asserted that it "has committed itself to providing maximum independence to and complete cooperation with Getnick & Getnick in its role as business integrity counsel." *Id.* NYRA explained that:

> Getnick & Getnick's retainer agreement letter with NYRA speaks to these points, saying: "NYRA agrees and acknowledges that it is the intent of both NYRA and G&G to afford maximum independence to G&G in performing its function as business integrity counsel, including, but not limited to, interacting with governmental entities and industry regulators, consistent with the underlying counsel relationship between NYRA and G&G. NYRA agrees to cooperate fully with G&G and to provide promptly all information known or available to it relevant to our representation of it. This cooperation shall include, but not be limited to, NYRA using its best efforts to ensure that G&G receives from all persons working directly or indirectly for or with NYRA full and complete access to all facilities and records pertaining to any and all matters relating to NYRA."

*Id.* at 3, n.2.

---

[14]    *See* G&G Supplemental Opposition, Ex. 23.

The Court Authorizes the Debtor to Solicit
Acceptances of Its Proposed Reorganization Plan

On November 29, 2007, NYRA filed its Third Amended Plan of Debtor Pursuant to

Chapter 11 of the United States Bankruptcy Code (the "Third Plan") with this Court.  *See* ECF

No. 698.  By order dated November 29, 2007, the Court authorized the solicitation and

acceptances with respect to the Third Plan.  *See* ECF No. 700.

The State Enacts Modified Racing Law

On February 13, 2008, the Senate and the Assembly passed the legislation contemplated

in the MOU, and as reflected in amendments to the Racing Law.  *See* Motion ¶ 6.  On February

19, 2008, the Governor enacted the legislation into law as Chapter 18 of the Laws of 2008.  *Id.*

On June 24, 2008, the Senate and the Assembly passed legislation, S. 8709 and A. 11502,

respectively, amending the legislation to correct certain technical errors and clarify certain

provisions of the legislation.  On June 30, 2008, that legislation was enacted into law.  *See id.* ¶

9.

The Debtor Confirms Its Reorganization Plan

On April 28, 2008, this Court conducted a hearing (the "Confirmation Hearing") in

accordance with section 1129 of the Bankruptcy Code to consider confirming the Third Plan, as

modified (the "Modified Plan").  *See* Motion ¶ 8.  At that hearing, NYRA presented testimony

and other evidence regarding, among other things, the compromise and settlement between

NYRA and the State, including the granting of the Franchise pursuant to that certain franchise

agreement, dated September 12, 2008, by and among New NYRA, the State and the New York

State Franchise Oversight Board (the "Franchise Agreement"), and other understandings set forth

in that certain State Settlement Agreement, dated as of September 12, 2008, by and among

NYRA, New NYRA, the State, the New York State Franchise Oversight Board and New York

18

State Division of Lottery (the "Settlement Agreement").[15]  By order dated April 28, 2008 (the

"Confirmation Order") the Court confirmed the Modified Plan and authorized the consummation

of the transactions contemplated therein, including, without limitation, the execution and

delivery of the Franchise Agreement and the Settlement Agreement.

New NYRA Retains G&G as Independent
Integrity Counsel Effective September 12, 2008

The Modified Plan became effective on September 12, 2008.  At that time, New NYRA

was formed under section 402 of the New York Not-For-Profit Corporation Law and section 201

of the Racing Law.  That day, pursuant to the amended Racing Law, the State awarded New

NYRA the Franchise for twenty-five (25) years, ending no later than December 31, 2033, and the

State and New NYRA executed the Franchise Agreement.  *See* N.Y. Racing Law §§ 206(1), (2).

In accordance with section 206(4) of the Racing Law, New NYRA adopted by-laws and a

corporate governance code calculated to "ensure that [it] is operated in an efficient and

transparent manner, with the highest degree of integrity and is fully accountable to the people of

the state of New York."  *See id.* § 206(4).  Section 206(5) of the Racing Law directs the

franchised corporation to:

> comply with all applicable laws and regulations and retain an independent business
> integrity counsel, who, among other things, will act as an independent source to
> help ensure the integrity of the franchised corporation, its officers and employees,
> and its operations.

*Id*. § 206(5).  To satisfy that requirement, on the effective date of the Modified Plan, NYRA

assumed and assigned the Retainer Agreement to New NYRA.

---

[15]    At the time of the Confirmation Hearing, each of the Franchise Agreement and Settlement Agreement were
undated and unexecuted, and had been submitted to the Bankruptcy Court in substantially final form.  *See* Motion ¶
8, n.1.

The Debtor Closes The
Chapter 11 Case in March 2009

On March 5, 2009, this Court entered the final decree closing NYRA's chapter 11 case.[16]

In March 2011 NYRA Purports to Terminate The
Retainer Agreement and G&G's Services Thereunder

G&G contends that during 2010, New NYRA ceased to provide information critical to

G&G's performance of its job. *See* G&G Further Response ¶ 30. It maintains that New

NYRA's refusal to "cooperate fully" with it was a fundamental breach of the Retainer

Agreement (*id.*), and that to maintain its independence and to avoid any appearance of

impropriety that might arise from accepting compensation under those circumstances, it

voluntarily refrained from billing New NYRA for fees and expenses for the period beginning in

June of 2010. *Id.* ¶ 31. In January of 2011, in the face of New NYRA's alleged continued lack

of cooperation, G&G retained ethics counsel to advise it on its responsibilities. *Id.* ¶ 32. G&G

asserts that on February 28, 2011, after consultation with its ethics counsel, G&G requested the

opportunity to meet and brief the Special Oversight Committee (the "Oversight Committee") of

New NYRA's Board regarding specified integrity issues that G&G had previously raised with

New NYRA's senior management and certain Board members. *Id.* No such meeting took place.

On March 10, 2011, the Chairman of the Oversight Committee advised G&G by telephone that

the Oversight Committee had met and voted to terminate G&G's retention. *See id.* ¶ 33; *see also*

Motion ¶ 14 ("On March 10, 2011, New NYRA's Special Oversight Committee terminated

G&G's employment.").[17] After further consultation with its ethics counsel, G&G prepared a

---

[16]   *See* Final Decree Closing Debtor's Chapter 11 Case Pursuant To Bankruptcy Code Section 350(a), Bankruptcy Rule 3022 and Local Rule 3022-1 [ECF No. 1160].

[17]   After terminating the Retainer Agreement, New NYRA retained replacement business integrity counsel.

report to the Board.  *See* G&G Further Response ¶ 34.  G&G says that the report provided the

Board with a detailed account of two integrity investigations that G&G undertook within the

scope of its responsibilities, both of which were cut off by the termination of G&G's retention.

*Id*.  On September 6, 2011, G&G's counsel sent a letter to New NYRA's counsel regarding New

NYRA's "purported termination" of G&G as its integrity counsel.  *See* Motion ¶ 14, Ex. C.

Among other things, G&G's counsel advised that the purported termination of G&G: (i) was not

authorized by State law; (ii) constituted a breach of the five-year term in  the Retainer

Agreement; and (iii) violated the terms of the Retention Order.[18]

The Court Reopens the Case to Consider New NYRA's
Request That It "Clarify" or "Amend" the Retention Order

New NYRA asserts that pursuant to the so-called "discharge rule" applicable to attorney-

client relationship under New York law, it had the unqualified right to terminate the Retainer

Agreement in March of 2011, notwithstanding the terms of the agreement or the Retention

Order.  It filed the motion to reopen the case in May of 2012.  In doing so, New NYRA asked the

Court to "clarify" or, if necessary, "amend" the Retention Order to acknowledge its alleged right

under State law to unilaterally terminate the Retainer Agreement.  Motion ¶ 29.  It contended that

in doing so, the Court would avoid future conflict among the parties because "[a]mending the

---

[18]    The letter states, in part:

> By its terms, the Retainer Agreement provides that G&G would serve as Integrity Counsel for a period of five years unless NYRA failed to maintain its franchise to conduct thoroughbred racing and license to conduct pari-mutuel racing in New York State (the "Franchise"). Furthermore, the [Retention] Order provides that upon the confirmation of NYRA 's plan of reorganization, which has already occurred, NYRA is prohibited from terminating G&G except as specifically provided for in the Retainer Agreement. Since the only two circumstances specified by the Retainer Agreement for the termination of G&G's services -- expiration of the five-year term or NYRA's failure to maintain its Franchise -- have not occurred, NYRA 's purported termination of G&G's services constitutes a breach of the Retainer Agreement, violates the [Retention] Order, and is unauthorized under New York's Racing statute.

Motion, Ex. C.

[Retention] Order to explicitly state that New NYRA has a unilateral right to terminate G&G would address the crux of the dispute between New NYRA and G&G and avoid future litigation and efficiently and effectively address New NYRA and G&G's dispute." *Id.* ¶ 31.  G&G consented to reopening the case,[19] and on May 31, 2011, the Court reopened it.[20]  However, G&G opposed New NYRA's request for relief from the Retention Order.  It asserts that New NYRA could not terminate the agreement without an order of this Court.  Moreover, it says that the discharge rule is not applicable to the Retainer Agreement because the agreement gives rise to a five-year, "special" attorney-client relationship that was terminable by New NYRA only if it lost the Franchise during the term of the agreement.  G&G contends that since that did not occur, in asking the Court to "clarify" or "amend" the Retention Order, New NYRA actually "seeks an outright nullification of [that] key provision of the Retainer Agreement and this Court's Order adopting it."  *See* G&G Further Response ¶ 4.  Among other things, G&G asserted that although New NYRA failed to cite Fed. R. Civ. P. 60(b), that rule is applicable to the Motion because New NYRA is seeking relief from the terms of the Retention Order.  *See id.* ¶ 38.[21]  It contends

---

[19]    *See* Getnick & Getnick LLP's Consent to Reopening of the Case and Reservation of All Other Objections to the Pending Motion of The New York Racing Association, Inc. [ECF No. 1169].

[20]    *See* Order Granting Motion of The New York Racing Association, Inc. for Entry of an Order, Pursuant to Section 350(b) of the Bankruptcy Code and Rule 5010 of the Federal Rules of Bankruptcy Procedure, Reopening the Chapter 11 Bankruptcy Case for the Limited Purposed of (A) Clarifying and, if Necessary, Amending Order Authorizing the Employment of Getnick & Getnick LLP and (B) Addressing Claims Associated Therewith [ECF No. 1175].

[21]    With certain irrelevant exceptions, Bankruptcy Rule 9024 makes Rule 60(b) applicable in this case.  Rule 60(b) provides:

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> > (1) mistake, inadvertence, surprise, or excusable neglect;
> >
> > (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

that none of the provisions in Rule 60(b) are applicable to the Retention Order. *Id.* Further it

contends that in seeking such relief, "[New] NYRA effectively acknowledges that its firing of

G&G violated the Retainer Agreement and [Retention] Order as written." *See id.* ¶ 4.

The Parties Unsuccessfully Work
to Resolve Their Dispute Out of Court

In the order reopening the case, the Court scheduled a hearing for June 27, 2012, to

address any claims "associated" with the Retention Order. *See* Order Reopening Case at 2. That

hearing did not go forward. Earlier in May of 2012, the Governor and the Legislature announced

that New NYRA would be placed under temporary public control. *See* G&G Supplemental

Request ¶ 10.[22] In October of 2012, the Governor signed legislation that was designed to place

New NYRA under public control for a period of three years, after which it would revert to

private control. *Id*. ¶ 11. The legislation provided that during that three-year period, New

NYRA would be controlled by a Board of Directors, a majority of which would be appointed by

the Governor and Legislature, with a chairman appointed by the Governor. New NYRA's then-

existing Board would appoint the remaining directors. *Id.*

---

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or
misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an
earlier judgment that has been reversed or vacated; or applying it prospectively
is no longer equitable; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

[22] *See* Getnick & Getnick LLP's Supplemental Request for Enforcement of This Court's 2007 Order and Related
Relief [ECF No. 1178].

In view of the State's then pending temporary takeover of New NYRA, the parties adjourned the proceedings in this Court and attempted to resolve their dispute out of court. *Id.* ¶ 12. G&G and New NYRA conducted settlement discussions from time to time through August of 2014. *Id.* ¶ 13. Those discussions included a series of detailed briefings by G&G with respect to the integrity concerns that G&G had previously raised with New NYRA's pre-takeover Board and management. The subject of G&G's unpaid attorney's fees and expenses was raised in the discussions on New NYRA's initiative. The parties were not able to resolve the dispute. *Id.*

The Parties Return to This Court and Ask
The Court to Determine Whether New NYRA
<u>Had an Unqualified to Terminate the Retainer Agreement</u>

Thereafter, the parties returned to this Court. G&G supplemented its opposition to the Motion by requesting that the Court award it fees that it says it is owed under the Retainer Agreement.[23] The matter that is central to the resolution of the disputes among New NYRA and G&G is the nature of their attorney-client relationship. *See, e.g.*, *In re New York Racing Ass'n Inc.*, Case No. 06-12618, 2016 WL 6081087, at *11 (Bankr. S.D.N.Y. Oct. 17, 2016). The Court authorized the parties to conduct discovery on that issue. The parties agree that the issue before the Court is whether in March of 2011, New NYRA had an unqualified right under the Retention Order – which incorporates the Retainer Agreement - to terminate the agreement and G&G's performance thereunder. That was the focus of the additional briefing that the Court received from the parties, and the hearing that the Court conducted on the Motion.[24]

---

[23]    *See id.* ¶¶ 16-17. *See also* Cross Motion to Compel Enforcement of this Court's Order dated September 29, 2007, and Related Relief [ECF No. 1188].

[24]    By agreement among the parties, and the order of this Court, at the hearing the parties were limited to oral argument supplemented by documents of record. *See* Order Concerning Hearing and Related Briefing [ECF No. 1244]; *see also* Transcript of Hearings held on June 14, 2017 and September 20, 2017 on the Motion. [ECF Nos. 1254, 1258].

<u>Discussion</u>

The Retainer Agreement calls for G&G to "provide legal services to NYRA" in its

capacity as NYRA's "business integrity counsel."  Retainer Agreement at 1.  The agreement

describes the legal services as "those services necessary for [G&G] to assess, report on and

provide counsel in connection with matters affecting NYRA's business integrity . . . includ[ing],

but not be limited to, monitoring and investigating NYRA's business practices and operations [in

several different areas.]"  *Id*.  In the agreement, NYRA "agrees and acknowledges" that "it is the

intent of both NYRA and G&G to afford maximum independence to G&G in performing its

function as business integrity counsel . . . consistent with the underlying counsel relationship

between NYRA and G&G."  *Id*.  NYRA also agrees to retain G&G for a Term of five years,

"unless NYRA does not maintain a franchise to conduct thoroughbred racing and a license to

conduct pari-mutuel wagering in the State of New York (the 'Franchise'), in which case the

Term will end as of the date NYRA no longer maintains the Franchise."  *Id*. at 3.  The Retention

Order speaks to the parties' rights to terminate the agreement.[25]  In part, it states that:

> notwithstanding anything contained in the [Retention] Application, the Getnick
> Declaration and the Retainer Agreement to the contrary, (a) at any time prior to the
> entry of a final order confirming a chapter 11 plan in NYRA's chapter 11 case (the
> "Plan"), NYRA shall have the right to terminate the Retainer Agreement and
> G&G's services thereunder, without cause and the payment of penalty upon sixty
> (60) days prior written notice to G&G, and (b) upon and after the entry of a final
> order confirming the Plan, the services to be provided pursuant to the Retainer
> Agreement may only be terminated in accordance with the terms and provisions of
> the Retainer Agreement[.]

Retention Order at 2-3.  New NYRA purported to terminate the Retainer Agreement and G&G's

services thereunder after entry of the Confirmation Order.  To resolve whether New NYRA had

---

[25]    The Retainer Agreement gives G&G "the right to withdraw as counsel for non-payment of fees and costs."
Retainer Agreement at 2.

an unqualified right to do so, the Court must determine whether it was so authorized under "the terms and provisions of the Retainer Agreement."

"[A] lawyer, as one in a confidential relationship and as any fiduciary, is charged with a high degree of undivided loyalty to his client." *Matter of Kelly*, 23 N.Y.2d 368, 376 (1968). Accordingly, the attorney-client relationship is a "unique relationship . . . founded in principle upon the elements of trust and confidence on the part of the client and of undivided loyalty on the part of the attorney[,]" and, as such, "remains one of the most sensitive and confidential relationships in our society." *Demov, Morris, Levin & Shein v. Glantz*, 53 N.Y.2d 553, 556 (1981). Given the special nature of that relationship, "[i]t follows . . . that an attorney cannot represent a client effectively and to the full extent of his or her professional capability unless the client maintains the utmost trust and confidence in the attorney." *Id.* For that reason, attorney-client retainer agreements are not treated like conventional commercial agreements. *See Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420, 444 (S.D.N.Y. 1998) ("The courts of New York and most other jurisdictions have long held that retainers between attorneys and clients are subject to special rules that are an outgrowth of the attorney's role as a fiduciary and as an officer of the court.") (citations omitted). What sets retainer agreements apart from those agreements is that pursuant to the so-called "discharge rule," "a client has the implied right to terminate the attorney-client relationship at any time, with or without cause, so that premature termination is not an actionable breach[.]" *Levisohn, Lerner, Berger & Langsam v. Medical Taping Sys., Inc.*, 20 F. Supp. 2d 645, 659 (S.D.N.Y. 1998) (citation omitted); *see also Matter of Cooperman*, 83 N.Y.2d 465, 472 (1994) ("public policy recognizes a client's right to terminate the attorney-client relationship *at any time with or without cause*") (citation omitted); *Campagnola v. Mulholland, Minion & Roe*, 76 N.Y.2d 38, 43 (1990) ("[I]t is well established that

notwithstanding the terms of the agreement between them, a client has an absolute right, at any time, with or without cause, to terminate the attorney-client relationship by discharging the attorney.") (citations omitted).  By application of the discharge rule, the termination of a retainer agreement does not give rise to a claim for breach of contract, "because it is a term of such contract, implied from the peculiar relationship which calls the contract into existence, that the client may terminate the contract at any time with or without cause."  *Martin v. Camp*, 219 N.Y. 170, 174 (1916).  A client that discharges its attorney without cause "cannot be compelled to pay damages for exercising a right which is an implied condition of the contract, and the attorney discharged without cause is limited to recovering in *quantum meruit* the reasonable value of services rendered."  *Demov, Morris, Levin & Shein v. Glantz,* 53 N.Y.2d at 557 (citations omitted).  *Accord Lai Ling Chang v. Modansky Leasing Co., Inc*., 73 N.Y.2d 454, 457-58 (1969) ("When a client discharges an attorney without cause, the attorney is entitled to recover compensation from the client measured by the fair and reasonable value of the services rendered whether that be more or less than the amount provided in the contract or retainer agreement.") (citation omitted).  There are two exceptions to the discharge rule.  A client does not have an unconditional right to terminate a retainer agreement where "the attorney has relied reasonably and to his detriment on the client's promises by changing his position or incurring expenses upon entering into the client agreement."  *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d at 446.  *See also Atkins & O'Brien L.L.P. v. ISS Int'l Serv. Sys., Inc.*, 252 A.D 2d 446, 468 (1st Dep't 1998) (stating that the discharge rule will not apply where "the attorney in entering into such a contract has changed his position or incurred expense" (quoting *Martin v. Camp*, 219 N.Y. at 176)).  In addition, the discharge rule is not applicable "to a case where an attorney is employed under a general retainer for a fixed period to perform legal services in relation to matters that may arise

during the period of the contract." *Martin v. Camp*, 219 N.Y. at 176. *See also Kelly v. MD*

*Buyline, Inc*., 2 F. Supp. 2d at 445 (noting that an "attorney's right of compensation is not limited

to quantum meruit for pre-termination services if the relationship involves a 'general' retainer, as

distinguished from a 'special' retainer.") (citation omitted).

The parties agree that the Retainer Agreement gives rise to an attorney-client relationship

that is governed by New York law.  In essence, New NYRA's position is that the Retainer

Agreement embodies a conventional attorney-client relationship, with one exception.  It says that

by providing in the Retainer Agreement that G&G would have "maximum independence" in

performing its duties as business integrity counsel, the parties agreed that G&G would report to,

and take direction from, representatives of NYRA's Board and the Oversight Committee, but

that it would act independently of NYRA's management.  *See* NYRA Supplemental Brief at 1-

3.[26]  New NYRA contends that it is consistent with the counsel relationship among the parties to

afford G&G cooperation and independence from management, but that it is antithetical to that

relationship for G&G to operate without Board oversight.[27]  It maintains that, consistent with the

terms of the Retainer Agreement, the Board agreed to afford G&G maximum independence,

subject to the constraints of the attorney-client relationship, which meant that management had to

afford G&G independence, but that the Board retained its fundamental client rights.  It says that

level of autonomy relieved G&G, as business integrity counsel, from reasonable concerns of

---

[26]    *See* Supplemental Brief of The New York Racing Association, Inc. With Respect to Its Motion (A) Clarifying
And, If Necessary, Amending Order Authorizing the Employment of Getnick & Getnick LLP and (B) Addressing
Claims Associated Therewith [ECF No. 1246].

[27]    A corporation is "an artificial creature of law functioning through representatives." *In re O.P.M. Leasing
Servs., Inc.*, 670 F.2d 383, 386 (2d Cir. 1982).  Generally, a lawyer representing a corporate client reports to and
takes direction from the client's management and board of directors.  *See* MODEL RULES OF PROF'L CONDUCT r.
1.13(A) (AM. BAR ASS'N 2002) ("A lawyer retained by an organization represents the organization acting through its
duly authorized constituents."); *see also* N.Y. RULES OF PROF'L CONDUCT r. 1.13(a) ("An organizational client is a
legal entity, but it cannot act except through its officers, directors, employees, members, shareholders and other
constituents.").

inappropriate retaliation by management, and allowed it to "assess, report on, and provide

counsel" to its client, New NYRA, as represented by its Board.  *Id.* at 3.  New NYRA asserts that

at the same time, like all other lawyers, G&G owed it fiduciary duties, including the duty of

loyalty.  It says that as a matter of law, pursuant to the discharge rule, acting through the Board,

it had an implied right under the Retainer Agreement, and, therefore, pursuant to the Retention

Order, to terminate G&G's role as business integrity counsel at any time.

     G&G does not contend that in executing the Retainer Agreement, it relied to its detriment

on promises by NYRA by changing its position or incurring expenses.[28]  Hence, that exception

to the discharge rule is not applicable herein.  Neither is the second exception, as the Retainer

Agreement is not a "general" retainer agreement.[29]  Nonetheless, G&G contends that the

---

[28]    In its Supplemental Opposition, G&G made the alternative argument that even if parties' relationship were viewed as a "traditional" attorney-client relationship, the general discharge rule would not apply here.  *See* G&G Supplemental Opposition ¶¶ 34, 35.  G&G voluntarily withdrew that argument.  *See* Getnick & Getnick's Supplemental Response Brief in Further Opposition to NYRA's Motion to "Clarify" or "Amend" This Court's 2007 Order [ECF No. 1252] (the "G&G Supplemental Response"), ¶ 5, n.2.

[29]    A "general" retainer agreement is one in which "the client agrees to pay a fixed sum to the attorney in exchange for the attorney's promise to be available to perform, at an agreed price, any legal services (which may be of any kind or specific kind) that arise during a specified period . . . such fees are 'earned when paid' because the payment is made for availability." *Levisohn, Lerner, Berger & Langsam v. Medical Taping Sys., Inc.*, 20 F. Supp. 2d 645, 651 (S.D.N.Y. 1998) (quoting Lester Brinkman and Lawrence A. Cunningham, *Nonrefundable Retainers Revisited*, 72 N.C. L. REV. 1, 6 (1993)).  *See also Wong v. Michael Kennedy, P.C.*, 853 F. Supp. 73, 78 (E.D.N.Y. 1994) (same).  The Retainer Agreement obligates G&G contractually to perform a range of legal services during the term of the agreement.  It calls for G&G to be compensated for those services pursuant to a "monthly retainer and minimum fee for professional services [of] $125,000.00 [(the 'Monthly Minimum')] to be billed against hourly billings by G&G, and persons working under the direction of G&G[.]"  Retainer Agreement at 2.  It also states that "[t]o the extent the Monthly Minimum exceeds the amount of the monthly hourly billings by G&G in any given month, the remainder of the Monthly Minimum will be credited towards the following month's hourly billings over that month's Monthly Minimum."  *Id.*  The payment of the Monthly Minimum to G&G is for services rendered, not as consideration for G&G's availability to act as business integrity counsel.  Indeed, the Retainer Agreement does not speak at all to G&G's "availability" to act as counsel.  The Court finds that the Retainer Agreement is not a "general" retainer agreement.  *See, e.g.*, *Medical Taping Sys., Inc.*, 20 F. Supp. 2d at 654 (finding that agreement that called for payment to counsel of a fixed fee over a five-year period, obligated counsel to provide a broad range of legal services over the life of the agreement, and made no reference to a separate fee in exchange for availability of counsel, separate and apart from the fee charged for services was not a "general" retainer agreement excepted from the discharge rule); *Plattsburgh Housing Auth. v. Cantwell*, No. 2013-0858, 2017 WL 593160 at *31 (Sup. Ct. Clinton Co. Feb. 10, 2017) (attorney was not retained pursuant to a "general" retainer agreement where the retainer agreement "required [her] to work as the [client's] attorney on a full time basis[,]" and she "was not being compensated for her availability to the [client]").  G&G does not contend otherwise.

discharge rule is not applicable to the Retainer Agreement and that New NYRA breached its legal obligations to G&G under the agreement and the Retention Order when it purported to terminate the agreement.  G&G disputes New NYRA's description of their relationship under the Retainer Agreement.  It asserts that with the State's guidance, NYRA and G&G deliberately crafted what G&G says is a "middle ground" between a "monitorship," at one extreme, and a conventional attorney-client relationship in which the Board, as the client, exercises unlimited authority over business integrity counsel, and such counsel exercises no independence at all, at the other.  *See* G&G Supplemental Response ¶ 17.  G&G maintains that in the Retainer Agreement, the parties agreed to a "unique" or "special" attorney-client relationship, not subject to the discharge rule, in which G&G could act independently from NYRA – including its Board and the Oversight Committee – and that the loss of the Franchise was the only ground for terminating the agreement within the Term of the agreement.  It also contends that the scope of New NYRA's rights under the agreement must be evaluated in the context of the development of the MOU and amended Racing Law.  To that end, it says that after reaching agreement on the terms of the Retainer Agreement, NYRA and the State agreed in the MOU to craft the new Racing Law to codify the "independence" of business integrity counsel and in doing so, provided the basis for the five-year term of the Retainer Agreement under which G&G would exercise "maximum independence" and could only be terminated if NYRA lost the Franchise.  In summary, G&G asserts that in purporting to terminate the Retainer Agreement, New NYRA violated:

> (i) G&G's "independent status" under section 206(5) of the Racing Law which required New NYRA to "retain an independent business integrity counsel, who, among other things, will act as an independent source to help ensure the integrity of the franchised corporation, its officers and employees, and its operations";

(ii) G&G's "independent status" under the "related" MOU between NYRA and the State, which provided that NYRA "will continue the retention of independent business integrity counsel, acceptable to the State, who, among other things, will act as an independent source of checks and balances to help NYRA identify and counteract new and emerging threats to the sport of horse racing and transparency in pari-mutuel pools;

(iii) The five-year term for G&G's engagement – with no allowance for termination - expressly provided by the Retainer Agreement; and

(iv) The Retention Order which expressly approved all provisions of the Retainer Agreement including its five-year term.

*See, e.g.*, G&G Further Response ¶ 2.  G&G also contends that, in any event, in agreeing to a five-year term in the Retainer Agreement, NYRA, a sophisticated party represented by sophisticated counsel, deliberately waived the discharge rule to enhance its chances of winning the Franchise.  *See* G&G Supplemental Opposition ¶¶ 31-33.

As noted, New NYRA took an assignment of the Retainer Agreement to satisfy the mandate of section 206(5) that it, as the franchised corporation, retain "business integrity counsel."  Before reviewing the terms of the Retainer Agreement and Retention Order, the Court considers the impact of the MOU and Racing Law on the parties' rights under the agreement.

<u>The MOU and the New York Racing Law</u>

As the Federal Monitor, G&G was responsible for overseeing NYRA's compliance with the provisions of the Deferred Prosecution Agreement, the restructuring of NYRA's senior management, and NYRA's adoption of a new company Code of Ethics.  *See* Retention Application ¶ 10.  In doing so, it was not acting as NYRA's counsel.  Under that agreement, G&G was a District Court–appointed fiduciary bound to promote and protect the public interest by ensuring that NYRA complied with the Deferred Prosecution Agreement.  In amending the Racing Law, the State could have called for the appointment of a business integrity "monitor" charged with the duty of protecting the public interest.  It did not do so.  Instead, section 206(5)

of the Racing Law mandates that the franchised corporation retain "an independent business integrity counsel."[30]

G&G says that the central purpose of the attorney-client relationship between the franchised corporation and its business integrity counsel under section 206(5) is to vest business integrity counsel with an oversight role designed to serve both the franchised corporation's private interests and the public interest. *See* G&G Supplemental Opposition ¶¶ 26-27. It maintains that counsel retained under section 206(5) is not merely the franchised corporation's advocate; rather such counsel has an obligation to protect and promote the State's and public's interests in ensuring the integrity of thoroughbred racing in New York State. *See* G&G Further Response ¶ 12. It says in that way, business integrity counsel retains "true" independence from the franchised corporation, so that it is free to impose "checks and balances" on the corporation, and to conduct investigations of the franchised corporation that are beyond the control of the corporation. *Id.* G&G says that section 206(5) is aimed specifically and exclusively at the franchised corporation – as it mandates that it retain an "independent business integrity counsel" as an "independent source" of integrity safeguards. G&G Supplemental Response ¶ 20. In essence, G&G reads the term "independent" used in section 206(5) to mean that business

---

[30]    New NYRA contends that in negotiating the MOU, a State representative proposed language to require NYRA to retain an independent monitor – not business integrity counsel – and that G&G counseled and convinced NYRA's Chairman to reject that language, in favor of language calling for the retention of such counsel. NYRA Supplemental Brief at 2, 7; *see also* MOU draft [Ex. 18 to Declaration of Robert S. Berezin in Support of NYRA's Supplemental Brief of The New York Racing Association Inc. With Respect to its Motion (A) Clarifying and, if Necessary, Amending Order Authorizing the Employment of Getnick & Getnick LLP, and (B) Addressing Claims Associated Therewith [ECF No. 1247] (the "Berezin Supplemental Declaration")]. New NYRA asserts that the State accepted NYRA's proposal, which is memorialized in the MOU. *See* NYRA Supplemental Brief at 2. It maintains that this fact alone rebuts G&G's assertion that the State required NYRA's Board to accept integrity oversight outside of the Board's control. *Id.* The Court finds no merit to that contention. The record is clear that as the Franchise bidding process unfolded, bidders were required to make their own arrangements for integrity safeguards and would not be able to rely on a government appointed "monitor." Moreover, at the time NYRA and the State were negotiating the terms of the MOU, the State was aware that NYRA was seeking to retain G&G as its business integrity counsel.

integrity counsel is free to act without the oversight of its client, the franchised corporation. It

asserts that although attorneys ordinarily cannot act in that way, under the Racing Law (i) such

independence is explicitly and fundamentally what the statute requires; and (ii) counsel's

independence would be illusory if the franchised corporation's Board of Directors could

terminate the engagement at any time, for any reason. *Id.* It says that in calling for the retention

in section 206(5) of "an independent business integrity counsel" whose job is "to help ensure the

integrity of the franchised corporation . . . and its operations," the State intended to bind the

franchised corporation's Board of Directors, not just its management, to the provisions of the

statute that ensure business integrity counsel's maximum independence. *Id.* ¶ 18. In sum, G&G

argues that it is "[p]lainly not the case" that section 206(5) gives rise to a "typical" attorney-

client relationship between business integrity counsel and the franchised corporation. G&G

Further Response ¶ 47. It says that is so because under the MOU, NYRA committed to "'the

retention of an independent business integrity counsel, acceptable to the State, who, among other

things, will act as an independent source of checks and balances to help New NYRA identify and

counteract new and emerging threats to the sport of horse racing and transparency in pari-mutuel

pools.'" *Id.* ¶ 46 (quoting the MOU). It contends that it is "nonsensical" for New NYRA to

suggest that the "typical" attorney-client relationship involves the choice of an attorney

"acceptable to the State" who will serve as an "independent source of checks and balances." *Id.*

¶ 46. G&G asserts that section 206(5) of the Racing Law modifies common-law rules regarding

the attorney-client relationship, in favor of a special relationship between the franchised

corporation and its integrity counsel in which counsel exercises genuine independence. It says

that the discharge rule is inapplicable to that "special" attorney-client engagement because that

rule was developed in the context of purely private relationships, to prevent overreaching by

attorneys, particularly with respect to unsophisticated clients who lacked other legal counsel.

*See id.* ¶ 32.  It also says that by mandating that the franchised corporation retain an

"independent" business integrity counsel, section 206(5) preempts application of the discharge

rule.  *See* G&G Supplemental Response ¶ 20.

The Court disagrees with G&G.  The MOU is "a non-binding agreement subject to,

among other things, the passage of State legislation, State regulatory approvals, approval of the

U.S. Bankruptcy Court and the negotiation and execution of definitive documents."  *See* MOU at

7.  As relevant, it has been superseded by the Franchise Agreement and the Racing Law.  Thus,

the terms of the MOU are not operative, except to the extent they are incorporated in the

agreement or the legislation.  The Franchise Agreement does not mention the MOU, but it

incorporates certain of the amendments to the Racing Law that concurrently took effect with that

agreement.  The Court will focus its discussion on the amended Racing Law.  When construing a

statute, courts "seek to discern and give effect to the Legislature's intent . . . and the starting

point for accomplishing this is the statute's language."  *Roberts v. Tishman Speyer Props., L.P.*,

13 N.Y.3d 270, 286 (2009) (internal citations omitted).  In contrast to the MOU, the Racing Law

does not mandate that business integrity counsel be "acceptable to the State" or that such counsel

serve as an "independent source of checks and balances."  The Racing Law does not purport to

regulate the attorney-client relationship between business integrity counsel and the franchised

corporation.  For example, it does not mandate that business integrity counsel be retained for a

fixed period and does not bar, or even limit, the franchised corporation's right to terminate the

services of such counsel.[31]  Moreover, the Racing Law does not vest such counsel with an

oversight role, an obligation to protect the public interest, or the right to "impose" anything on

---

[31]    It is undisputed that the State has not taken any action against New NYRA based on its purported termination of
the Retainer Agreement and that New NYRA has subsequently replaced the integrity counsel that replaced G&G.

the franchised corporation.  It does not provide that the business integrity counsel is free to

conduct investigations that are beyond the control of the franchised corporation.  Rather, the

statute assigns counsel a traditional role of support to its client by directing that it "*help* ensure

the integrity of the franchised corporation, its officers and employees, and its operations."  N.Y.

Racing Law § 206(5) (emphasis added).

Still, as noted, the statute speaks of an "independent business integrity counsel," who will

act as an "independent source" of help to the franchised corporation.  *Id.*  The Court agrees with

G&G that attorneys do not act without the oversight of their clients.  Rather, they owe them a

duty of undivided loyalty and allegiance.  *See, e.g.*, *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d

1384, 1386 (2d Cir. 1976) (noting that an attorney owes "the duty of undivided loyalty . . . to

each of his clients"); *Pierce & Weiss, LLP v. Subrogation Partners LLC*, 701 F. Supp. 2d 245,

252 (E.D.N.Y. 2010) ("[A]ll attorneys owe a duty of undivided loyalty to the clients which have

hired them.").  In construing the Racing Law, the Court must give effect to the plain meaning of

the language used in the statute.  *See, e.g.*, *Simon v. Usher*, 17 N.Y.3d 625, 628 (2011) ("When

construing a statute, we must begin with the language of the statute and give effect to its plain

meaning.") (internal quotation marks and citation omitted); *Kramer v. Phoenix Life Ins. Co.*, 15

N.Y.3d 539, 550 (2010) (internal citations omitted) ("[W]here the language of a statute is clear

and unambiguous, courts must give effect to its plain meaning.") (internal citations omitted).

The statute does not provide that integrity counsel can act without the oversight of the franchised

corporation's Board.  Neither did the MOU.  The Court disagrees with G&G that by using the

term "independent" in section 206(5) of the Racing Law, the State intended to vest business

integrity counsel with the power to do so.  The Court also disagrees that by using the term

"independent," the draftsmen preempted application of the age-old discharge rule with respect to

35

business integrity counsel.  The Court construes the term "independent" to mean that business

integrity counsel must be "outside" counsel—i.e., counsel that is not affiliated with the

franchised corporation.  In doing so, the Court gives effect to the plain language of section

206(5), while preserving the well settled duty of undivided loyalty that attorneys owe their

clients.  There is nothing in the statute to suggest that the draftsmen intended to alter that duty.

*See Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 94 F.3d 772, 779 (2d Cir.

1996) (refusing to interpret statute in question (31 U.S.C. § 3720A)(g)) as abrogating common

law rights of setoff against refunds, and noting that "[i]t is a longstanding principle that 'statutes

which invade the common law... are to be read with a presumption favoring the retention of

long-established and familiar principles, except when a statutory purpose to the contrary is

evident.'" (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952))); *Spentonbush/Red

Star Cos. v. NLRB*, 106 F.3d 484, 489 (2d Cir. 1997) ("Statutes which invade such long-

established and familiar principles should be read with a presumption favoring their retention

unless a statutory purpose to the contrary is evident." (citing *Edmonds v. Compagnie Generale

Transatlantique*, 443 U.S. 256, 263 (1979))).  Moreover, the Court's construction of the term

"independent" is in keeping with the position G&G advocated to the State Comptroller in 2010.

In a letter dated April 27, 2010, in response to the State Comptroller's inquiry as to why New

NYRA was required to retain the services of an outside law firm to serve as its business integrity

counsel, G&G explained that the Racing Law called for New NYRA to retain "independent

business integrity counsel," and that "[b]y definition, an independent business integrity counsel

must be an outside, independent entity and not part of NYRA's in house staff."  *See* Getnick

Supplemental Declaration, Ex. 26, at 1.[32]  G&G made the same points in a letter to the State

Comptroller dated July 2, 2010, that it authored for James P. Heffernan, Vice Chairman of New

NYRA's Board and Chairman of the Oversight Committee.  *See id.*, Ex. 24.  The Court disagrees

with G&G's contention that section 206(5) of the Racing Law gives rise to a "special" attorney-

client relationship in which business integrity counsel serves the public's interest and is not

subject to the discharge rule.[33]  In reaching this determination, the Court disagrees with G&G

that *Garcia v. New York Racing Ass'n, Inc.*, 1:10-cv-01092, 2011 WL 3841524 (N.D.N.Y. Aug.

29, 2011), supports its contention that "independent business integrity counsel," can act without

the oversight of the Board.  *See* G&G Supplemental Response ¶ 19; *see also* G&G Supplemental

Opposition ¶ 28. *Garcia* does not speak, at all, to the relationship between business integrity

counsel and the franchised corporation's Board of Directors.  It provides no support for G&G's

---

[32]    *See* Declaration of Neil V. Getnick In Support of Getnick & Getnick LLP's Supplemental Brief and
Supplemental Response Brief in Further Opposition to NYRA's Motion to "Amend" or "Clarify" This Court's 2007
Order [ECF No. 1253].

[33]    Even if business integrity counsel is viewed as serving some public oversight function, it does not follow that
the discharge rule is inapplicable to counsel's relationship with the franchised corporation.  Contrary to G&G's
assertion, the discharge rule did not evolve as a tool to protect unsophisticated clients.  The rule is founded on the
unique fiduciary attorney-client relationship and is intended to promote public confidence in those relationships.  It
is "an outgrowth of the attorney's role as a fiduciary and as an officer of the court."  *Kelly v. MD Buyline, Inc.*, 2 F.
Supp. 2d 420, 444 (S.D.N.Y. 1998).  "The greatest trust between [people] is the trust of giving counsel.'"  *Matter of
Cooperman*, 83 N.Y.2d 465, 472 (1994) (quoting Bacon, *Of Counsel,* in The Essays of Francis Bacon, at 181
(1846)).  "This unique fiduciary reliance, ... is imbued with ultimate trust and confidence."  *Id.*  Accordingly, the
*Cooperman* court noted:

> Because the attorney-client relationship is recognized as so special and so sensitive in our society,
> its effectiveness, actually and perceptually, may be irreparably impaired by conduct which
> undermines the confidence of the particular client or the public in general.  In recognition of this
> indispensable desideratum and as a precaution against corrosive potentiality form failing to foster
> trust, public policy recognizes a client's right to terminate the attorney-client relationship *at any
> time with or without cause.*

*Id.* at 468 (citations omitted); *see also Martin v. Camp*, 219 N.Y. 170, 174 (1916) (noting that the discharge rule
"springs from the personal and confidential nature of the relation which such a contact of employment call into
existence.").  G&G has not shown any reason why the discharge rule would not be applicable to the attorney-client
relationship under the Racing Law, even if counsel is viewed as serving some public oversight function.  The law
mandates that the franchised corporation retain business integrity counsel.  It does not state that the corporation
cannot replace such counsel, or that the discharge rule is not applicable to that relationship.

assertion that business integrity counsel retained pursuant to section 206(5) of the Racing Law is free to act without the oversight of the franchised corporation's Board.[34]

Moreover, the Court disagrees that section 206(5) preempts application of the discharge rule. *See* G&G Supplemental Response ¶ 20. It is settled that a statute does not preempt common law rights unless there is "clear and specific legislative intent" to do so. *Hechter v. New York Life Ins. Co.*, 46 N.Y. 2d 34, 39 (1978). The intent must be "unambiguous." *Id.* G&G contends that the reference in the statute to an "independent" business integrity counsel is an explicit modification of the traditional attorney-client relationship in which counsel has no independence, acts entirely at the client's direction and can be discharged at any time, for any reason. It maintains that by codifying "independence," the statute modified these common law

---

[34] In *Garcia*, an individual (the "Plaintiff") who worked for NYRA as a seasonal employee of the Saratoga Race Course was fired one week after he reported to security and business integrity counsel that there was beer and alcohol in the employees' break room and the loft of the barn in violation of the policy prohibiting all alcohol and drugs in the barn. *See* 2011 WL 3841524 *at* *4. He contended that integrity counsel quickly determined that a facility manager (the "Manager") was responsible for the infraction, and that the Manager fired him without cause. *See id.* Plaintiff sued, among others, New NYRA and certain of its employees, including the Manager (the "NYRA Defendants") alleging, among other things, various civil rights violations pursuant to 42 U.S.C. §§ 1981 and 1983.

Under section 1983, a court can grant relief to a party whose constitutional rights were violated by a state or local official or anyone acting under color of state law. To establish a constitutional violation under that provision, a plaintiff must demonstrate that (i) the defendants were acting under color of state law at the time of the alleged malicious action; and (ii) the action was a deprivation of a constitutional or statutory right. *See Washington v. Cty. of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004).

The NYRA Defendants filed a motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiff's claim for relief under section 1983. They contended that the Plaintiff had failed to plead both (i) a violation of his constitutional right to freedom of speech, and (ii) that New NYRA is a state actor capable of acting under color of state law. *See Garcia*, 2011 WL 3841524, at *5. The court granted the motion. In doing so, it found that the Plaintiff alleged facts that supported an inference that the State and New NYRA had a "symbiotic relationship" and, as such, that New NYRA was acting under color of state law. However, it held that the Plaintiff could not plausibly allege that the NYRA Defendants violated his constitutional right to free speech. *See id.* at *10. In reaching that determination, and in providing "Background" information regarding NYRA, the court described NYRA's integrity counsel as a "statutorily-created, independent entity that is not subject to direct control by NYRA, but its sole purpose is to 'ensure the integrity of the franchised corporation, its officers and employees, and its operations.'" *Id.* at *4, n.4 (quoting section 206(5) of the Racing Law). G&G says that language bolsters its contention that business integrity counsel under section 206(5) can act without Board oversight. The Court disagrees. At issue in *Garcia* was NYRA's relationship with the State, and whether actions taken by NYRA's management personnel in their official capacities violated 42 U.S.C. § 1983, not the scope of G&G's attorney-client relationship with NYRA.

rules.  There is no evidence that the draftsmen considered the discharge rule in mandating that

the franchised corporation retain business integrity counsel.  Section 206(5) speaks of the

retention of "business integrity counsel."  Although the statute provides that counsel must be

"independent" and that counsel will act as an "independent" source "to help ensure the integrity

of the franchised corporation, its officers and employees, and its operations[,]" it does not

purport to alter the traditional attorney-client relationship, including the discharge rule.

Moreover, there is no indication in any other part of the Racing Law that the State sought to

upset the well-settled common law right of a client to terminate, at will, the services of its

attorney.  Under the Racing Law, New NYRA is a not-for-profit corporation.  It is settled that

under New York law, corporations may terminate contracts for legal services without cause.  *See*

*generally Cosgrove v. Tops Mkts. Inc.*, 39 Fed. App'x 661, 663-64 (N.Y. 2002) ("Under New

York law, a client has the absolute right to terminate the attorney-client relationship at any time,

with or without cause." (citing *Cohen v. Grainger, Tesoriero & Bell (In re Cohen)*, 81 N.Y.2d

655, 658 (1993))).  Given the unique fiduciary relationship between an attorney and its client,

and the importance that a client be free to retain the services of counsel of its choice, and, as

necessary, terminate the services of retained counsel, the Court would expect that the intent to

overrule the discharge rule would be expressed in the statute, if the draftsmen intended to do so.

*See, e.g.*, *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 18 N.Y.3d 341, 351 (2011)

(noting that "[t]he plain text of the Martin Act . . . does not expressly mention or otherwise

contemplate the elimination of common-law claims[.]") (citation omitted); *ABN AMRO Bank,*

*N.V. v. MBIA, Inc.*, 17 N.Y.3d 208, 224 (2011) ("If the Legislature actually intended the

Superintendent to extinguish the historic rights of policyholders to attack fraudulent transactions

under the Debtor and Creditor Law or the common law, we would expect to see evidence of such

intent within the statute."). That is not the case here. The Court finds no merit to G&G's

contention that section 206(5) of the Racing Law preempts application of the discharge rule.

Accordingly, the Court finds no merit to G&G's construction of the MOU and Racing

Law. The Court rejects G&G's assertion that in purporting to terminate the Retainer Agreement,

New NYRA violated G&G's "independent status" thereunder, and that application of the MOU

and Racing Law barred New NYRA from terminating the Retainer Agreement. The Court now

considers the Retainer Agreement and Retention Order.

<u>The Retention Order and the Retainer Agreement</u>

G&G maintains that throughout its relationship with New NYRA, it complied with the

duties it owed to its client, such as the duties of loyalty and care, and the duty to maintain

confidences pursuant to the attorney-client privilege. *See* G&G's Supplemental Response at ¶ 7.

It says that it fulfilled those duties, as well as its obligation to report to, and to take directions

from, the Board within the bounds of the "maximum independence" that it is accorded under the

Retainer Agreement. *Id.* It maintains that within those limits, it was authorized to conduct

investigations of New NYRA without oversight by, or interference from, New NYRA's Board

and its management. *Id.* G&G says that the "guaranteed" fee payable under the agreement,

coupled with the five-year term of the engagement, promoted and protected its independence by

ensuring that it would not be beholden to the Board but, instead, would have the financial

resources and time necessary to perform its public oversight role. *See id.* ¶ 10. G&G also says

that by requiring NYRA to "cooperate fully" with it, the agreement prevented the Board from

denying it the sources of information it needed to fulfill its role as business integrity counsel. *Id.*

It maintains that although the Board could direct it to investigate integrity issues, and although it

was obligated to report its findings and conclusions to them, its "maximum independence" was

intended to ensure that neither the Board nor the Oversight Committee could direct it to abandon an investigation or prematurely fire it during an on-going investigation. *Id.* ¶ 9.

The Retention Order provides, in substance, that prior to plan confirmation, NYRA could terminate the Retainer Agreement on 60 days' notice to G&G, and that after confirmation, NYRA could terminate it only in accordance with its terms. G&G says that the only basis upon which New NYRA could terminate the agreement post confirmation, was if it lost the Franchise. *See* G&G Supplemental Opposition ¶ 19. It asserts that NYRA persuaded the Court to enter the Retention Order – which authorized NYRA to enter into a five-year contract for legal services – and thereafter, New NYRA violated the plain terms of that order by prematurely firing it in March of 2011, and doing so without Court approval. It contends that under the order, New NYRA never had the ability to terminate the engagement at will because the agreement vested it with "maximum independence" from New NYRA's Board and management. Moreover, it says that, in any event, New NYRA could not terminate the agreement without first obtaining authorization from this Court to do so.

The Court does not read the Retention Order to require New NYRA to obtain an order of this Court before acting to terminate the Retainer Agreement. There is nothing in the plain language of the order or the agreement mandating such action. Moreover, the Court finds no merit to G&G's construction of the term "maximum independence" in the Retainer Agreement. "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Phillies Records, Inc.*, 98 N.Y.2d 562, 569 (2002). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* (internal quotation marks and citation omitted). There is no support in the plain language of the Retainer Agreement for the proposition that the use of the term "maximum

41

independence" overrides the fundamental right of a client to replace its counsel.  Rather, the

opposite is true.  The agreement restricts the "maximum independence" accorded to G&G "to

[the performance of] its function as business integrity counsel[.]"  Retainer Agreement at 1.

Thus, the "maximum independence" given to G&G is subject to the bounds of the attorney-client

relationship under the agreement.  The agreement identifies G&G as NYRA's "business integrity

counsel" and states that the "legal services" that G&G will provide to NYRA are "those services

necessary for it to assess, report on, and provide counsel in connection with matters affecting

NYRA's business integrity."  *See* Retainer Agreement at 1.  It further provides that those

services will "include, but not be limited to monitoring and investigating NYRA's business

practices and operations" in several areas.  *Id.*[35]  The agreement does not state that the parties

intend to create a "special" or "unique" attorney-client relationship and does not purport to vest

G&G with an oversight role with respect to New NYRA.  It does not provide that G&G is free to

operate under the agreement - to any extent - independent of the Board's oversight and control.

Although the agreement provides that its Term ends on the earlier of the date that New NYRA

no longer retains the Franchise, or the date that is five years after the Effective Date, it does not

expressly bar New NYRA from terminating it prior to that time.  Nor does it state that New

NYRA cannot terminate the agreement and the attorney-client relationship under the agreement,

---

[35]    Those areas are:

> (i) living and working conditions on the backstretch; (ii) simulcast signal sales and rebate shops;
> (iii) horse drug testing and sanctions; (iv) pre-race horse monitoring; (v) segregation and
> maintenance of horsemen's funds; (vi) implementation of the company Code of Ethics; (vii)
> preparation and presentation of financial statements; and (viii) implementation of anti-money
> laundering policies and other financial system protections.

Retainer Agreement at 1.  Indeed, the Retainer Agreement goes on to state that G&G would be afforded "maximum
independence" in performing its function as business integrity counsel "consistent with the underlying counsel
relationship between NYRA and G&G."  *Id.*

without cause. All of that is in sharp contrast with the Federal Monitor Agreement.[36] Under that agreement, G&G and NYRA stated that there was no attorney-client relationship between them, and that G&G was operating independently of NYRA's Board.[37] Moreover, even as it specified the term of the agreement, the Federal Monitor Agreement unequivocally stated that NYRA could not terminate the agreement and discharge G&G.[38] The Retainer Agreement could have specifically addressed whether G&G was free to take actions independent of the Board and Oversight Committee, and whether NYRA was powerless to terminate the attorney-client relationship, without cause. It failed to do so. The plain language in the agreement does not support G&G's construction of the term "maximum independence."

Under New York law, a contract is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages

---

[36]  *See* Retainer Agreement between NYRA and G&G, as Monitor, dated April 21, 2004 (the "Federal Monitor Agreement") [Berezin Supplemental Declaration, Ex. 2].

[37]  The Federal Monitor Agreement states, in relevant part:

> NYRA understands and acknowledges that the Monitor may withhold information from NYRA which it obtains during the course of the Monitorship. NYRA further understands and acknowledges that communications between G&G and NYRA will not be protected by the attorney-client privilege or the work product doctrines. NYRA further understands and acknowledges that communications between those working under the direction of G&G (including auditors, investigators and other non-attorneys) and NYRA will not be protected by standards of confidentiality normally applying to those relationships.

Federal Monitor Agreement at 2.

[38]  The relevant provision states:

> The term of this agreement is determined by the Order, and any subsequent related orders issued by the Court. Accordingly, this agreement runs from the date of the Order, March 1, 2004, through July 1, 2005. The term may be extended if the Court issues subsequent orders tolling the term of the monitorship . . . . In any event, NYRA may not terminate this retainer agreement and discharge G&G.

Federal Monitor Agreement at 2.

and terminology as generally understood in the particular trade or business." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).  Here, reasonable minds differ on the meaning of the term "maximum independence" as used in the Retainer Agreement.  As noted, New NYRA says that the parties intended that term to mean that integrity counsel could operate independent of New NYRA's management, but not its Board, while G&G says that that it vests counsel with independence from management and the Board. The general rule is that courts construe ambiguous language in a contract against the party who proposed the language.  *See Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (1985) (noting that "[i]n cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language.") (citing *67 Wall Street Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 249 (1975)).  That rule is "especially strictly applied to attorney retainer agreements." *Judd Burstein, P.C. v. Long*, 180 F. Supp. 3d 308, 315 (S.D.N.Y. 2016) (citing *Albunio v. City of New York*, 23 N.Y.3d 65, 71 (2014)).  It is undisputed that G&G proposed the "maximum independence" language in the Retainer Agreement.  However, NYRA and its counsel also played an active role in the drafting of the Retainer Agreement.  Indeed, NYRA proposed the termination language in the agreement, and negotiated the resolution of the Committee Objection and agreed to the Creditors Committee's request that the terms of the Retention Order be modified to address the potential termination of the Retainer Agreement prior to the confirmation of the Plan.  In these circumstances, the Court will not apply the general rule of construing ambiguous language in an agreement against the draftsman.  *See, e.g.*, *Spatz v. Nascone*, 368 F. Supp. 352, 354 (W.D. Pa. 1973) ("[W]here a contract is the result of the joint efforts of attorneys or negotiators, then it is not construed

against either party."). In any event, in New York, that rule of construction applies "only as a matter of last resort after all aids to construction have been employed without a satisfactory result," and "does not preclude the admission of parol evidence[.]" *Albany Savings Bank, FSB v. Halpin*, 117 F.3d 669, 674 (2d Cir. 1997) (internal quotations and citations omitted). Under New York law,

> while the parol evidence rule requires the exclusion of evidence of conversations, negotiations and agreements made prior to or contemporaneous with the execution of a written [contract] which may tend to vary or contradict its terms . . . such proof is generally admissible to explain ambiguities therein . . . .

*U.S. Fire Ins. Co. v. Gen. Reinsurance Co*., 949 F.2d 569, 571 (2d Cir. 1991) (quoting *67 Wall Street Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248 (1975)). *See also Diesel Props S.r.l. v. Greystone Business Credit II LLC*, 631 F.3d 42, 51 (2d Cir. 2011) ("When the district court as factfinder is confronted with a contract provision that is not unambiguous, it may properly consider evidence extrinsic to the contract, including testimony offered by the parties.") (citations omitted). Here, the Court will "look to the surrounding facts and circumstances to determine the intent of the parties." *67 Wall Street Co. v. Franklin Nat'l Bank*, 37 N.Y.2d at 248; *see also Judd Burstein, P.C. v. Long*, 180 F. Supp. 3d at 315 (noting that "[a]mbiguity permits a court to look outside the four corners of an agreement in construing its meaning").

Neither the Retention Application nor the Getnick Declaration submitted in support thereof speaks to the concept of "maximum independence," or related matters like the governance rights of the Board or Oversight Committee, or New NYRA's right to terminate G&G's services. Neither states that the discharge rule is not applicable to the attorney-client relationship under the Retainer Agreement, let alone that the agreement does not give rise to a conventional attorney-client relationship. That holds true for the email correspondence among G&G, NYRA and the State leading up to the execution of the agreement. Although the evidence

shows that in supporting the approval of the Retention Application the State opposed limiting the

hours G&G could expend as integrity counsel, there is no evidence that the State read the

discharge rule out of the Retainer Agreement.  Moreover, the Retention Application – supported

by the State – provides that it "does not raise any novel issue of law and contains citations to the

applicable authorities."  Retention Application ¶ 31.  That is plainly inconsistent with the notion

that the parties agreed to a "unique" or "special" attorney-client relationship that was not subject

to the discharge rule.  G&G says that New NYRA's distinction between management and the

Board in accounting for the "maximum independence" under the agreement is made "out of

whole cloth."  *See* G&G Supplemental Response ¶ 3.  *See also id.* ¶ 2 ("NYRA now tries to

justify its position by drawing a spurious distinction between NYRA's management and

NYRA's Board.").  It labels the distinction as a "last minute fabrication" that does not appear in

the Retention Order, the Retainer Agreement, the Racing Law, or any document filed by NYRA

or New NYRA with the State or this Court, until now.  Moreover, it contends that if the Court

gives effect to that alleged distinction, business integrity counsel's independence will be illusory,

because a basic principle of corporate law is that the Board controls management and could order

management to stop cooperating with integrity counsel.  Accordingly, it says that the only

reading of the term "maximum independence" which makes it effectual is that G&G was

authorized to perform its functions as business integrity counsel without interference by New

NYRA's management or the Board.  However, the evidence in the record contradicts that

assertion.  It demonstrates that both before and after the parties entered into the Retainer

Agreement, G&G agreed that to maintain its "maximum independence" under the Retainer

Agreement, it would report to and take direction from the Board and Oversight Committee – free from interference from NYRA's management.[39]

New NYRA's interpretation of the Retainer Agreement is consistent with the plain language of the agreement and the parties' conduct in furtherance of the agreement.  The Court finds no merit to G&G's assertion that the Retainer Agreement gives rise to a "special" attorney-client relationship, not subject to the discharge rule.  As such, the Court finds that under the Retainer Agreement and the Retention Order, New NYRA had an unqualified right to terminate G&G's services.

The Alleged Waiver of the Discharge Rule

Finally, the Court considers G&G's assertion that, in any event, the discharge rule is inapplicable to the Retainer Agreement because in negotiating the terms of that agreement, NYRA, a sophisticated party represented by sophisticated counsel, deliberately waived its rights under the discharge rule, and that it did so to promote its own interests.  G&G maintains that NYRA knew that providing it with a guaranteed five-year term in the Retainer Agreement would maximize its chances of success in competing for the Franchise.  *See* G&G Supplemental Opposition ¶ 31.  It says that as an essential part of its effort to win the Franchise, NYRA

---

[39]   *See*, *e.g.*, Berezin Supplemental Declaration, Ex. 11 (Draft Minutes of August 2007 NYRA Board of Trustee Meeting, G&G000615-628) at 622 ("The next item discussed was the retention of Getnick & Getnick (G&G) as NYRA's integrity counsel. Neil Getnick addressed the Trustees regarding the retention process, the necessary approval from the bankruptcy court and the scope of the work G&G intends to undertake. G&G will report to the NYRA Chairman and to the Special Oversight Committee of the NYRA Board of Trustees."); Berezin Supplemental Declaration, Ex. 12 (Statement to Village Voice Reporter dated 9/15/07, G&G002366-7) at 2367 ("Note, off the record: I am neither exasperated by that criticism or, following my retention by NYRA, am I 'completely independent'; rather our retention agreement provides for maximum independence consistent with the underlying counsel relationship between NYRA and Getnick & Getnick."); Berezin Supplemental Declaration, Ex. 14 (1/30/09 Draft Report of Business Integrity Counsel to Special Oversight Committee of The New York Racing Association, Inc. Board of Directors, G&G 480-506) at 2 of 23 ("G&G's unique role as independent business integrity counsel is served by a dual reporting line whereby G&G reports to, and takes direction from, (i) the Chairman of the Board of Directors, and (ii) the SOC [Special Oversight Committee]."); Berezin Supplemental Declaration, Ex. 16 (Letter to Comptroller, G&G102-107) at 1 ("Getnick & Getnick, in order to maintain its independence as NYRA's business integrity counsel, does not report to, nor take direction from, NYRA Management. Rather, Getnick & Getnick reports to the Chairman of the Board, C. Steven Duncker, and the Special Oversight Committee . . .").

06-12618-jlg    Doc 1262    Filed 03/01/19    Entered 03/01/19 17:27:35    Main Document
Pg 49 of 53

amended its Franchise Proposal to highlight its commitment to integrity, as demonstrated by its

retention of G&G.  *See id.* ¶ 20.  G&G maintains that in response to NYRA's request for advice

in drafting the amendment to its Franchise Proposal, "Mr. Getnick recommended language that

emphasized G&G's 'maximum independence,' which he noted was 'consistent with the

emphasis by Richard Rifkin [the Governor's Special Counsel] during my discussion with him

before G&G entered into the business integrity counsel agreement with NYRA.'"  *Id.* (citation

omitted).  G&G asserts that in its final form, NYRA's Amended Franchise Proposal included

several representations regarding G&G's independence in acting as integrity counsel.[40]  It also

contends that after the State awarded it the Franchise, New NYRA continued to assure the State

that G&G's five-year engagement was non-terminable, and that this feature was essential to

protecting G&G's "maximum independence."  *Id.* ¶ 22.[41]  G&G says that NYRA is now

essentially arguing that those representations were meaningless.

---

[40]   Specifically, G&G cites to the following:

> "To ensure that NYRA continues to maintain the highest standards of integrity and transparency,
> NYRA has retained the law firm of Getnick & Getnick as business integrity counsel. In this role,
> Getnick & Getnick will act as an independent source of checks and balances . . . ."  Amended
> Franchise Proposal at 3 [ECF No. 1245, Ex. 23].

> "NYRA has committed itself to providing maximum independence to and complete cooperation
> with Getnick & Getnick in its role as business integrity counsel."  *Id.*

> "Getnick & Getnick's retainer agreement letter with NYRA speaks to these points, saying:
> 'NYRA agrees and acknowledges that it is the intent of both NYRA and G&G to afford maximum
> independence to G&G in performing its function as business integrity counsel, including, but not
> limited to, interacting with governmental entities and industry regulators, consistent with the
> underlying counsel relationship between NYRA and G&G. NYRA agrees to cooperate fully with
> G&G and to provide promptly all information known or available to it relevant to our
> representation of it.'"  *Id.* at n.2.

> NYRA would provide the State with "[t]he highest standards of integrity, transparency, and
> corporate governance."  *Id.* at 13.

[41]   As support, G&G cites to the July 2, 2010 letter of James P. Heffernan (discussed *infra.* at n.32) to the State
Comptroller that it drafted.  G&G notes that the letter states, in part, as follows:

There is no evidence in the record of the weight, if any, that the State attached to Amended Franchise Proposal in awarding the Franchise to NYRA. The Court notes that the proposal was submitted to the State after the parties executed the MOU – i.e., after the State had determined that it would award the Franchise to New NYRA. The evidence shows that the State clearly supported the Retention Application, including granting G&G "maximum independence" in fulfilling its duties as business integrity counsel under section 328 of the Bankruptcy Code, because G&G would not be limited on the hours it could expend as integrity counsel and because NYRA's competitors were not capping the hours their proposed business integrity counsel could spend in fulfilling their respective mandates. However, there is no evidence that the State equated NYRA's agreement to provide G&G with "maximum independence" to a waiver of the discharge rule.[42]

---

The provisions in the Retainer [Agreement] are designed to ensure and maximize this independence. First, the Retainer [Agreement] specifies a non-exhaustive list of subject matter areas for Getnick & Getnick to address. Highlighting these areas – areas that were previously emphasized by the OSC [Office of the State Comptroller] – is intended to ensure that Getnick & Getnick is not prevented from continuing to address these important integrity matters. Second, the agreement is in effect for a five-year period. This precludes a potential short-term strategy by management to impede, obstruct, or ignore integrity efforts. Third, the Retainer contains a monthly minimum fee for professional services designed to ensure that the efforts of business integrity counsel cannot be limited by having its funding restricted.

G&G Supplemental Opposition ¶ 22, Ex. 24. G&G also cites to an April 27, 2010 letter to the State Comptroller from Stuart Subotnick, as Vice Chairman of New NYRA's Board (*id.*, Ex. 25), and its own April 27, 2010 letter to the Board. *Id.*, Ex. 26. G&G authored both letters and both contain language similar to that quoted above from the Heffernan letter.

[42]     In October 2007, the New York State Commission of Investigation (the "Commission") began an inquiry into NYRA's process for awarding contracts. During its investigation, the Commission became aware of the Retainer Agreement and the fact that NYRA entered into the agreement with G&G without first subjecting the agreement to competitive bidding. It considered whether, in entering into the agreement, NYRA violated the mandate in section 213(5) of the Racing Law that contracts of $250,000 and more, be competitively bid. *See* An Investigation into the New York Racing Association's Business Integrity Counsel Contract With Getnick & Getnick (Ex. 29 to Declaration of Robert S. Berezin in Support of NYRA's Responsive Brief to Getnick & Getnick LLP's Supplemental Brief to NYRA's Motion to "Clarify" or "Amend" This Court's 2007 Order) [ECF No. 1251], at 6-8. After conducting its investigation, the Commission found, among other things, that NYRA had violated the Racing Law. *Id.* at 8 ("The Commission concludes that by entering into a business integrity counsel contract with G&G without bidding it competitively, NYRA violated [Racing Law] §231(5)."). New NYRA attaches great significance to that determination. It asserts, in substance, that whatever support the State expressed for the Retainer Agreement when this Court approved it, is completely undermined by the fact that the Commission thereafter concluded that

G&G also contends that the position advocated by New NYRA flatly contradicts NYRA's prior representations to this Court regarding G&G's independence under the Retainer Agreement.  In that regard, it notes that when NYRA submitted its draft Retention Order, that order provided that, prior to plan confirmation, NYRA would have the right to terminate the engagement "upon sixty (60) days prior written notice to G&G."  *See* G&G Supplemental Opposition ¶ 19.  The Court adopted NYRA's draft order verbatim.  G&G contends that now New NYRA asserts that the 60-day notice provision was meaningless because its position is that the Board had unlimited authority to terminate the engagement at any time, without notice. G&G also points out that NYRA's discussions the Creditors Committee to resolve the Committee Objection to the Retention Motion would have been moot if the discharge rule was applicable to the Retainer Agreement.  *See id.* ¶¶ 12, 17. G&G makes these points in support of its assertion that NYRA waived its rights under the discharge rule.

Waiver requires proof of a voluntary and intentional relinquishment of a known and enforceable right.  *See Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (1982) ("[W]aiver requires no more than the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable.") (citation omitted); *see also Charell v. Gonzalez (In re Gonzalez)*, 241 B.R. 67, 75 (S.D.N.Y. 1999) ("Waiver has been defined as an 'intentional relinquishment of a known right or privilege.'" (quoting *In re*

---

NYRA lacked the authority to enter into the agreement.  The Court, however, attaches no weight to that matter.  The State plainly supported NYRA's execution of the Retainer Agreement and, apparently, at that time, did not question NYRA's authority to enter into the agreement.  Moreover, even as the Commission found that NYRA violated the Racing Law in entering into the agreement, it concluded that under the law, the New York State Racing and Wagering Board ("RWB") was powerless to prevent NYRA from entering into the agreement or to prevent enforcement of the contract from going forward. *Id.* at 9-10.  Thus, the Commission's finding does not undermine the validity of the agreement.  The Commission found that the RWB's only recourse was "to fine NYRA or in the extreme, revoke NYRA's franchise." *Id.*  The Court is not aware of what action, if any, the RWB took in response to the Commission's investigative report.

*Westchester Tank Fabricators, Ltd.*, 207 B.R. 391, 399 (Bankr. E.D.N.Y. 1997))).  It requires

"full knowledge of the facts upon which the existence of the right depends."  *Amrep Corp. v. Am.

Home Assurance Co*., 81 A.D.2d 325, 329 (1st Dep't 1981) (citation omitted).  A waiver "may

be accomplished by express agreement or by such conduct or a failure to act as to evince an

intent not to claim the purported advantage."  *Hadden v. Consolidated Edison Co. of N.Y.*, 45

N.Y.2d 466, 469 (1978) (citations omitted).  The burden is on G&G to prove the facts supporting

their assertion of waiver and this burden is a difficult one.  A waiver "should not be lightly

presumed," *Berger v. Manhattan Life Ins. Co*., 805 F. Supp. 1097, 1109 (S.D.N.Y. 1992)

(citation omitted), and the facts alleged in support thereof must be "clear, unmistakable and

without ambiguity."  *Port Distrib. Corp. v. Pflaumer*, 880 F. Supp. 204, 211 (S.D.N.Y. 1995)

(citation omitted); *see also Boston Concessions Grp., Inc. v. Criterion Ctr. Corp*., 200 A.D.2d

543, 545 (1st Dep't 1994) ("[T]he establishment of a waiver . . . is ordinarily a question of

fact[.]"); *Wyeth v. King Pharmaceuticals, Inc*., 396 F. Supp. 2d 280, 290 (E.D.N.Y. 2005)

("Whether there was a knowing and intentional waiver of rights is a factual question that we

determine based on the totality of the circumstances.") (citations omitted).

When NYRA executed the Retainer Agreement and sought this Court's approval of that

agreement, it assumed that its engagement with G&G would last for five years.  To be sure, in

resolving the Committee Objection, NYRA clearly appears to have acceded to the Creditors

Committee's view that it was signing on to an agreement that obligated it to pay $7.5 million in

fees to G&G.  Moreover, after obtaining Court approval to retain G&G, NYRA clearly supported

that relationship and the terms thereof when questions regarding G&G's retention were raised by

the State.  However, there is no evidence that NYRA agreed that its Board would not exercise

oversight and control over G&G.  Indeed, as noted, the opposite is true.  Moreover, there is no

evidence that in negotiating the terms of the agreement, NYRA and G&G discussed the

application of the discharge rule to the attorney-client relationship thereunder, let alone that that

NYRA knowingly, intentionally and unequivocally waived application of that rule to its

attorney-client relationship with G&G.  It is undisputed that G&G did not explain the discharge

rule to NYRA's Board, let alone that in G&G's view, NYRA would waive the discharge rule by

agreeing in the Retainer Agreement to give G&G "maximum independence" in fulfilling its role

as business integrity counsel.  As previously noted, the discharge rule and concept of "maximum

independence" are not discussed in the Retention Application, the Getnick Declaration submitted

in support thereof, or the email correspondence leading up to the execution of the Retainer

Agreement.  Moreover, although a purported waiver of the discharge rule is clearly outside of the

ordinary attorney-client relationship, the application stated that "it does not raise any novel issues

of law[.]"  Retention Application ¶ 31.  There is no evidence that NYRA knowingly and

intentionally waived application of that rule.

<u>Conclusion</u>

Based on the foregoing, the Court finds that New NYRA had an unqualified right under

the Retention Order to terminate the Retainer Agreement.  That is because, without limitation,

the discharge rule is applicable to the attorney-client relationship between G&G and New NYRA

under the Retainer Agreement, and New NYRA did not waive, and the State did not preempt,

enforcement of the rule.

IT IS SO ORDERED.

Dated: March 1, 2019
       New York, New York                              /s/ *James L. Garrity, Jr.*
                                                       United States Bankruptcy Judge